Mark Mausert
NV Bar No. 2398
930 Evans Avenue
Reno, NV 89512
(775) 786-5477
Fax (775) 786-9658
mark@markmausertlaw.com
*Attorney for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**

**IN AND FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| MAUREEN McKISSICK & DEANNA GESCHEIDER, | Case No.: |
| Plaintiffs, | |
| vs. | **COMPLAINT AND JURY DEMAND** |
| CITY OF RENO and DOES I-X, | |
| Defendants | |

COME NOW plaintiffs, through counsel, who hereby complain of defendant City of Reno, and doe defendants, as follows:

<u>Parties, Venue, Jurisdiction and Jury Demand</u>

1. Plaintiffs are residents of northern Nevada, i.e., Reno, Nevada, and were employed by defendant in northern Nevada, i.e., in the City of Reno, in an at-will capacity. Most, or all, of the acts, statements and omissions alleged herein occurred in northern Nevada. Plaintiffs hereby request a jury trial relative to all issues so triable. Plaintiffs have obtained Notices of Right to Sue from the Equal Employment Opportunity Commission, i.e., plaintiffs have exhausted administrative remedies in accord with federal law. This Complaint and Jury Demand is timely filed in accord with the Notices of Right to Sue.

2. Defendant City of Reno is an established political entity, i.e., a City incorporated in the State of Nevada. At all relevant times the City of Reno (hereinafter "City") employed in

excess of 15 persons on a full-time basis, at least twenty weeks per year.  Defendant conducts the normal business activities associated with running a metropolitan area.  Defendant is located in northern Nevada.

3. Doe defendants I-X are persons, corporations, partnerships, limited liability companies, or other entities which are in whole or part responsible for plaintiffs' injuries or damages.   Plaintiffs believe various individuals associated with the City, both employed and not employed, conspired to deprive them of their federally protected rights to a work environment free of sexual/retaliatory harassment and/or retaliation. When plaintiffs discover the identities of these doe defendant(s), and evidences supporting causes of action sounding in conspiracy,  they will seek leave of Court so as to amend this Complaint and Jury Demand, and thereby hold those persons legally accountable.

4. This Court has venue over this action because all, or almost all, acts, statements and omissions alleged herein occurred in  Nevada; defendant is located in Nevada; and defendant conducts business in Nevada.  Furthermore, plaintiffs reside in Nevada.  This Court has venue pursuant to 42 U.S.C. 2000e-5(f)(3).

5. This Court has jurisdiction over this matter as plaintiffs' lawsuit arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e.  Subject matter jurisdiction is invoked under  28 U.S.C. 1343.  Jurisdiction exists because plaintiffs are women who were sexually harassed "because of sex", and who thereupon experienced retaliatory hostility and retaliation because they opposed sexual harassment.

## First Cause of Action

(Sexually Hostile Work Environment/Retaliatory Hostility)

6. Plaintiffs hereby incorporate the allegations of all other paragraphs.  Plaintiff McKissick is bringing this cause of action.  Plaintiff McKissick was offended by the sexual and retaliatory hostility experienced by plaintiff Gescheider, as well as other female employees. Both plaintiffs were "at-will" employees, who could have been terminated by the City Manager

for any reason which did not violate the law or public policy at any time. City Manager Andrew Clinger periodically reminded plaintiffs, and other employees, of their at-will status, i.e., he routinely implicitly threatened the precipitous termination of plaintiffs' employment.

7. Plaintiff McKissick was aware of the events and statements alleged by plaintiff Gescheider contemporaneously, or shortly after those events and statements. That is, Ms. McKissick was aware of the manner in which plaintiff Gescheider was targeted and harassed as the result of having made a complaint of sexual harassment. Plaintiff McKissick was made aware by plaintiff Gescheider. For instance, Mrs. Gescheider asked plaintiff McKissick to sit between her and City Manager Clinger at meetings and informed her of the reason underlaying the request, to wit, to prevent Clinger from touching her. Plaintiffs were offended and threatened by the sexualized environment the City allowed to develop under the management of Clinger. Both plaintiffs were aware, to a certain degree, of Clinger's prior reputation, i.e., his reputation for sexual harassment and his propensity for retaliation. Plaintiffs' awareness was enhanced in August, 2016, when former State Controller, Kim Wallin, provided testimony to the Reno City Council as to Mr. Clinger's inappropriate sexual behavior while in the employ of the State, including an allegation Clinger used his State office for sex. That environment, in addition to and including the statements and events described in the other Causes of Action, also included the following:

Clinger allowed the dissemination of an inappropriate and misogynistic video, to wit, "The Hot Crazy Matrix" in approximately January, 2015, and thereafter referred to Assistant City Manager Kate Thomas as his "unicorn". A unicorn, per The Hot Crazy Matrix, is a very attractive woman, who is only a little crazy.

Clinger extended preferential treatment to Ms. Thomas, based on his perception of her as a unicorn. This treatment included divesting her of work duties, and reassigning those duties to plaintiff McKissick, commencing in approximately February, 2015, and continuing thereafter. Clinger failed to inform Thomas why he divested Thomas of duties. Instead, upon

information and belief, he lied to Thomas and thereby falsely informed Thomas Ms. McKissick maneuvered so as to obtain those duties and the additional staff which accompanied those duties. In addition to being saddled with an excessive workload, based on Clinger's preferential treatment of a younger female, whom he regarded as very sexually attractive, Ms. McKissick endured a protracted course of hostility emanating from Ms. Thomas.  That preferential treatment included unwarranted promotions and pay increases.  Ms. Thomas exhibited hostility to plaintiff McKissick as the result of the transfer of duties, and some staff, who were re-assigned to Ms. McKissick's supervision, attendant to the transfer of duties.

Clinger openly engaged in sexually flirtatious and inappropriate conduct with Ms. Thomas, including a sexual liaison on the fifteenth floor of the City building, which was heard, in part, by a City employee in June, 2015.  That employee was working after-hours and her presence on the fifteenth floor was unknown to Clinger & Thomas.

Upon information and belief, Clinger lied as to why duties were transferred to Ms. McKissick.  Upon information and belief, Clinger told Ms. Thomas, and others, Ms. McKissick had maneuvered so as to effect the re-assignment of duties. This caused, and/or increased hostility which was directed at Ms. McKissick by Ms. Thomas.

Clinger fielded a number of complaints, made by plaintiff McKissick, re hostility manifested and caused by Ms. Thomas, and which were caused by Clinger's sexual favoritism. Clinger promised Ms. McKissick the hostility would be remedied, but he failed to implement timely, adequate remedial action.  Clinger also fielded information from Assistant City Manager Bill Thomas, which corroborated the complaints of Ms. McKissick.  Clinger nonetheless failed to take action.

Plaintiffs lodged formal complaints of sexual harassment pursuant to being directed by Mayor Hillary Schieve, Councilwoman Naomi Duerr and City Attorney Karl Hall to complain. These three promised plaintiffs protection from retaliatory hostility and/or retaliation if they complained.   Mayor Schieve knew Andrew Clinger had a propensity for engaging in sexual

harassment. Mayor Schieve described to a number of persons, the manner in which Clinger sexually harassed her. It is within this context the City failed to properly investigate, for instance, by narrowing the scope of the investigation conduct by Ms. Mercado. Plaintiffs complained to the City's Human Resources Director Kelly Leerman, and they were assured by Ms. Leerman their identities would remain confidential and the City would deal with their complaints in a professional, thorough and serious manner. Plaintiff McKissick was assured retaliation would be investigated and dealt with in a very serious manner. The City breached these promises. The breach of these promises caused plaintiff McKissick to suffer emotional distress, fear and apprehension. The breach of these promises constituted retaliatory hostility. As a direct and proximate result of the stress induced by the City's failure to keep its word plaintiff McKissick took leave pursuant to FMLA.

Acting City Manager Bill Thomas informed plaintiff McKissick, in approximately September, 2016, he did not know what plaintiff would do if she returned to work, i.e., all of her work assignments were given to others during the period of plaintiff's FMLA leave. Mr. Thomas informed plaintiff McKissick the City could not protect her if she returned, i.e., the City could not protect her from retaliatory hostility. That is, plaintiff McKissick apprehended Acting City Manager Thomas was dissuading her from returning to work.

The City failed to timely and adequately investigate the hostility plaintiffs endured. Upon information and belief, an adequate investigation of the hostility Ms. Thomas manifested and orchestrated (Ms. Thomas convinced a number of employees to isolate Ms. McKissick) has never been conducted. This failure is memorialized by the inadequate investigation conducted by retired Judge Wall. For instance, this did not take into account the testimony and evidence presented by former State Controller Kim Wallin on or about August 4, 2016.

On or about October 7, 2016 the City's Human Resources Director provided plaintiffs with an agreement to the effect they would be placed on paid administrative leave pending the conclusion of second investigation and implementation of remedial action. The parties entered

in this agreement on or about October 14, 2016. On or about November 17, 2016, the City breached this agreement by instructing plaintiffs to return to work, absent completion of remedial action, and subsequent to an inadequate investigation. Adequate remedial action was never undertaken.

8. The City's second investigation resulted in a finding plaintiff McKissick's complaint of hostility, orchestrated by Assistant City Manager Kate Thomas, was meritorious. Nonetheless, the City failed to timely and adequately remedy that hostility. Instead, the City implicitly ratified the hostility. For example, Acting City Manager Bill Thomas warned plaintiff McKissick the City could not protect her if she returned to work. On or about November 17, 2016, plaintiff McKissick was constructively and wrongfully discharged from the employ of the City of Reno.

9. As a direct and proximate result Ms. McKissick has suffered emotional distress, loss of enjoyment of life, physical manifestations of stress, and apprehension and fear. It has been necessary for her to incur costs and retain counsel to attempt to vindicate her right to a workplace free of sexual /retaliatory hostility.

Second Cause of Action

(Sexually Hostile Work Environment/Retaliatory Hostility)

10. Plaintiff Gescheider is bringing this cause of action. Plaintiff hereby incorporates the allegations of paragraphs 1 through 9, inclusive, as well as all other paragraphs herein. This cause of action is based upon the retaliatory hostility plaintiff Gescheider endured after making a complaint of sexual harassment. At all times herein mentioned defendant City of Reno was possessed of a legal obligation to implement a prompt, fair and thorough investigation of any and all sexual harassment complaints and to thereupon implement prompt and reasonable remedial action, sufficient to address past harassment and deter future harassment. Retaliatory hostility is a recognized form of sexual harassment, regardless whether the harassment is itself intrinsically "sexual".

11. Plaintiffs made complaints of sexual harassment, subsequent to being directed by the City of Reno to disclose any incidents of sexual harassment. Plaintiff Gescheider's complaint was triggered by various statements and actions of former City Manager, Andrew Clinger. One of the acts of sexual harassment, which triggered plaintiff's complaint, occurred on or about May 13, 2016, at an establishment known as the Coffee Bar. Andrew Clinger, who was sitting next to plaintiff, rubbed the top of plaintiff's thigh a number of times with his hand, in a back and forth motion. This action was witnessed by City employee Robert Chisel. Several other employees were in a position to see this action, although plaintiff is unaware of whether those employees did actually see Clinger's action. Mr. Robert Chisel saw Clinger rub plaintiff Gescheider's thigh, and also observed her reaction, i.e., Mr. Chisel apprehended plaintiff reacted with fear and concern. Immediately after the meeting at the Coffee Bar, plaintiff Gescheider and Mr. Chisel discussed Clinger's action in the parking lot of the Coffee Bar. Mr. Chisel encouraged plaintiff to complain. Plaintiff, who was on the verge of crying, was fearful of the consequences of complaining. Her fear was palpable and was witnessed by Mr. Chisel. Plaintiff did, eventually, complain, pursuant to assurances offered by the City to the effect there would be no retaliatory hostility or retaliation elicited by any such complaint.

12. City Manager Clinger engaged in other forms of sexual harassment. For instance, after directing plaintiff to install the application "Telegram" on her mobile telephone, Clinger commenced sending plaintiff sexual text messages. Clinger first directed the app "Slack" be used, but then discovered the more effective Telegram app. The Telegram app is the same app used by criminals and terrorists because it encrypts and destroys messages, and also renders the recovery of those messages impossible. Clinger directed implementation of these apps for the express purpose of preventing the public from learning of his activities, i.e., he harbored the intent to subvert and defeat public records requests. The gross impropriety of Clinger's use, and direction to use Telegram, is established by Nevada Revised Statute 239.320, i.e., Clinger engaged in apparently felonious conduct, with the express intent of destroying public records.

Both plaintiffs objected to Clinger's intent to subvert the public records law.  Plaintiff Gescheider, shortly after she was directed to install Telegram, deleted that application from her telephone in violation of Clinger's instruction.

13. City Manager Clinger implemented the use of the Telegram application subsequent to a protracted course of illegal conduct.  Prior to the use of the Slack application (used and directed to be used by Clinger just before he commenced use of Telegram) and the Telegram application, Clinger was in the habit of directing members of the City's Executive Staff to destroy text messages Clinger sent to them, and which were sent by the members to Clinger. Clinger knew, and/or should have known, his directions constituted felonies, i.e., violations of Nevada Revised Statute 239.320.

14. Upon being presented with a copy of the *Nissen* Opinion, i.e., an Opinion issued by the Supreme Court of the State of Washington in August of 2015, Clinger decided to destroy City records, in violation of NRS 239.320, in a more efficient manner.   That is, Clinger was expressly informed, via obtaining the *Nissen* Opinion, and via discussion of that Opinion at an Executive Staff meeting, of the fact the destruction of City records, in violation of NRS 239.320, was illegal, regardless whether such destruction occurred relative to a City-issued telephone or a privately owned telephone.  Clinger, instead of mending his ways per receipt of this information, opted to commit felonies on a wholesale basis via directing his subordinates to adopt first the Slack application, and then the Telegram application. The Supreme Court of Washington, via *Nissen*, held ownership of a telephone is irrelevant to the question whether substantive text messages, relating to government business, and stored on a telephone, are discoverable.  Once Clinger knew plaintiff Gescheider had followed his direction, and installed Telegram, Clinger began sending sexual messages to Mrs.  Gescheider.  Clinger's willingness to deliberately flout the law, on a routine and wholesale basis, is illustrated by (1) his actual knowledge of the *Nissen* Opinion; and (2) his long term willingness to systematically destroy thousands of government records.  Upon information and  belief the City is exposed to

massive civil liability in many cases, both filed and unfiled, per the doctrine of spoilation of evidence.  Clinger knew, and should have known, of this exposure.  Clinger's wilful destruction of thousands of text messages constituted deliberate malfeasance, as did his open violation of the City's sexual harassment policy/Title VII law.   These instances of malfeasance should have resulted in his immediate termination, ***without payment of severance benefits.***  Instead, the City ignored Clinger's conduct, while praising him, and misallocated over a quarter of a million of taxpayer dollars, which the City was no longer contractually obligated to pay.

15. Plaintiff's complaint was directed, in material part, at Clinger's sexual text messages, as facilitated by the forced use of the Telegram application.  Plaintiff Gescheider's complaint of sexual harassment constituted protected activity per Title 42 of the United States Code.

16. After plaintiff Geschedier opposed sexual harassment by former City Manager Clinger she was subject to retaliatory hostility. Retaliatory hostility is a recognized form of sexual harassment.  The course of retaliatory hostility plaintiff was subject to included, but was not necessarily limited to, the following actions.

First, Councilwoman Jardon, while cognizant of plaintiff Gescheider's complaint of sexual harassment, suggested to plaintiff the best way to resolve the situation was to tender her resignation.

 Second, the initiation of an inadequate investigation (conducted by attorney Alice Campos Mercado, Esq. at the direction of the City Attorney) which was designed to be inadequate, and whose inadequacy was assiduously maintained, notwithstanding the attempts of plaintiffs, and at least one other employee, to cause the City to conduct a proper investigation.  Ms. Mercado was repeatedly provided with evidence of a course of sexual harassment by Clinger.  Ms. Mercado refused to investigate allegations of sexual harassment, while stating such allegations were not within the scope of her investigation.

Third, the conduct of a second investigation, which was also inadequate, and conducted so as to be inadequate. This investigation was rendered inadequate because, for instance, the City failed to interview the women who complained of sexual harassment. Pursuant to Rule 4.2 of Nevada's Rules of Professional Conduct (the Rules which govern the conduct of attorneys), as interpreted by State Bar Counsel in this case, the plaintiffs were entitled to refrain from all contact. Nonetheless, plaintiffs offered to facilitate the City's second investigation. The City failed to cause these women to be interviewed because the City insisted on the right to attempt to use the interviews against the complainants in potential litigation. That is, the City determined the ability to potentially exploit the interviews in litigation was more important than discharging the City's non-delegable duty to conduct a thorough investigation. The investigation was also rendered inadequate by failure to properly investigate Clinger's felonious conduct re destruction of City records, coupled with directing substantial investigative efforts at the plaintiffs, based upon the theory plaintiffs engaged in a conspiracy. Inquiry directed at the complainants was a direct and crystalline form of hostility. Ideation of a conspiracy, allegedly indulged in by the complainants, was compounded by the public release of both reports. The City also failed to fully investigate retaliatory hostility, as complained of by the plaintiffs. In addition to knowledge acquired via the complaints of plaintiffs, the City had independent knowledge of systemic retaliatory hostility directed at plaintiffs, but nonetheless failed to properly investigate and/or implement proper remedial action.

Fourth, City Attorney Karl Hall created an atmosphere which sanctioned hostility. For instance, City Attorney Hall characterized the investigation of Clinger's activities as "likely a witch hunt by disgruntled employees." See, November 21, Report, p.33. City Attorney Hall provided advance notice of the identities of the complainants to City Manager Clinger, while trivializing the complaints, and thereby inviting retaliatory hostility by Clinger, and the orchestration of retaliatory hostility among other City employees against the complainants.

For instance, City Attorney Hall is reported as remarking regarding the rubbing of plaintiff Gescheider's thigh, "it's just a leg being touched." (See, p.26 of the November 21, 2016 Report, authored by retired Judge David Wall). City Attorney Hall went so far as to accuse the plaintiffs of having engaged in a "witch hunt". City Attorney Hall sought to impede the investigation of sexual harassment by insisting on a formal complaint; keeping the investigation "in-house"; influencing the manner in which both investigations were conducted, for example, by narrowing the scope and preventing the interviews of plaintiffs; breaching confidentiality; encouraging Clinger to make hostile statements; City Attorney Hall failed to timely and thoroughly inform members of the City Council of the complaints, the progress of the investigations, the need for remedial action and other relevant aspects, as required by City policies; trivializing Clinger's conduct; and inviting hostility towards plaintiffs by accusing them of engaging in a conspiracy and a "witch hunt".

Fifth, Clinger's openly hostile statements, *and the toleration of those statements by management level City employees, including members of the City Council*. Clinger is reported to have made such remarks as "[the complainants] are evil", "they'll pay", and "payback's a bitch" (see, p.26 of the November 21, 2016 Report) to at least four persons: Mayor Hillary Schieve, Council member Naomi Duerr, City Attorney Karl Hall, and Human Resources Director Kelly Leerman. Clinger also made statements such as "karma is a bitch". Clinger openly made these statements, and similar statements, with vehemence, and with obvious retaliatory animus, and was allowed to retain his position for a considerable period thereafter, without any significant discipline in the interim. Clinger is reported, as memorialized in Judge Wall's Report, to have openly ranted, at length, as to his intent to exact vengeance upon the complainants. On or about July 30, 2016, Clinger publicly characterized the complainants as liars. Clinger was employed as the City Manager when he did so. The City failed to take timely, adequate remedial action, and instead, eventually gave Clinger and his attorney in excess of a quarter of a million of taxpayer dollars.

Sixth, Clinger, and others acting in concert with him, such as Assistant City Manager Kate Thomas, openly manifested and orchestrated hostility towards the complainants, and were allowed to do so without consequence. For instance, City employee William Dunne, a close friend of Assistant City Manager Kate Thomas, approached plaintiff Gescheider and threatened her and plaintiff McKissick in response to their complaints of sexual harassment. Among other acts of hostility, Clinger was allowed, without contradiction by the City or discipline implemented by the City, to make public statements which falsely asserted his innocence, and which implicated the complainants.

Seventh, the burglary of plaintiff Gescheider's City office, and the theft of her file regarding her complaint of sexual harassment, as well as documents regarding plaintiff McKissick. This file included privileged materials, i.e., attorney work-product materials and attorney-client communications regarding both plaintiffs and another complainant. Notwithstanding the prompt report of the burglary/theft, the City forestalled from implementing prompt and adequate remedial action, e.g., causing a police investigation to be promptly conducted.

Eighth, the interference in what were supposed to be independent investigations by City Attorney Hall. Upon information and belief, Hall interfered with the *Mercado* investigation by establishing and maintaining strict parameters regarding the investigation, which attorney Mercado refused to breach. Despite the fact attorney Mercado was repeatedly presented with powerful evidence which inculpated Clinger relative to sexual harassment, she refused to consider that evidence, while stating such evidence "is beyond the scope of my investigation." Ms. Mercado, who is a respected and ethical attorney, was compelled to truncate her investigation, i.e., she followed the directives issued by City Attorney Hall. City Attorney Hall interfered in the second investigation by preventing the interviews of the complainants, i.e., by insisting on the ability to use *unrecorded* investigatory interviews against the complainants. As City Attorney Hall well knew, this method of proceeding would probably have led to a

swearing contest between the complainants and a retired Judge regarding what was said during interviews which could have gone as long as four or six hours, or even longer.

 Ninth, the public release of both reports. The *Wall* report failed to discuss the significance of Clinger's felonious destruction of records, just as the City basically ignored that destruction. The *Mercado* report followed its apparent intended design, and the release of both reports resulted in the widespread misapprehension (1) Clinger had been exonerated; and (2) the complainants had filed false complaints, and engaged in a conspiracy.

 Tenth, the payment to Clinger, and his attorney, of over a quarter of a million of taxpayer dollars, along with statements of praise for Clinger, stated by various City Council members. Upon information and belief, Clinger's contract with the City of Reno would have allowed the City to forego from any payment to Clinger. In fact, the City Council had an obligation to the citizens of Reno, to refuse any payment. Clinger breached his contract by repeatedly indulging in malfeasance, ***as he admitted during his discussions with Judge Wall.*** See, November 21, 2016 Report of Judge Wall, pp.49 & 53. That is, Clinger admitted to the repeated, protracted and deliberate destruction of City records, in violation of Nevada Revised Statute 239.320. Clinger engaged, as alleged herein, in acts and statements which violated the City's sexual harassment policy. The City ignored Clinger's conduct. The City ignored the fact Clinger's conduct constituted malfeasance, and negated any obligation to pay Clinger severance. The City, after paying for a report which diverged from its purpose and publicly vilified the complainants via allegations of conspiracy, paid Clinger hundreds of thousands of taxpayer monies, while praising Clinger as he left the employ of the City. The City thereby reinforced the erroneous impression (1) Clinger had been exonerated; and (2) the complainants filed false complaints and engaged in a conspiracy. Payment to Clinger and his attorney was the antithesis of the prompt and adequate remedial action, sufficient to address past harassment and deter future harassment, as required by Title VII law. Clinger, shortly after leaving the employ of the City, acquired a comparable position with the State. Accordingly, because the

City implicitly ratified Clinger's conduct via a huge financial payment, ***Clinger financially profited by sexually harassing the plaintiffs.*** Upon information and belief, Clinger profited both by the payment itself, and by the false and biased reporting which the City orchestrated and paid for, i.e., the reports of attorney Mercado and retired Judge Wall.

Eleventh, statements by Acting City Manager Bill Thomas to plaintiff Gescheider, to the effect the City could not protect her from retaliatory hostility. The City, while knowing retaliatory hostility was occurring, and would continue to occur absent strong remedial action, failed to implement strong remedial action and instead expressly informed one of the victims she would not be protected. Plaintiff Gescheider, shortly after being told this by Assistant City Manager Bill Thomas, informed plaintiff McKissick of the refusal of the City to offer protection.

Twelfth, the plaintiffs, as opposed to City Manager Clinger and/or Bill Dunne, were placed on administrative leave.

Thirteenth, plaintiff Gescheider was aware of the hostility directed at plaintiff McKissick, and plaintiff McKissick was aware of the hostility directed at plaintiff Gescheider.

17. As a direct and proximate result of this retaliatory hostility plaintiff Gescheider suffered emotional distress, fear and anxiety, and loss of enjoyment of life. It has been necessary for plaintiffs to incur costs and retain counsel to attempt to vindicate their federally protected right to a workplace free of sexual/retaliatory hostility.

18. The actionable work environment, which was the product of the retaliatory hostility alleged herein compelled plaintiff to incur costs and retain counsel to attempt to vindicate her federally protected right to a workplace free of sexual harassment/retaliatory hostility. Additionally, plaintiff was compelled to resign, i.e., she was constructively and wrongfully discharged.

Third Cause of Action

(Retaliation)

19. Plaintiffs hereby incorporate the allegations of paragraphs 1 through 18, as well as all the allegations in all other paragraphs herein.

20. Defendant City improperly placed plaintiffs on administrative leave. This was an act of retaliation. The retaliatory aspect of this adverse, tangible job action was amplified by the transfer of plaintiffs' duties while they were on leave, and in particular the transfer of plaintiff McKissick's duties, coupled with acts and statements of hostility made by City employees during the time plaintiffs were on leave, which were intended to cause, or which had the predictable and natural consequence of discouraging plaintiffs from returning to work.

21. The City prematurely attempted to compel plaintiffs to return to work, just prior to Thanksgiving. This attempt, which amounted to an ultimatum, constituted an act of retaliatory hostility. This attempt constituted a breach of a promise made by the City to plaintiffs when plaintiff were placed on administrative leave. For example, the City thereby attempted to compel plaintiffs to return to a hostile work environment, and one which the City knew to be hostile, as evidenced by the statement of Acting City Manager Thomas.

22. As a direct and proximate result of being subjected to this retaliation, plaintiffs were injured and damaged as described herein.

### Fourth Cause of Action
### (Retaliation/Constructive Discharge)

23. Plaintiffs hereby incorporate the allegations of paragraphs 1 through 22, inclusive, as though the same were fully stated herein.

24. The acts and statements described above created an intolerable work environment for plaintiffs.   Based on the City's actions, statements, and failures to act, plaintiffs concluded the ambient hostility would continue indefinitely.

25. Plaintiffs' work environment became intolerable. A reasonable woman, similarly situated to either plaintiff, would have found the work environment to be intolerable.

26.  Plaintiffs were constructively and wrongfully discharged. The constructive

discharges which plaintiffs were subject to constitute acts of retaliation, i.e., retaliation in response to plaintiffs' opposition to sexual harassment.

27. As a direct and proximate result, plaintiffs were injured as described herein. Further, plaintiffs sustained, and continue to sustain, economic damages, including diminution of retirement benefits.

28. Plaintiffs have been compelled to retain counsel and incur costs in order to attempt to obtain to vindicate their right to be free of retaliation.

WHEREFORE, plaintiffs request the following relief:

1. For awards of compensatory damages;

2. For awards of economic damages;

3. For awards of punitive damages;

4. For sanctions per the spoliation of evidence, up to and including a directed verdict;

5. For an award of reasonable costs and attorney's fees;

6. For such other relief, including an injunction to compel defendant to adopt and enforce a policy against sexual harassment and retaliation, and the appointment of a Court Master to enforce such, as the Court or jury may deem just.

DATED this 31st day of July, 2017.

/s/ Mark Mausert  
Mark Mausert  
NV Bar No. 2398  
930 Evans Avenue  
Reno, NV 89512  
TELEPHONE:(775) 786-5477  
FACSIMILE: (775) 786-9658  
*Attorney for Plaintiffs*