Mark Mausert
NV Bar No. 2398
930 Evans Avenue
Reno, NV 89512
(775) 786-5477
Fax  (775) 786-9658
mark@markmausertlaw.com
Attorney for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT**

**IN AND FOR THE DISTRICT OF NEVADA**

MAUREEN McKISSICK &          CASE NO. 3:17-cv-00458-MMD-VPC
DEANNA GESCHEIDER,

     Plaintiffs,

  vs.                          **PLAINTIFFS' MOTION TO RECUSE
                              THE RENO CITY ATTORNEY'S
CITY OF RENO and DOES I-X,    OFFICE**

     Defendants

_____/

     COME NOW plaintiffs, through counsel, who hereby move to recuse the Reno

City Attorney's Office, and all attorneys in the employ of that Office, from appearing as

counsel of record in this case, as well as from directing/overseeing this litigation.  This

Motion is supported by the pleadings on file herein and by the accompanying points and

authorities.

<u>Points and Authorities</u>

     A motion to recuse an attorney should not be lightly filed, or granted.  Counsel

has, in 36 years of practice, never filed such a motion.  Here, the circumstances militate

strongly for the recusal of the Reno City Attorney.  Karl Hall, Esq. is an elected official.

Accordingly, he was not hired by the Reno City Council in the usual fashion.  More

importantly, he may not be removed in the usual manner. Mr. Hall has a strong motive to

conceal the misconduct he has indulged in – as opposed to properly litigating for his

client, the City of Reno. The normal duties of an attorney re his client will be subject to

1

compromise. Instead of focusing on the best result for his client, Mr. Hall is likely to concentrate on the best result for himself, per how he appears in the public eye.  Counsel does not lightly make this observation. It is made on the track record Mr. Hall has established since June 2016.

The misconduct, which has occurred to date, includes the following:

1.  Willfully failing to keep his client, e.g., the City Council, timely apprised of material facts;

2.  Insisting on a formal sexual harassment complaint as a predicate to conducting an investigation;

3.  Arranging for an inadequate initial investigation by Attorney Alice Campos Mercado, in violation of the duty to conduct a fair and thorough investigation in a timely manner;

4.  Comprising the independence of retired Judge David Wall and thereby sabotaging Judge Wall's ability to conduct a thorough second investigation which the Council directed to be independent of Mr. Hall;

5.  Arranging a meeting with the plaintiffs and their attorney under false pretenses, i.e., Mr. Hall dissembled as to the purpose of the meeting (he claimed the meeting was to be had for settlement discussions).  In fact, Mr. Hall desired to effect ex parte contact between Council members and the plaintiffs – there was no meaningful discussion of settlement;

6.  Initiating extensive, unethical contact with the press;

7.  Selective leaking of case documents to the press, including the plaintiffs' settlement position;

8.   Prematurely disclosing the identities of the plaintiffs/sexual harassment complainants to the alleged perpetrator, City Manager Andrew Clinger, while failing to take any reasonable measures to protect plaintiffs against retaliatory hostility emanating from Mr. Clinger and his entourage and while failing to prevent collusion and witness intimidation by Mr. Clinger and his "unicorn," Assistant City Manager Kate Thomas;

9.  Failing to repudiate or remediate the statements of City Manager Clinger, which Mr. Clinger made subsequent to learning of the identities of the plaintiffs and subsequent to being prematurely and inaccurately told he was found innocent by Mr. Hall, and

whereby Mr. Clinger mischaracterized the plaintiffs as liars and openly invited retaliatory hostility against the plaintiffs;

10. After Mr. Clinger publicly attacked the complainants, Mr. Hall publicly supported him, i.e., he falsely confirmed the initial investigation found no evidence of wrongdoing. Mr. Hall engaged in this deception notwithstanding the fact his Assistant City Attorney, Mark Dunagan, acknowledged the investigation was deficient;

11. Openly trivializing the complaints of sexual harassment and manipulating the ensuing investigations, i.e., characterizing the investigation as a "witch hunt," spearheaded by the complainants;

12. Trivializing blatant sexual harassment despite multiple eye-witness accounts, i.e., Clinger's rubbing of plaintiff Gescheider's thigh at a meeting, by characterizing it as only the "touching of a leg";

13. Exhibiting an openly hostile and adversarial manner to the complainants subsequent to their complaints of sexual harassment;

14. Failing to take prompt action after being informed of retaliation, e.g. the burglary of plaintiff Gescheider's office (her attorney-client communication file was stolen);

15. Overseeing a massive payment, of approximately a quarter of a million dollars, to Mr. Clinger notwithstanding his admitted malfeasance, i.e., retaliation against Title VII complainants and systemic destruction of City records – malfeasance which excused the City from the obligation to pay Mr. Clinger per the terms of his contract;

16. Allowing Mr. Clinger, either knowingly or negligently, for years, to destroy City records – conduct which constituted felonies per NRS 239.320;

17. Attempting to force the complainants to return to a work environment which had not been thoroughly investigated, and most importantly, remediated, thereby violating the terms of his own administrative leave agreement with the claimants;

18. Exhibiting a focus inimical to remediation. That is, Mr. Hall focused throughout on future litigation – and thereby guaranteed such litigation would occur. Mr. Hall should have focused on compliance with the City's policy as required by *Ellerth/Faragher*; and,

19. Wasting tax-payer monies by drawing the City into expensive litigation.

1   **Argument:   THE CITY ATTORNEY, VIA EXTRAORDINARY CONDUCT,**
2   **HAS CREATED A CONFLICT OF INTEREST WHICH**
3   **WARRANTS RECUSAL.**
4
5   Rule 1.7 of the Nevada Rules of Professional Conduct reads:

6   **Rule 1.7.  Conflicts of Interest: Current Clients.**

7   (a) Except as provided in paragraph (b), a lawyer shall not represent a client if
8   the representation involves a concurrent conflict of interest.  A concurrent conflict
9   of interest exists if:
10   (1) The representation of one client will be directly adverse to another client; or
11   (2) There is a significant risk that the representation of one or more clients will
12   be materially limited by the lawyer's responsibilities to another client, a former
13   client or a third person *or by a personal interest of the lawyer*.
14   (b) Notwithstanding the existence of a concurrent conflict of interest under
15   paragraph (a), a lawyer may represent a client if:
16   (1) The lawyer reasonably believes that the lawyer will be able to provide
17   competent and diligent representation to each affected client;
18   (2) The representation is not prohibited by law;
19   (3) The representation does not involve the assertion of a claim by one client
20   against another client represented by the lawyer in the same litigation or other
21   proceeding before a tribunal; and
22   (4) Each affected client gives informed consent, confirmed in writing.

23   Emphasis added.

24   This case presents an unusual fact pattern – one peculiarly suited to recusal.  Mr.

25   Hall is an elected official.  As such, he is not subject to the customary level of control a

26   client exercises over an attorney.  For example, he cannot be fired, absent a super-

27   majority vote (six out of seven) of the City Council members.  Further, this case

28   implicates the public fisc. It is within this context Mr. Hall's office so badly processed

29   complaints of sexual harassment.  Instead of mitigating the situation, Mr. Hall directly

30   fostered retaliatory hostility – to the point at which the plaintiffs resigned/were

31   constructively discharged.  These facts lend themselves to an unsettling conclusion, to

32   wit, if the City Attorney's Office continues to provide representation, this litigation will

33   be conducted per an ulterior motive, i.e., the best interest of Mr. Hall, as opposed to the

34   best interest of the City of Reno.  Because of Mr. Hall's elected status the City Council's

35   ability to control Mr. Hall is very limited. Further, Mr. Hall has consistently and

36   deliberately withheld information from the Council, especially regarding his misconduct,

37   and *there is no other mechanism through which the Council can become informed*. The

38   undersigned is prohibited per Rule 4.2 from contacting Council members. These

4

1  circumstances call for intervention by the Court – to ensure this case will be

2  professionally litigated with an eye to achieving a just resolution based on the merits.

3       The propriety of recusal is illustrated by consideration of the Court's emphasis on

4  achieving good faith settlements.  Most cases amicably settle, often with the assistance

5  of the Court via the Early Neutral Evaluation Program, or a settlement conference.  At

6  every turn the parties are actively encouraged to realistically evaluate their cases,

7  minimize the effect of emotion and ego, consider risk, and attempt to achieve a

8  negotiated resolution.  Here, given Mr. Hall's misconduct, it is unlikely this process will

9  occur.  More likely, the orientation, which in large part created this case, will continue.

10  Mr. Hall will not be paying the bill. The taxpayers of the City of Reno will fund this

11  litigation.  However, instead of having a skilled attorney at the helm, evaluating the case

12  based on the merits, and in the best interest of the client, the attorney who committed the

13  indiscretions alleged within this motion will be making decisions.

14       Mr. Hall's misconduct began before my clients complained and served as a

15  catalyst for their complaints. In the days after the June 22, 2016 meeting, presided over

16  by Mr. Hall, in which Mayor Hillary Scheive directed the complainants to report any

17  instances of sexual harassment, Finance Director Chisel informed Mr. Hall several

18  women had confided in him regarding sexual harassment by City Manager Andrew

19  Clinger.  Mr. Chisel urged Mr. Hall to open an investigation.  Mr. Hall refused, absent a

20  formal complaint.[1]  My third client, Ms. Brianna Wolf, who is filing a separate lawsuit

21  and will seek to join this case, was thereby compelled to file a formal complaint on June

22  29, 2016.  Ms. McKissick and Ms. Gescheider followed two days later.

23  Contemporaneously, Mr. Hall intervened to stop a Reno Police Department investigation

24  into reports of sexual harassment by Mr. Clinger requested by the Mayor on or around

25  June 22, 2016.[2]

26       Mr. Hall's insistence on a formal complaint as a predicate to taking action was

27  highly improper, showing either a lack of understanding of City Policy/federal law, a

28  desire to protect Clinger or perhaps both.  City Policy 607 VII(5) promises employees an

29  investigation will be quickly conducted regardless whether the complaint is filed verbally

---

[1] See Ms. Gescheider, Ms. McKissick and Ms. Wolf Declarations
[2] See Wall Report pp. 41 and 60

5

or in writing. In *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1121 (th Cir. 2004), the Ninth Circuit repudiated Mr. Hall's insistence on a formal complaint as a predicate to initiation of an investigation.

> GTE's remediation of DeLeon's racial comments also gives cause for concern. Although counseling and a warning may suffice if successful in stopping the harassment, *see Intlekofer*, 973 F.2d at 779, GTE did not issue this warning until McGinest had filed a complaint with the EEOC.  In fact, McGinest had informed his manager or immediate supervisor of the events involving Noson, Hughes, DeLeon, and others, to no avail.  In each of these cases, GTE did not respond until McGinest initiated formal proceedings. This delay does not satisfy Title VII's requirement of prompt remedial action.  *See, e.g., Fuller*, 47 F.3d at 1528; *Intlekofer*, 973 F.2d at 778; *Steiner*, 25 F.3d at 1464.

Also see, *Equal Employment Opportunity Commission v. Dinuba Medical Clinic*, 222 F.3d 580, 587 (9th Cir. 2000) (Sexual harassment complaints need not be in writing.)

When filing the complaint, Human Resources Director Kelly Leerman, in conformance with city policy, assured Ms. Wolf her identity would remain confidential.[3] However Mr. Hall revealed her identity to Mr. Clinger the very afternoon she filed.  Mr. Hall knew he was not supposed to reveal the identity of a sexual harassment complainant. Per Director of Human Resources Kelly Leerman, Hall did so anyway.[4] This not only exposed Ms. Wolf to retaliatory hostility, but also compromised Ms. McKissick as Ms. Wolf's supervisor. Mr. Hall violated the promise made to Ms. Wolf by the City's sexual harassment policy. City Policy 607 states "[c]onfidentiality will be maintained throughout the investigatory process to the extent consistent with conducting an investigation and determining appropriate corrective action."

Subsequently, Mr. Hall **lied** to Ms. Wolf regarding the disclosure of her identity. On July 18, 2016, Mr. Hall met with Ms. Wolf.  Mr. Hall unequivocally denied having disclosed Ms. Wolf's identity. Ten minutes before Mr. Hall's denial, Ms. Leerman informed Ms. Wolf of the fact Mr. Hall did disclose her identity. She also recounted a conversation with Mr. Hall, wherein Mr. Hall asked Ms. Leerman if he should apologize to Ms. Wolf for the disclosure.[5]  Accordingly, when Hall outright lied, Ms. Wolf knew Hall was lying.  Ms. Wolf informed Ms. McKissick that Mr. Hall could not be trusted,

---

[3] See Ms. Wolf Declaration
[4] Wall Report, p.45, last full paragraph
[5] See Ms. Wolf Declaration

1   i.e., he lied about breaching confidentiality and this prompted both of them to seek

2   counsel for protection on July 19, 2016.

3         Mr. Hall breached confidentiality in the worst way possible, i.e., he told the

4   accused, very early on, of the allegations and of the identity of one of the complainants.

5   Mr. Hall also appears to have been less than forthright with Judge Wall during the second

6   investigation.

> 7   Hall said he met with Clinger shortly after the first complaint was filed. Hall
> 8   advised him generally that the complaint alleged sexual harassment and told
> 9   Clinger there would be an investigation. *Hall couldn't recall if he told Clinger the*
> 10   *names of the complainants, but believes he might have done so as to warn Clinger*
> 11   *not to retaliate against them.* Hall does not recall Clinger's initial reaction to
> 12   being told of the complaints.

13   November 21, 2016 "Confidential Investigation Report" by Judge Wall (hereafter

14   referred to as Wall Report), p.47 (Emphasis Added). *A copy of the redacted Report*

15   *accompanies this Motion.*

16         The proposition Mr. Hall revealed the complainants' identities to facilitate a

17   warning to Mr. Clinger to forego from retaliation is disingenuous. Human Resources

18   Director Kelly Leerman warned Mr. Hall to maintain confidentiality. The only reasonable

19   inference is Mr. Hall dissembled to Judge Wall for an ulterior purpose, i.e., to insulate

20   himself from the consequences of disregarding Director Leerman's advice.

21         The consequences of revealing the identity of Ms. Wolf to Mr. Clinger at a very

22   early stage went beyond allowing Mr. Clinger an opportunity to retaliate. Mr. Hall gave

23   Mr. Clinger a head start. He was provided with a chance to coordinate with employees

24   who favored him – or had a reason to conceal facts – and an opportunity to intimidate

25   witnesses. Indeed, Mr. Clinger and Ms. Thomas apparently colluded, evaluating the

26   evidence against them and framing a counter-narrative that depicted Ms. McKissack as

27   the mastermind behind Ms. Wolf's complaints.[6] Mr. Clinger and Ms. Thomas also both

28   attempted to bias key witnesses prior to their interviews with the investigator. Ms.

29   Thomas informed Ms. Gescheider right before her interview with Ms. Mercado that Mr.

30   Clinger had retained his full text history and implied he had compromising texts from

31   Ms. Gescheider and nothing compromising in his text history from Ms. Thomas.[7] Mr.

32   Clinger's secretary Ms. Siddharthan was apparently influenced to lie about her

---

[6] See Ms. McKissack and Ms. Wolf Declarations
[7] See Ms. Gescheider Declaration

1   perceptions of Mr. Clinger's relationships after being lobbied by Mr. Clinger. Ms.

2   Siddharthan's statements to Ms. Wolf and Ms. McKissick stand in direct contrast to the

3   sanitized statements she provided to Ms. Mercado. [8]

4           On July 18, 2016, Ms. Wolf informed Mr. Hall of the fact Assistant City Manager

5   Kate Thomas was spreading rumors to the effect she and Ms. McKissick were conspiring

6   to take her and Mr. Clinger down. Ms. Wolf also pointed out the only way Ms. Thomas

7   could be aware of her identity was if Mr. Clinger told her. When confronted with

8   evidence of collusive behavior directly resulting from his breach, Mr. Hall was

9   indifferent.  Instead of exhibiting alarm and taking action, Mr. Hall trivialized this

10  activity. He countered with the statement, "How is that retaliation?"[9] Hall took no

11  measures to protect Ms. Wolf and Ms. McKissick. This response stands in stark

12  contradiction to his statements to Judge Wall that he informed Mr. Clinger of identities so

13  as to prevent retaliation. The clear retaliation by Ms. Thomas and the breach in

14  confidentiality by Mr. Clinger were not investigated or remediated.  The rejoinder is

15  obvious and one which should have been known to the City Attorney. Spreading such

16  rumors has a readily predictable effect, to wit, employees are encouraged thereby to

17  engage in acts of retaliatory hostility and to ostracize. Mr. Hall knew this, and yet ignored

18  the report. By prematurely sharing details with Mr. Clinger, he encouraged such

19  retaliatory hostility. And by his inaction, he ratified the retaliatory hostility fomented by

20  Mr. Clinger and Ms. Thomas.

21          Mr. Hall repeatedly failed to curb retaliatory hostility. For instance, Mr. Hall

22  protected William Dunne, even after several reports were made by the complainants of

23  Mr. Dunne spreading defamatory rumors and threatening revenge.[10] Mr. Hall also failed

24  to timely respond to the burglary of Ms. Gescheider's office – he was notified of the

25  burglary on July 29, 2016 and did not initiate an investigation for a full two weeks.

26          Mr. Hall made further missteps in overseeing the first investigation completed by

27  outside counsel, Alice Campos Mercado. The parameters of Ms. Mercado's investigation

28  were evidently strictly controlled to preclude inquiry into Ms. McKissick's complaints.

29  The retaliatory hostility which Ms. McKissick endured as the result of sexual favoritism,

---

[8] See Ms. Wolf and Ms. McKissick Declarations
[9] See Ms. Wolf Declaration
[10] See Ms. Gescheider, Ms. McKissick and Ms. Wolf Declarations

in favor of Ms. Thomas, was viewed as generic harassment – unrelated to Title VII.[11]  In fact, during her interview with Ms. Mercado, Ms. Wolf expressly linked the favoritism directed at Ms. Thomas by Mr. Clinger, the transfer of duties from Ms. Thomas to Ms. McKissick, and ostracism of Ms. McKissick by Ms. Thomas and her entourage to the sexual relationship between Mr. Clinger and Ms. Thomas and the liaison she overheard in May or June of 2015. Yet Ms. Mercado continually redirected Ms. Wolf and made no note of her claims on behalf of Ms. McKissick in her Report.[12]  Instead of dealing with dysfunction, directly caused by sexual favoritism, Ms. Mercado ignored the blatant and protracted hostility orchestrated by Ms. Thomas toward Ms. McKissick.

Conduct which flowed from Mr. Clinger's sexual favoritism, but which was not itself inherently "sexual" is still actionable. See, e.g., *Oncale v. Sundowner Offshore Services, Inc.*, 532 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998); *Draper v. Coeur Rochester*, 147 F.3d 1104 (9th Cir. 1998). In *Draper*, the Court wrote:

> Discriminatory behavior comes in all shapes and sizes, and what might be an innocuous occurrence in some circumstances may, in the context of a pattern of discriminatory harassment, take on an altogether different character, causing a worker to feel demeaned, humiliated or intimidated on account of her gender. See *Meritor Savings*, 477 U.S. at 65, 106 S.Ct. 2399 (noting that employees have the 'right to work in an environment free from discriminatory intimidation, ridicule, and insult).

147 F.3d at 1109.

During their interviews, Ms. Wolf and the two plaintiffs provided fairly comprehensive information to Ms. Mercado about sexual harassment *and other misconduct*.[13] The "no finding" result of Ms. Mercado's investigation did not arise from a failure of complainants/witnesses to provide accurate and compelling information, but rather from a studied refusal to pursue information which was provided. How did that happen? Additionally, all three of my clients reported retaliation as a result of making the complaint to Ms. Mercado.[14] Yet Ms. Mercado only chose to investigate the retaliation reported by Ms. Gescheider. Ms. Mercado, a skilled and knowledgeable Title VII lawyer, did not unilaterally decide to forego the benefit of her expertise, acquired per many years

---

[11] See Ms. Wolf and Ms. McKissick Declarations
[12] See Ms. Wolf Declaration
[13] See Ms. Gescheider, Ms. McKissick and Ms. Wolf Declarations
[14] See Ms. Gescheider, Ms. McKissick and Ms. Wolf Declarations

of practice. The parameters which Mr. Hall imposed forced Ms. Mercado to ignore the information freely provided. Even if the incriminating information could somehow be divorced from the designation of sexual harassment (given such cases as *Draper* it is hard to see how a legitimate distinction could be made), the allegations nonetheless involved serious misconduct by the City Manager.

On Friday, July 15, 2016 Ms. McKissick and Ms. Gescheider each scheduled appointments with the Human Resources Director Leerman to report an uptick in retaliatory hostility by Mr. Clinger, Ms. Thomas and their entourage. In each of those meetings Ms. Leerman informed the plaintiffs that while Ms. Mercado had not yet delivered the investigation report, she had nonetheless communicated she was not going to be able to make a finding of sexual harassment.[15] Ms. McKissick was suspicious and questioned how that could be possible given what she knew had been reported by herself and Ms. Wolf. She also realized Mr. Clinger must have been told of the "no-finding result," a circumstance which explained the increase in retaliation. In response, Ms. Leerman admitted to Ms. McKissick the scope of Ms. Mercado's investigation had been set "too narrow."  Later that afternoon Ms. McKissick was expressly informed, by Assistant City Attorney Mark Dunagan, "the process was flawed", or words to that direct effect, and the City knew it needed to fix the mistake with another investigation.[16] However, when Ms. Leerman and Mr. Hall were confronted by Ms. Wolf on Monday, July 18, 2016 with the impropriety of revealing results to the perpetrator before the City Council, they both flatly denied they had told anyone anything about the results – ***another outright lie.*** They did acknowledge a plan to provide the City Council with a significant list of concerning behaviors by Mr. Clinger exposed by the investigation, regardless whether the investigation found a violation of the sexual harassment policy.[17] They were attempting to whitewash the artificial parameters of the Mercado investigation that they had clearly acknowledged on the 15th with lies and a work-around scheme as communicated on the 18.th They apparently spent the weekend fomenting a cover-up strategy.

[15] See Ms. Gescheider and Ms. McKissick Declarations
[16] See Ms. McKissick Declaration
[17] See Ms. Wolf Declaration

1    Because Mr. Clinger showed a marked increase in his rage towards the claimants

2    starting July 15th, Mr. Hall almost certainly also told Mr. Clinger of the early "results" of

3    the Mercado investigation.[18] Even members of Council noted how Mr. Clinger was newly

4    emboldened to forcefully insist on his innocence. On July 21, 2016, Councilwoman

5    Naomi Duerr attended a lunch meeting with Mr. Clinger. Councilwoman Duerr told Mr.

6    Clinger that she was aware of the claims and hoped the investigation would go well so

7    that everyone could move forward (note, the official results of the Mercado Investigation

8    were still unknown to Council and, as noted, should have been unknown to everyone

9    else). Councilwoman Duerr said at that point Mr, Clinger "goes ballistic," proclaiming

10   his innocence in an angry outburst that lasted nearly an hour. Councilwoman Duerr

11   described him as "furious." No complainants' names were mentioned, but Mr. Clinger

12   threatened vengeance against them, saying things like, "they're evil," and "they'll pay."

13   He told Councilwoman Duerr it's a conspiracy against him, which he declared was a

14   felony, and he vowed to hold them accountable. Councilwoman Duerr said that Mr.

15   Clinger went on to say things like, "Payback's a bitch," and Councilwoman Duerr

16   explained that she was "freaking out" at this point and tried to calm Mr. Clinger down.

17   She told him he shouldn't be at work and should take a few days off. He agreed to do so.

18         But the following day, July 22, 2016, Duerr saw Clinger at a City firehouse
19         dedication event. She also saw [deleted] as she spoke with Councilwoman
20         Neoma Jardon and Mayor Schieve. Duerr told [deleted] she should leave because
21         Clinger was there. That afternoon, *Duerr said she had a conversation with Karl*
22         *Hall and relayed to him Clinger's lunch conversation with her, including the*
23         *threats about taking revenge.* Duerr's message to Hall was that Clinger ought not
24         to be in the office. *Duerr said Hall told her that Clinger had made the same type*
25         *of comments to him.*

26   Report, p.26 (emphasis added); also see, p.53 (Also see: Clinger threatened to fire the

27   three complainants).

28         City Attorney Hall was placed on notice of Mr. Clinger's propensity for

29   retaliation/vengeance by many people, including by Mr. Clinger, and failed to respond.

30   Instead, Mr. Hall intensified the harassment. City Manager Clinger was allowed, for a

31   considerable period, to vent rage at the plaintiffs. He did so in the presence of Council

---

[18] On the bottom of p.47 of the Wall Report, Mr. Hall admits he told Mr. Clinger – and no one else – the
results of the Mercado Investigation but estimates that date as the 18th or 19th of July. The likelihood that it
actually occurred on the 15th of July is supported on p.75 where Wall notes texts between Mr. Clinger and
Ms. Thomas start to discuss details of the allegations on July 15th.

1  members. Worse, Mr. Hall allowed Mr. Clinger to use Ms. Mercado's inadequate

2  investigation as a springboard to publicly castigate the plaintiffs in a press release, i.e., to

3  encourage their co-workers to ostracize them.[19] That ostracism is a form of sexual

4  harassment.  *See, e.g., Draper v. Coeur Rochester,* 147 F.3d 1104 (9th Cir. 1998)

5  (morphing erotic-based harassment into derision does not constitute cessation of sexual

6  harassment).  No response from the City was timely had.

7       Mr. Hall did nothing to publicly correct Mr. Clinger's false statements. Despite

8  the City implicitly admitting the inadequacy of the Mercado investigation by embarking

9  on a second investigation, Mr. Hall made statements to the media confirming the

10  Mercado Investigation found no evidence of misconduct.[20] The inaccuracy of Mr. Hall's

11  public statements was confirmed by Special Counsel Greg Kamer. According, to

12  information conveyed to Ms. McKissick (unsolicited), by Mayor Schieve on September

13  20, 2016, Special Counsel Kamer advised her the Mercado Investigation was so poorly

14  done as to be worthless, i.e., it could not be used as the basis for any action.[21]

15       The second investigation by Judge Wall was, ostensibly, explicitly devised to

16  preclude Mr. Hall's involvement.[22] However the resulting November 21, 2016

---

[19] See Andrew Clinger July 30, 2016 Press Release:
"I am not going to sit back and let people attack my character or attempt to ruin my reputation with outright lies" and "It is important to note the city attorney told me personally the investigation his office initiated, and which was conducted by an impartial, independent law firm, concluded nothing happened and the allegations against me were baseless"
Link: https://www.scribd.com/document/319745358/Clinger-s-July-30-Statement
Also see Andrew Clinger August 4, 2016 interview with News4:
"The most important thing for the public to know is that I am innocent" and "This is a process that was handled in Karl Hall's office, who is the City Attorney. And it is important for people to understand that Karl Hall does not work for me. He is an independent elected official. And his office conducted the investigation." Link: http://mynews4.com/news/local/renos-city-manager-speaks-publicly-for-the-first-time-on-sex-harassment-claims

[20] See Mr. Hall August 8, 2016 interview with News4:
"Hall reconfirmed to News 4 the initial investigation, overseen at the direction of his office, determined no wrongdoing on the part of Clinger." And "Hall expressed disappointment in learning Clinger had placed himself on voluntary administrative leave." Link: http://mynews4.com/news/local/reno-city-manager-andrew-clinger-places-himself-on-administrative-leave

[21] See McKissick Declaration

[22] See the City Council discussion at the August 4th Special Meeting to approve the contract with Mr. Kamer. Quotes from Councilman Bobzien confirms the second investigation was intended to be independent of Mr. Hall (emphasis added):
I am very comfortable with delegating this to you [Mayor Schieve]. … I would move to authorize the appointment of special counsel to manage an investigation of the complaints alleged misconduct of City Manager Andrew Clinger and to *delegate to Mayor Hillary Schieve to select, contract with, and direct the special counsel in an amount not to exceed $50k.*
And:

1   "Confidential Investigation Report" of retired Judge David Wall shows it was deeply

2   biased by Mr. Hall.

3          Judge Wall memorialized the necessity of interviewing the complainants, and

4   disavowed responsibility for his inability to do so, i.e., the City Attorney's Office (and to

5   a much lesser degree Special Counsel Kamer) controlled the negotiations which

6   determined that ability.  Report, pp.2-3.  Judge Wall wrote:

7           The inability to speak with [the complainants] made the completion of the instant
8           investigation far more challenging.  Access to the complainants would have
9           allowed me to ask cogent questions regarding their claims, to further attempt to
10          seek corroboration thereof, to request access to certain documents and personal
11          information they possess and to take normal investigatory steps to determine facts
12          and assess credibility.  Credibility assessment is normally conducted in one-on-
13          one interviews, or otherwise determined in the existence or non-existence of
14          corroborative evidence.  Additionally, in interviews the claimants would have had
15          the opportunity to support their versions of events. *It is therefore a fair criticism*
16          *of this Report to allege that it was completed without having spoken with the very*
17          *complainants who necessitated it in the first place.*

18   Report, p.3, first paragraph (emphasis added).

19          Mr. Hall's insistence on a right to use plaintiffs' interviews against them resulted

20   in a refusal by plaintiffs to be interviewed. The plaintiffs manifested a willingness to be

21   interviewed by Judge Wall (they previously submitted to interviews by Ms. Mercado)

22   under reasonable conditions.[23] Per *Palmer v. Pioneer Associates*, Ltd., 118 Nev. 943, 59

---

Just some clarifying comments on my motion, I understand the scope to be very broad, as much as it needs to be and as thorough as it needs to be. *I also would hope and recognize due to the special circumstances here given the parties reporting lines and everything else, Mayor, you should select someone on staff to assist you with the contract and execution in terms of invoices, billables, etc. and that you keep us apprised because we are delegating this authority to you.* I'm very confident that you will keep the entire Council apprised as well as the public.
And Mr. Hall's improper involvement in the second investigation was discussed by the City Council at the November 16th Council meeting where the Mayor blamed Hall for not managing costs. In response, Councilman McKenzie pointed out Hall should not be involved *at all* given that the goal of hiring outside counsel was to get independent advice. Councilman McKenzie's quote (emphasis added):
   Mr. Hall, I appreciate the situation you are in because *we are the ones who decided to hire an outside counsel and now we are looking at you and asking why it cost us so much*. That procedure is something that we should be developing as counsel *because when we go to outside counsel it's usually because we have something that we disagree with you about* and we put you in a really strange position when disagree with you and we have hired someone else to give us another opinion, we ask you to be the mediator, so I think that is something that if we ever get those Council policies together that we've been working on since I've been on this City Council that we do something. It's qualified in code how we seek outside counsel but this Council has to be the one to establish that policy, we can't expect Karl to establish that process for us.
[23] Counsel for the plaintiffs proposed the following conditions:
   1.  Counsel for plaintiffs would be present.

1   P.3d 1237 (Nev. 2002), the Court adopted the "management-speaking agent" test, i.e.,

2   Rule 4.2. applies to those persons who have authority to bind a party. Since the plaintiffs

3   are the parties, they obviously possess this authority and therefore fall within the ambit of

4   Rule 4.2. Accordingly, absent their consent, defendant City of Reno was precluded from

5   substantive contact with them regarding their allegations. Implicit in these circumstances

6   is the proposition the plaintiffs were possessed of a right to impose *reasonable*

7   *conditions*, as a predicate to waiving their Rule 4.2 rights. They did so but Mr. Hall

8   decided not to agree to them and instead forestalled from a thorough investigation.[24] He

9   insisted on an ability to attempt to use the interviews against the complainants while

10   knowing that condition was unacceptable and would result in the inability to conduct the

11   interviews.

12        Per the caselaw quoted herein, the City had an affirmative, non-delegable

13   obligation to conduct a thorough investigation. The City reneged on that obligation –

14   because Mr. Hall forestalled from morphing interviews with the plaintiffs into a

15   mechanism to acquire advantage at trial.[25] Insisting on a tactical advantage, to which one

16   is not entitled as a matter of law, is not a valid reason to abdicate the affirmative

17   obligation to conduct a thorough investigation. By adopting this position, Mr. Hall

18   demonstrated bias against the plaintiffs. Worse, he prevented the City from availing itself

---

2.  The plaintiffs would not question the efficacy of the interviews.

3.  The interviews would be used only for internal investigatory purposes. Neither party would offer testimony or evidence as to what was said during the interviews.

The latter condition was intended to avoid a swearing contest. Counsel did not wish to create a situation whereby he would become a witness. Nor did plaintiffs' counsel wish to create a situation whereby Judge Wall would be testifying as to his belief as to what was said during a lengthy, unrecorded interview.

[24] See November 2, 2016 report from News4 (emphasis added):

Hall and Mausert are at odds over conditions placed that would allow for the interviews to occur. Mausert said he wants to be present when his clients are being interviewed. He also does not want what they say to be used in the event of a trial. He said, "I don't want to open that door where there is a squabble over what was said in a five-hour interview." He added, "This should be an investigation where the City hopes to obtain information that would allow for it to do the right thing and correct any problems." He said the City is under obligation to conduct an investigation to ensure the workplace is one that adheres to federal law. He said, "This should not be a tool for the City to try and gain 'tactical advantage' in a trial." Hall disagrees. He said, "*My obligation is to protect the City. We want a fair and impartial investigation and if they want to put conditions upon the investigation that are unacceptable, that is their choice.* It is not mine."

Link: http://mynews4.com/news/local/taxpayers-might-not-be-happy-with-clinger-investigation

[25] See November 2, 2016 report from News4 where the reporter said "Hall wants to be able to use the women's interviews to potentially look for inconsistencies should this matter go to trial." And quoted Mr. Hall as saying, "I would assume that there is one truth now and one truth later if we end up getting sued."

Link: http://mynews4.com/news/local/taxpayers-might-not-be-happy-with-clinger-investigation

1   of the benefit of the *Ellerth/Faragher* affirmative defense. That defense requires a

2   prompt, thorough investigation.

3       Mr. Hall bypassed the investigatory and remedial processes and moved into

4   adversary mode. He used intimidation and retaliation to try to make the complainants

5   dismiss their complaints. Forcing the complainants into an adversarial position is the

6   antithesis of remediation. A purpose of remediation is to avoid conflict, i.e. defuse a

7   volatile situation created by sexual harassment. Mr. Hall's facile approach might work re

8   weak women, bereft of counsel. Here, Mr. Hall deepened the conflict, and worse, the

9   City's exposure. This appears to sink to the level of malpractice.

10       City Policy 607, based on Title VII, was a promise to the complainants. By

11   focusing on winning any potential future litigation, Mr. Hall structured his actions and

12   statements so as to contravene the City's policy and break the promise inherent in the

13   policy. Mr. Hall forced the complainants to become litigants and then criticized them for

14   doing so.[26] This misconduct occurred against the backdrop of the City's obligation to

15   quickly implement an effective remedy.

16           We have held that an effective remedy is one that is "reasonably calculated to end
17           the harassment" and such remedy should be "assessed proportionately to the
18           seriousness of the offense." *Ellison v. Brady*, 924 F.2d 872, 882 (9th Cir. 1991)
19           (citations omitted). The reasonableness and adequacy of the remedy depends upon
20           its ability to stop the individual harasser from continuing to engage in such
21           conduct and to discourage other potential harassers from engaging in similar
22           unlawful conduct.

23   *Mockler v. Multnomah County*, 140 F.3d 808, 813 (9th Cir. 1998); also see, *McGinest v.*

24   *GTE Service Corp.*, 360 F/3d 1103, 1120 (9th Cir. 2004) ("To be adequate, an employer

25   must intervene promptly. *Intlekofer v. Turnage*, 973 F.3d 773, 778 (9th Cir. 1992).").

26       In *Mockler v. Multnomah County*, 140 F.3d 808, 813 (9th  Cir. 1998), the Court

27   observed, "[t]he failure to react promptly to a complaint, or to reprimand the harasser

28   strongly, is evidence relevant to determine whether the employer took sufficient remedial

29   action." Citing, *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1464 (9th  Cir. 1994).

---

[26] See January 20, 2017 statement released by Karl Hall to the media:
    "By placing unreasonable conditions on the City's investigation, and counseling his clients not to
cooperate with the City's investigator, Mr. Mausert substantially interfered in the City's complaint
resolution process, needlessly increased the cost of the investigation for City taxpayers, delayed the
timely resolution of this matter, and created a media circus. Mr. Mausert embarked on this course of
action knowingly, at his own risk, and ultimately, the risk of his clients. The City looks forward to
defending itself in court." Link: http://www.ktvn.com/story/34138252/city-of-reno-releases-final-
investigation-report-on-andrew-clinger

In *Swenson v. Potter*, 271 F.3d 1184, 1193 (9th  Cir. 2001), the Court repudiated the sort of manipulation of the investigatory process which has occurred here.

> The most significant immediate measure an employer can take in response to a sexual harassment complaint is to launch a prompt investigation to determine whether the complaint is justified.  An investigation is a key step in the employer's response, see *Swentek v. USAIR, Inc.*, 830 F.2d 552, 558 (4th  Cir. 1987) (employer obliged to investigate complaint and to present a reasonable basis for its subsequent action), and can itself be a powerful factor in deterring future harassment.  By opening a sexual harassment investigation, the employer puts all employees on notice that it will take such allegations seriously and will not tolerate harassment in the workplace. An investigation is a warning, not by words but by action. We have held, however, that the "fact of investigation alone" is not enough. *Fuller*, 47 F.3d at 1529. An investigation that is rigged to reach a pre-determined conclusion *or otherwise conducted in bad faith will not satisfy the employer's remedial obligation. See id*."

Emphasis added.

The *Swenson* Court insisted on an investigation which is "fully objective and fair." 271 F.3d at 1196-97.  Neither of the two investigations by the City qualify as such.

In *McCaw v. Potter*, (2006 U.S. Dist. LEXIS 61774), the Court articulated an analysis directly on point to Mr. Hall's fixation on preparing for litigation. In this context, preparation for litigation is more aptly termed, "preparation for retaliation".

> Based on the record before it, the Court finds that a jury could reasonably infer that the sexual harassment charge was not pursued in an attempt to retaliate against Plaintiff for bringing the claim. If so, it is reasonably likely that an individual would not file a sexual harassment complaint if she felt that her complaint would not be thoroughly investigated or that she would not be believed. Accordingly, the Court will not dismiss this claim.

The Judge Wall Report also reveals Mr. Hall likely never took the allegations seriously. For example, prior to the results of the first investigation, Mr. Hall denigrated the seriousness of Mr. Clinger's conduct.  Regarding the thigh rubbing incident, witnessed by Finance Director Chisel, Mr. Hall told Councilwoman Duerr, "it's just a leg being touched."  Report, p.26, first full paragraph.

> Hall did not confine trivializing the plaintiffs' complaints to conversations with Councilwoman Duerr.  He voiced the same sentiment to Councilman Paul McKenzie. McKenzie said he didn't meet with any of the complainants prior to their complaints being filed. City Attorney Karl Hall told him about the complaints after they were filed. Hall also mentioned at some point before the completion of the [Mercado] investigation that he thought it was "*likely a witch*

16

1   *hunt by disgruntled employees*."  McKenzie found this comment by Hall to be
2   inappropriate.

3   Report, p.33, last full paragraph (emphasis added).

4        Mr. Hall took great liberty in trivializing Mr. Clinger's conduct. This approach is

5   not countenanced by the Circuit, i.e., it was not Mr. Hall's perspective which controls,

6   but that of a reasonable woman.

7        Under the third element to determine whether an environment is sufficiently
8        hostile or abusive to violate Title VII, we look "at all the circumstances, including
9        the frequency of the discriminatory conduct; its severity; whether it is physically
10       threatening or humiliating, or a mere offensive utterance; and whether it
11       unreasonably interferes with an employer's work performance. *Clark County Sch.*
12       *Dist. v. Breeden*, 532 U.S. 268, 121 S.Ct. 1508, 1510, 149 L.Ed.2d 509 (2001)
13       (internal quotation marks and citations omitted); see *Nichols*, 256 F.3d at 872.
14       Moreover, "the work environment must both subjectively and objectively be
15       perceived as abusive," *Fuller*, 47 F.3d at 1527 (citation omitted), *and the*
16       *objective portion of the claim is evaluated from the reasonable woman's*
17       *perspective. Ellison*, 924 F.2d 879-80.

18   *Little v. Windermere Relocation, Inc*., 301 F.3d 958, 966(9th Cir. 2001)(emphasis added).

19       In *Ellison v. Brady*, 924 F.2d 872, 879-80 (9th Cir. 1991), the Court wrote:

20       By acknowledging and not trivializing the effects of sexual harassment on
21       reasonable women, courts can work towards ensuring that neither men nor women
22       will have to "run a gauntlet of sexual abusive in return for the privilege of being
23       allowed to work and make a living." *Henson v. Dundee*, 682 F.2d 897, 902 (11th
24       Cir. 1982).

25       Mr. Hall's protestations of an innocent intent, re such actions as breaching

26   confidentiality, delaying the investigation, placing unreasonable and artificial parameters

27   on the scope of either investigation, sabotaging the ability of Judge Wall to interview the

28   complainants, etc., should not be well taken. "That is because Title VII is not a fault-

29   based tort scheme. 'Title VII is aimed at the consequences or effects of an employment

30   practice and not at the . . . motivation' of co-workers or employers." *Ellison v. Brady*, 924

31   F.2d 872, 880 (9th Cir. 1991) (citations omitted).

32       That Mr. Hall let his personal views bias the handling of the complaints is an

33   ethical violation of his post. Worse, once the complainants became aware of his missteps

34   and informed him they were seeking counsel, Mr. Hall went into adversary mode and

1    started preparing for litigation. ***Seeing the plaintiffs as future potential litigants, Mr.***
2    ***Hall treated them as enemies.***

3        Mr. Hall sought opportunities to malign the plaintiffs in the press. As already
4    noted, Mr. Hall made improper and unfounded public statements backing-up Mr.
5    Clinger's claims of innocence to create public doubt about the validity of the plaintiffs'
6    claims the investigations were mishandled. Mr. Hall publicly blamed the plaintiffs'
7    counsel for the expense of the investigations.[27] Mr. Hall mischaracterized the plaintiffs'
8    counsel's position on the interviews to create the impression the plaintiffs were
9    unreasonable and had something to hide.[28] Mr. Hall did this to redirect public outrage
10   about the cost of the investigations from himself (as he is arguably to blame for the need
11   for a second investigation and the failure to reach reasonable terms for interviewing the
12   plaintiffs during the second investigation).

13       If Mr. Hall truly cared about protecting tax-payer monies, he would not have
14   advised the city council to give Mr. Clinger a quarter-million dollar severance. The City
15   Attorney ignored provisions in Mr. Clinger's contract which allowed the City to forego
16   payment to Mr. Clinger, in the event he committed malfeasance. Retaliation against Title
17   VII complainants, whether the claims are found meritorious or not, is a violation of Title
18   VII and actionable malfeasance. As noted above, Mr. Hall was very aware of Clinger's
19   malfeasance prior to disbursement of the funds to Mr. Clinger and his lawyer on
20   September 15, 2016. And yet, instead of refusing to pay the severance Mr. Hall
21   negotiated a separation agreement with Mr. Clinger that provided full indemnification.[29]

22       Mr. Hall further retaliated in the media by abusing the settlement process.  After
23   repeatedly soliciting an offer of settlement from myself, Mr. Hall took the plaintiffs'
24   settlement proposal and leaked it to the press – to characterize the complainants as
25   greedy. Contemporaneous with the leak of the plaintiffs' settlement proposal, Mr. Hall
26   has refused to release other documents not favorable to the City.[30]  Mr. Hall is very

---

[27] See November 16, 2016 RGJ report:
    At Wednesday's meeting, Hall blamed Mausert for the increase in investigation costs. "It was a
    significant amount of money spent in responding to letters and correspondence submitted by counsel
    representing the claimants," Hall said. "Tens of thousands of dollars." Link:
    http://www.rgj.com/story/news/2016/11/16/clinger-investigation-cost-jumps-another-75000/94001888/
[28] Again, see Mr. Hall quotes under footnote 26.
[29] See Mr. Clinger's separation agreement
[30] See August 10, 2016 RGJ report:

1   conscious of the concept and application of privilege.  He deliberately abused the

2   settlement process to further cast plantiffs in a bad light.

3            In October 2016, Mr. Hall telephoned myself and requested a settlement

4   conference. I agreed.  On October 17, 2016, a meeting was held.  The three complainants,

5   including the two plaintiffs, attended along with myself, Mr. Hall, William Petersen,

6   Esq., Mayor Schieve, Councilwoman Duerr and Councilwoman Neoma Jardon.  Mr. Hall

7   arranged this meeting under false pretenses.  The purpose of the meeting was not to

8   discuss settlement, but rather to attempt to arrange ex parte contact between the Council

9   members and the complainants[31].  The specious settlement meeting was traumatic for the

10  plaintiffs and blindsided them.[32] The City had and has a right to forestall from settlement

11  negotiations.  The City does not have a right to set up a bait-and-switch meeting, via

12  dishonest communications to plaintiffs' counsel.

13           On October 7, 2016 Mr. Hall offered to put the complainants on administrative

14  leave while Judge Wall investigated the claims of retaliation. Mr. Hall had the plaintiffs

15  sign an agreement, which explicitly stated the leave was offered through the completion

16  of the investigation, which was to include recommendations from Special Counsel Kamer

17  on remediation. On November 17, prior to the completion of the Judge Wall Investigation

18  and prior to Mr. Kamer's recommendations for remediation, which were never

19  completed, Mr. Hall instructed Human Resources Director Leerman to order the

20  complainants back to work, effective immediately. When the complainants protested

21  nothing had been done to remediate an incredibly hostile work environment, Ms.

---

The Reno Gazette-Journal filed a public records request for the initial investigation report, as well as letters delivered to the city by Peterson. Reno City Attorney Karl Hall denied the request, claiming those details could harm the ongoing investigation. Link: http://www.rgj.com/story/news/2016/08/10/reno-council-hires-vegas-law-firm-manage-clinger-probe/88530648/

[31] Incidents which occur during settlement negotiations may be admissible in subsequent litigation. *Bergene v. Salt River Project Agricultural Improvement and Power District*, 272 F.3d 1136, 1144 (9th Cir. 2001). Here, plaintiffs do not seek to admit substantive statements regarding settlement, but rather the facts relative to Mr. Hall's abuse of the settlement process. The document Mr. Hall caused the plaintiffs to sign, whereby they agreed to confidentiality, is itself incriminatory. I regarded such a document as superfluous as I was aware substantive negotiations are inadmissible. Assent to the meeting was obtained via a subterfuge, as were the complainants' signatures.

[32] See Ms. Gescheider, Ms. McKissick and Ms. Wolf Declarations

1  Leerman said she agreed. It was Mr. Hall's orders and out of her power to control.[33] **Mr.**

2  **Hall personally forced the plaintiffs to resign.**

3       In *Pennsylvania State Police v. Suders*, 524 U.S. 129, 124 S.Ct. 2342, 2347, 159

4  L.Ed.2d 204 (2004), the Court described the circumstances under which a

5  constructive/wrongful discharge will be deemed to have occurred. A plaintiff "must show

6  that the abusive working environment became so intolerable that her resignation qualified

7  as a fitting response." In addition to not addressing retaliation by others, Mr. Hall

8  personally took actions and made statements which resulted in an intolerable working

9  environment for the plaintiffs, culminating in an order to return to an admittedly

10 unremediated environment permeated with retaliatory hostility.

11      Mr. Hall released heavily redacted copies of the Mercado Report and the Wall

12 Report. Mr. Hall released the Mercado Report, *even though he knew it was deeply flawed*,

13 as noted above. Mr. Hall released the Wall Report, even though it suffered the same flaws

14 as the Mercado Report absent interviews with the claimants.[34] Mr. Hall sought to

15 influence public opinion with the inaccurate and incomplete reports. He told a reporter

16 the heavy redactions were <u>only</u> done to protect identities.[35] This was not true. A review of

17 the unredacted Wall Report shows the redactions were not limited to protecting identities

18 but also concealed information the City clearly judged damaging; i.e. all references to the

19 "Hot Crazy Matrix" and "unicorn" were removed.[36]

20      Further, Mr. Hall chose to release these Report on December 26, 2016.

21 Incredibly, the City intended to release these Reports just before Christmas, ***for the***

22 ***express purpose of ruining the complainants' holidays***. The timing says it all. The City

23 planned to release the Reports just prior to Christmas but could not complete the

---

[33] See Ms. Gescheider and Ms. Wolf Declarations
[34] See November 2, 2016 report by News4:
     For now, it is very possible the investigation could wrap up without the women's participation. Hall was
     asked about that. He replied, "You know, without their input, it would probably be more lopsided."
     Link: http://mynews4.com/news/local/taxpayers-might-not-be-happy-with-clinger-investigation
[35] See December 28, 2016 report by News4:
     "News 4/Fox 11 asked Hall why full paragraphs were redacted from the report. He said, "There are
     paragraphs that would be indicative of people who participated in the investigation and certainly we
     want to make sure that we're protecting the identity of our employees so that they feel comfortable
     coming forward if they have any issues with their employment or the environment here at the city."
     *Additional note*: In the video interview the reporter asked "And that is the only reason things have been
     redacted?" Mr. Hall responded with an unequivocal "Yes." Link: http://mynews4.com/news/local/city-
     of-reno-prepares-for-next-steps-after-release-of-clinger-investigation-report
[36] See Wall Report pp. 4, 11, 19, 46, 49, 54, 58 and 78.

redactions in time. So someone was reduced to working over Christmas. Hence the release on the legal holiday. This is consistent with Mr. Hall's demand the complainants return to work the Monday of Thanksgiving week. That the City Attorney's Office was motived by malice is shocking. Mr. Hall's conduct was the antithesis of measured enforcement of the City's sexual harassment policies. It is well established it is insufficient merely to have a policy. The policy must be enforced. *Swinton v. Potomac Corporation*, 270 F.3d 794, 810-11 (9th Cir. 2001) (citations omitted).

Mr. Hall succeeded in manipulating the press. He also manipulated the City Council with the same tactic of biased and selective sharing of information. Mr. Hall failed in his obligation to promptly and fully inform his clients.

Per Human Resources Director Leerman, Mr. Hall failed to keep the City Council informed of the allegations against Mr. Clinger during the first investigation.  He cited confidentiality as his excuse for this failure.[37] Mr. Hall similarly justified his failure to timely inform the Council to Ms. Wolf on July 18, 2016 by stating he did not trust the Council and was worried the Council would initiate its own investigation.  In other words, Mr. Hall abdicated his fiduciary duty to his client, apparently because he wished to control the investigatory process.  When Ms. Wolf informed Mr. Hall City Policy 607 required Council be fully informed from the start and actively engaged throughout the process to respond to possible retaliation, Mr. Hall admitted he was not familiar with the policy. When Ms. Wolf pointed out Mr. Hall's decision to not inform Council favored Clinger, Mr. Hall shrugged.[38] Mr. Hall assumed control of a Title VII investigation process while ignorant of and indifference to City and Federal policies.

On July 18, 2016, Human Resources Director Leerman informed Ms. Wolf she and Mr. Hall had arrived at a strategy to employ the attorney-client privilege to inform Council while limiting public disclosure. When Ms. Wolf questioned why this mechanism was not employed earlier to properly inform Council – neither Ms. Leerman nor Mr. Hall had an answer. They promised to fully brief Council at an attorney-client session called during the July 20, 2016 regular Council meeting.[39] However, at that meeting, Mr. Hall only informed the Council the three complainants had retained counsel

---

[37] See Wall Report, p.46, first paragraph
[38] See, Ms. Wolf Declaration
[39] See Ms. Wolf Declaration

1    and of the need to prepare for litigation.[40]  Rather than describing the complaints, i.e.,

2    fully informing his client, Mr. Hall identified the three complainants by name and

3    instructed the City Council members to refrain from speaking with the complainants.[41]

4    Compounding the problem, Mr. Hall prevented the Council from speaking with the

5    claimants but did not prevent them from speaking with Mr. Clinger, Ms. Thomas or any

6    of the other perpetrators, essentially ensuring a one-sided view by the Council. Mr. Hall

7    ensured the complainants would not tell their story. He caused a letter to be sent which

8    threatened termination if confidentiality was violated.[42] The plaintiffs were gagged while

9    Mr. Hall, Mr. Clinger and Ms. Thomas presented a carefully crafted story to the Council,

10   City staff and the media.

11        As of October 17, 2016, Mr. Hall still failed his obligation to timely and fully

12   inform City Council of Mr. Clinger's misconduct – or any other details that were

13   unfavorable to himself – which meant the three Councilwomen who attended the

14   "settlement conference" knew practically nothing. The ignorance of the three

15   Councilwomen of the facts of the case was obvious. Their ignorance also became a topic

16   of conversation.  They were struck by how little they knew and by their lack of control,

17   e.g. they were shocked to learn the Acting City Manager Bill Thomas told the

18   complainants he could not keep them safe – the opposite message of what the

19   Councilwomen had asked Mr. Thomas to communicate.[43]

20        Even when Mr. Hall was expressly told of his obligation to inform the Council by

21   Ms. Wolf in July, he abdicated his duty. Four months later, Mr. Hall still had not

22   discharged this duty. Council is the ultimate decision maker and must be properly

---

[40] See September 30, 2016 RGJ report:
Reno City Attorney Karl Hall provided the attorney general with an affidavit saying he and another lawyer met with council members on July 20 to advise them of the three sexual harassment complaints against Clinger and discuss the potential litigation that may ensue. It appears July 20 was the first time Hall formally met with council to discuss the allegations from the three women that were filed June 29. Link: http://www.rgj.com/story/news/2016/09/30/ag-no-open-meeting-law-violation-reno-city-council/91320782/

[41] See Ms. McKissick Declaration and see September 30, 2016 RGJ article:
"Reno City Attorney Karl Hall provided the attorney general with an affidavit saying he and another lawyer met with council members on July 20 to advise them of the three sexual harassment complaints against Clinger and discuss the potential litigation that may ensue." Link: http://www.rgj.com/story/news/2016/09/30/ag-no-open-meeting-law-violation-reno-city-council/91320782/

[42] See Ms. Wolf and Ms. McKissick Declarations

[43] See Ms. Wolf Declaration

informed. Council is accountable for the vote to spend $225,000 on a second investigation because Mr. Hall mismanaged the first. *The City Council, before conclusion of this investigation, should have had the benefit of a full analysis of the liability of not agreeing to the complainants' terms to be interviewed by Judge Wall.* Council is accountable for the vote to award Clinger a full severance, pay his lawyer fees and indemnify him despite malfeasance that voided the obligation to pay. *The City Council, before disbursing these funds, should have had the benefit of full disclosure by the City Attorney of what he knew of sexual harassment, including retaliatory hostility, along with a learned dissertation of operative sexual harassment law*. Instead, Mr. Hall kept the City Council in ignorance while playing deceptive games with the press. Mr. Hall's failure to properly inform the Council has compromised this case to a point where liability and exposure is significantly increased.

It is reasonable to infer Mr. Hall has not informed Council there was another basis for refusing to pay Mr. Clinger severance: Mr. Clinger's extensive systematic destruction of public records. Mr. Clinger's use of the Slack and Telegram smartphone applications for the express purpose of avoiding public discovery is well documented in the Wall Report (see pp. 12-13, 19-20, 46, 49-50, 52, 87-88). And, of course, as described in the accompanying Declarations by Ms. McKissick, Ms. Gescheider and Ms. Wolf, prior to causing apps to be used to destroy records, Mr. Clinger presided over the manual destruction of records.  This activity went on, **for years**, during the watch of City Attorney Karl Hall. The Nevada Revised Statutes provide:

**239.320.  Injury to, concealment or falsification of records or papers by public officer.**

An officer who mutilates, destroys, conceals, erases, obliterates or falsifies any record or paper appertaining to his or her office, is guilty of a category C felony and shall be punished as provided in NRS 193.130.

Mr. Clinger's commission of hundreds, or thousands, of category C felonies constitutes malfeasance. The City, by virtue of Mr. Clinger's felonious conduct, is now exposed to sanctions, per claims of spoliation of evidence, in not just this case, but in any case relevant to the period in which text messages were destroyed. Mr. Hall downplayed Clinger's felonious conduct to the press. On August 11, 2017, Mr. Hall reasoned if Mr. Clinger did delete text messages relating to the conduct of the City government, no harm

1    was done as they were likely not related to City business.[44]  However, that is not the case.

2    Mr. Hall, when making this statement, had the benefit of the Wall Report, which

3    memorialized Clinger's admission, i.e., he implemented the Slack and Telegram apps *for*

4    *the express purpose of defeating public records requests*. Mr. Hall's proposition Mr.

5    Clinger presided over the destruction of thousands of messages between himself and

6    members of the Executive Staff, and none of those message concerned City business, is

7    incredible. Rather than deal with Mr. Clinger's felonious destruction of thousands of

8    records, Mr. Hall conjured a benign hypothetical, divorced from the facts he knew, to

9    justify payment to Mr. Clinger of a quarter of a million of taxpayer dollars, and his

10   inaction.  Mr. Hall's disingenuous statements establishes scienter, i.e., Mr. Hall's

11   determination to conceal Mr. Clinger's misconduct, and his own.

12         Mr. Hall sold Mr. Clinger's separation agreement during the September 14, 2016

13   Special Council Meeting by informing the Council the agreement was financially

14   favorable to the City. Mr. Hall's statement to the Council memorializes the fact he knew

15   commission of a felony was a basis to refuse payment to Mr. Clinger.[45] In fact, the

16   agreement appears to be obtained via fraud by commission and via fraud by omission.

17   Mr. Clinger lied about his sexual harassment activities, and probably delayed disclosing

18   repeated destruction of City records until after he had the benefit of indemnity pursuant to

19   the separation agreement. Mr. Clinger had a duty to disclose both activities to Mr. Hall.

20   Notwithstanding the fact the separation agreement was obtained by fraud, Mr. Hall has

21   done nothing to claw back the monies obtained by Mr. Clinger and his attorney.

---

[44] See August 11, 2017 RGJ report:
"I guess we'll have to do some discovery and determine whether or not any public records were destroyed or whether (he used the Telegraph app) as simply a means of communication between his subordinates," Hall said. Link: http://www.rgj.com/story/news/2017/08/09/two-women-file-sexual-harassment-lawsuit-against-city-reno/552890001/

[45] See excerpt from September 14, 2016 Reno City Council meeting minutes:
Mr. Hall stated that they would be responsible for the $197,885 unless there was a commission of gross misdemeanor, a felony, or willful or wonton conduct.  Under the terms of the contract there would have to be some significant wrongdoing, which we do not have any evidence there was, in order to avoid paying out the severance package that was agreed upon in his employment contract.  What we are achieving here with the separation agreement is the release of liability and a prompt resolution of this issue.  We are going to continue on with the investigation and those results will be presented to Council and made public.  Mr. Hall stated that he does not have any inkling that there is anything that would allow the City to avoid paying Mr. Clinger a severance package. Link: http://renocitynv.iqm2.com/Citizens/Detail_Meeting.aspx?ID=1615

To a considerable extent, this case is the direct result of Mr. Hall's actions and statements. It is important to bear in mind that, with Mr. Hall's acquiescence, the plaintiffs were told they ***must complain if they knew of sexual harassment***. They were instructed to complain. When they did, Mr. Hall turned on them. Instead of immediately causing a fair and thorough investigation to be conducted, while keeping his client fully apprised, and then causing prompt and effective remedial action to be taken, Mr. Hall delayed. Before knowing the facts, he aligned himself with Mr. Clinger. Hall then structured Ms. Mercado's investigation by placing strict and very narrow parameters – to the extent Ms. Mercado, a skilled Title VII attorney, was reduced to ignoring very important evidence and coming to an erroneous result. Mr. Hall, in addition to his other indiscretions, revealed to the perpetrator the identity of a complainant, characterized the investigation as a "witch hunt," and compromised Judge Wall's independence by sabotaging Judge Wall's ability to interview the complainants, forcing him to rely on the faulty Mercado Report as the basis for his own. And Judge Wall's untimely investigation ignored the complaints of retaliation. Mr. Hall indulged in direct retaliatory hostility himself and allowed/encouraged Mr. Clinger, Ms. Thomas and others to do the same, ultimately resulting in constructive discharges. Mr. Hall oversaw a payment of a quarter of a million dollars and gave indemnity to a man who admitted to numerous felonies while employed as City Manager. All while keeping his clients in the dark. Mr. Hall is the perpetrator of much of the retaliatory hostility described in the Complaint and Jury Demand. Accordingly it would be a conflict of interest for him, or any member of the City Attorney's Office, to defend the City against the actions taken, or not taken, by Mr. Hall.

Mr. Hall treated the complainants as the enemy, based on the assumption litigation would eventually ensure. He created a prolepsis. A fair and thorough investigation, followed by effective remedial action, would have forestalled litigation. ***The plaintiffs did not want to resign, or sue. They wanted to do their jobs in an environment free of high-school type sexual intrigue and cruelty***. Instead of following City policies, i.e., the policies the plaintiffs were promised would be enforced, Mr. Hall treated the complaints of sexual harassment as challenges to his authority. The concept of a thorough investigation and appropriate discipline were disregarded. Mr. Hall actively

1  drew battle lines at every turn. His behavior, in the context of Mr. Clinger's conduct and

2  the instruction to the plaintiffs to report, is an abrogation of his duties as the City

3  Attorney.

4

5  **Argument: THE CITY ATTORNEY'S OFFICE WILL ULTIMATELY BE**

6  **RECUSED. IT WILL BE UNABLE TO TRY THIS CASE.**

7          City Attorney Karl Hall is a central figure in this case. He will be a witness.

8  Deputy City Attorney John Shipman and Deputy City Attorney Mark Dunagan were also

9  players/witnesses in this fact pattern. All three of these attorneys will be deposed and

10  may be called upon to testify during trial. Mr. Hall acknowledged he will be a witness

11  and unable to represent the City at trial on January 18, 2017.[46] Rule 3.7 of the Nevada

12  Rules of Professional Conduct will preclude Attorney's Hall, Shipman and Dunagan from

13  acting as advocates.

14      **Rule 3.7. Lawyer as Witness.**

15          (a) *A lawyer shall not act as advocate at a trial in which the lawyer is likely to*

16      *be a necessary witness* unless:

17          (1) The testimony relates to an uncontested issue;

18          (2) The testimony relates to the nature and value of legal services rendered in

19      the case; or

20          (3) Disqualification of the lawyer would work substantial hardship on the client.

21          (b) A lawyer may act as advocate in a trial in which another lawyer in the

22      lawyer's firm is likely to be called as a witness unless precluded from doing so by

23      Rule 1.7 or Rule 1.9

24  Emphasis added.

25          Any attorney, hired to litigate at trial will have to expend considerable effort to

26  acquire familiarity with this case. Accordingly, recusing the City Attorney's office at this

27  time does not impose an undue burden on the City.

28          As noted, in January 2017 City Attorney Karl Hall acknowledged the need to hire

29  independent counsel to handle this litigation. Yet instead of hiring outside counsel, Mr.

30  Hall subsequently designated a subordinate, Mr. Cooper, to litigate this case claiming he

---

[46] See January 18, 2017 RGJ report:
    Hall confirmed that he received one of the claims from the NERC this week and will ask the Reno City
    Council at an upcoming meeting to hire another outside lawyer to defend the city against that claim.
    Mausert has continually called Hall's role in the investigation into question, saying Hall showed
    favoritism to Clinger. Hall denies that, but said he likely will be called as a witness in any lawsuit and
    thus can't defend the city in this case. Link: http://www.rgj.com/story/news/2017/01/18/new-clinger-
    documents-settlement-talks-centered-18-million-request/96735710/

1    would not be involved personally.[47] Mr. Hall was not supposed to be involved in the Wall

2    Investigation, but he nonetheless sabotaged that investigation. Rule 1.10 of the Nevada

3    Rules of Professional Conduct reads:

4    **Rule 1.10 Imputation of Conflicts of Interest.**

5    (a) *While lawyers are associated in a firm, none of them shall knowingly*
6    *represent a client when any one of them practicing alone would be prohibited*
7    *from doing so* by Rules 1.7, 1.9, or 2.2, unless the prohibition is based on a
8    personal interest of the prohibited lawyer and does not present a significant risk of
9    materially limiting the representation of the client by the remaining lawyers in the
10   firm.

11   Emphasis added.

12   Pursuant to Rule 1.10 the City Attorney's office cannot litigate this case at trial.

13   Mr. Hall, the central actor in this case, supervises Mr. Cooper, and all other attorneys in

14   his office. Further, the proposition Mr. Cooper can represent the City absent supervision

15   by Mr. Hall breaches the integrity of the attorney-client relationship between the City

16   Attorney's Office and the City. Mr. Cooper is not an elected official. Independent counsel

17   must be retained for trial. ***Recusal at this time will ensure a fair and independent***

18   ***handling of the case prior to trial.***

19   //

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27   //

28   //

---

[47] See August 11, 2017 RGJ report:
Reno City Attorney Karl Hall said the allegations in the lawsuit are without merit and vowed to defend
the city. Hall, who is accused throughout the lawsuit of bungling the investigations into the women's
complaints, said his office, and not an outside lawyer, will handle the defense against the lawsuit. "I am
going to assign it to (Deputy City Attorney) William Cooper," Hall said. "He is going to handle it and
I'm not going to be involved personally in the defense." Link:
http://www.rgj.com/story/news/2017/08/09/two-women-file-sexual-harassment-lawsuit-against-city-
reno/552890001/

<u>Conclusion</u>

This case concerns Mr. Hall's conduct, and secondarily that of Mr. Clinger. ***This case exists because of Mr. Hall's decisions and actions***. Mr. Hall's conduct has fallen so far below the standard of care as to create a conflict of interest. Yet, as this case moves forward, Mr. Hall who has already demonstrated a penchant for failing to provide his client with material information and engaging in misconduct, will be in control. The City Attorney's Office should be recused.

DATED this 31st day of October, 2017.

<u>/s/ Mark Mausert</u>

Mark Mausert
NV Bar No. 2398
930 Evans Avenue
Reno, NV 89512
TELEPHONE:(775) 786-5477
FACSIMILE: (775) 786-9658
Attorney for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify, under penalty of perjury that I am an employee of Mark Mausert, Esq.; I am over the age of eighteen (18) years; I am not a party to, nor hold an interest in this action; and on the date set below, I sent via First Class mail, a true copy of the foregoing document, **PLAINTIFF'S MOTION TO RECUSE THE RENO CITY ATTORNEY'S OFFICE**, with the United States Postal Service in Reno, Nevada, to the address below:

WILLIAM E. COOPER
Reno City Attorney's Office
P.O. Box 1900
Reno, Nevada 89505

DATED this 31st day of October, 2017.


   __/s/ Brittaney Martin
Employee of Mark Mausert, Esq.

## INDEX OF EXHIBITS

Exhibit One…………………………………………………………Redacted Wall Report

Exhibit Two………………………………………………….…Redacted Mercado Report

Exhibit Three………………………………………………………………City Policy 607

Exhibit Four………………………………………………..……Clinger Separation Agreement

Exhibit Five…………………………………...…………Declaration of Maureen McKissick

Exhibit Six…………………………………………..…Declaration of Deanna Gescheider

Exhibit Seven……………………………………………...…Declaration of Brianna Wolf