# EXHIBIT 1

EXHIBIT 1



November 23, 2016

Edwin A. Keller, Esq.
Gregory J. Kamer, Esq.
Kamer, Zucker & Abbott
300 W. Charleston Blvd.
Suite 3
Las Vegas, NV 89102

Re: City of Reno
JAMS Ref. #: 1260004021

Gentlemen:

Attached please find the Report of Investigation regarding allegations made against the Reno City Manager. Along with the report I am forwarding an Appendix of exhibits referenced in the Report.

There are certain documents that are not contained within the Appendix that were still considered in preparing the Report. I received a number of documents from John Gallagher, Esq., counsel for Mr. Clinger, including Bates-stamped, printed text message histories between Clinger and [redacted] and [redacted] Some of those text messages have been quoted in the Report. Citations have been made to the Bates-numbered pages, but I have not included the message histories in the Appendix, based on Mr. Gallagher's request that I protect privacy concerns. I would assume the documents are available to be acquired from Mr. Gallagher.

Other than those documents, I have not taken steps to redact information from the Report, or from the documents in the Appendix. I have left the decisions about redactions in your capable hands.

Thank you for this most interesting assignment. Please let me know if I can provide any further information, or if you find items in the Report that require correction. I have endeavored to avoid errors in the Report.

Respectfully,

Hon. David T. Wall, (Ret.)
JAMS




CONFIDENTIAL INVESTIGATION REPORT

**NOVEMBER 21, 2016**

## I. Introduction

On or about August 23, 2016, the JAMS Las Vegas office was contacted by special counsel for the City of Reno, Edwin A. Keller, Esq., of the law firm of Kamer Zucker Abbott, regarding the need for a neutral third party investigator to conduct fact finding into allegations of misconduct against Reno's City Manager.

On August 29, 2016, Mr. Keller notified JAMS that he had initiated the process of having the undersigned appointed as the third party investigator charged with conducting fact finding into allegations made by three City of Reno employees of employment discrimination, harassment and/or retaliation. I was further charged with preparing the instant Report of my findings, including credibility assessments for review and consideration by the Reno City Council. On August 30, 2016, the undersigned accepted the appointment. On the same date, Mr. Keller advised JAMS that the matter of my appointment would be considered at a special meeting of the Reno City Council on September 6, 2016. On September 1, 2016, Mr. Keller in an email proposed the following language regarding the scope of services to be provided by the investigator:

> **Neutral fact finding as a third party investigator concerning allegations of alleged misconduct by the City Manager and related allegations of retaliatory actions, inclusive of any allegations not addressed in the initial investigator's report and those warranting further factual inquiry based on exercise of independent professional judgment. Utilization of fact-finding techniques, such as witness interviews, examination of documents, and the review/inspection of other forms of information and tangible items. Preparation of written report detailing factual findings and any credibility assessments for submission to the Reno City Council.**

In conjunction with the foregoing, in conversations with Mr. Keller and Gregory J. Kamer, Esq., also of Kamer Zucker Abbott, I was specifically instructed to limit my Report to factual findings and NOT to apply the provisions of either City of Reno Policies or applicable Nevada (or federal) law to the facts to reach legal conclusions. Further, I was given the latitude to "go where the facts lead you."

## II. Background of Investigation

The investigation stems from verbal complaints made to the City of Reno Human Resources Department by the following City of Reno employees (hereinafter collectively referred to as "the complainants"):

- [redacted] (complaint made June 29, 2016)
- [redacted] (complaint made July 1, 2016)

- (complaint made July 1, 2016)

Following these complaints, an investigation was conducted by Reno attorney Alice Campos-Mercado, Esq., (hereinafter "Mercado"), culminating in a report dated July 21, 2016. After correspondence and conversations with counsel for the three above-reference claimants, the City Attorney and the City Council determined that another investigation should be conducted. Reno attorney Bonnie Drinkwater, Esq., was originally chosen to conduct the second investigation. At some point thereafter, it was determined that the undersigned would be appointed to conduct the instant investigation.

During this investigation, the following individuals were contacted and/or interviewed (listed alphabetically):

David Bobzien, Councilman, City of Reno
Jenny Brekhus, Councilwoman, City of Reno
Andrew Clinger, former City Manager, City of Reno
Oscar Delgado, Councilman, City of Reno
Naomi Duerr, Councilwoman, City of Reno
John Gallagher, attorney for Andrew Clinger
Karl Hall, City Attorney, City of Reno
Neoma Jardon, Councilwoman, City of Reno
Kelly Leerman, City of Reno Human Resources Director, City of Reno
Mark Mausert, Esq., attorney for claimants
Paul McKenzie, Councilman, City of Reno
William E. Peterson, Esq., attorney for claimants
Hillary Schieve, Mayor, City of Reno
Anthony Tansimore, Vice President of Leadership Impact, Olive Grove Consulting

Notably absent from the foregoing list are the three complainants, and Repeated attempts were made to interview them, without success. It should be noted that I have been provided with copies of emails to Human Resources Director Kelly Leerman in September from both and indicating their willingness to be interviewed, subject to the approval of their attorney. I have had numerous conversations with their previous attorney, Mr. Peterson, and their current attorney, Mr. Mausert, regarding this issue. I am aware that negotiations were undertaken between Mr. Mausert and special counsel for the City (and the City Attorney) regarding the potential future use of information obtained from the interviews, as I was copied on correspondence regarding that issue. I have not injected myself into those negotiations and take no position as to the validity of any position taken therein. Ultimately no compromise was reached such that the complainants' counsel would allow the interviews to go forward. I would note that the three complainants were interviewed by the prior investigator, Ms. Mercado, who summarized those interviews in her Report of July 21, 2016.

The inability to speak with [redacted] made the completion of the instant investigation far more challenging. Access to the complainants would have allowed me to ask cogent questions regarding their claims, to further attempt to seek corroboration thereof, to request access to certain documents and personal information they possess and to take normal investigatory steps to determine facts and assess credibility. Credibility assessment is normally conducted in one-on-one interviews or otherwise determined in the existence or non-existence of corroborative evidence. Additionally, in interviews the claimants would have had the opportunity to support their versions of events. It is therefore a fair criticism of this Report to allege that it was completed without having spoken with the very complainants who necessitated it in the first place.

In lieu of such interviews, I have examined the following just to fully identify the allegations made by the complainants:

- Notes of Human Resources Director Kelly Leerman, who took the verbal complaints (Appendix, Exhibit 1);
- Summary of interviews conducted by Alice Campos-Mercado, Esq. as contained in her Report;
- Correspondence from William E. Peterson, Esq., counsel for complainants, to City Attorney Karl Hall, Esq., dated July 20, 2016, July 22, 2016, July 26, 2016, July 29, 2016, and August 1, 2016, with attachments, which outline the nature of the complaints (See 7/26/16 letter with attachments, Appendix, Exhibit 2);
- Correspondence from William E. Peterson, Esq., counsel for complainants, to Bonnie Drinkwater, Esq., dated July 28, 2016, which cites to information Ms. Drinkwater should have to conduct the investigation.
- Correspondence from Mark Mausert, Esq., to Edwin Keller, Esq., Special Counsel to the City of Reno, on August 30, 2016, September 22, 2016, September 28, 2016 (described therein as "an outline of the sexual harassment, retaliation and hostile work environment problems caused by former City Manager Clinger with assistance of others," but with caution that it "does not constitute a comprehensive list"), September 29, 2016, October 10, 2016 and October 11, 2016.

In addition, I have had the following conversations with counsel for the complainants to help identify their allegations (not an exhaustive list):

- Telephone conference with William E. Peterson, Esq., counsel for complainants, on or about September 18, 2016;
- Telephone conferences with Mark Mausert, Esq., counsel for complainants, on or about September 18, 2016, September 21, 2016 and October 16, 2016;

It must be noted that with respect to the summary of interviews of the complainants as conducted by Ms. Mercado, I fully appreciate that they are not valid substitutes for interviews I might have conducted. However, I interviewed as many as seven other individuals who were also interviewed by Ms. Mercado. On many occasions, I asked interviewees whether they had in fact told Ms. Mercado certain things that were contained in her Report. In virtually every instance, the interviewee related that they had in fact given Ms. Mercado that exact information. It is with that underlying confidence that I considered certain information given by the complainants to Ms. Mercado as reflected in her Report.

Therefore, based on the foregoing, I believe I have sufficient information with which to understand and investigate the claims of the complainants.

In addition to the materials listed above, among the many documents I have reviewed during the course of the investigation are the following (not an exhaustive list):

- Confidential Report of Investigation dated July 21, 2016, by Alice Campos-Mercado, Esq. (Appendix, Exhibit 3);
- Interview Notes and Harassment Interview Outline from the investigation file of Ms. Mercado (Appendix, Exhibit 4);
- City of Reno Equal Employment Opportunity and Non-Discrimination Policy 603 and City of Reno Prohibited Discrimination, Harassment and Retaliation Policy 607 (Appendix, Exhibit 5);
- 2016 City Manager Performance Review, employee survey results (Appendix, Exhibit 6);
- City Manager Annual Performance Evaluation form, completed by Councilwoman Jenny Brekhus (Appendix, Exhibit 7);
- Notes from files of [REDACTED] (Appendix, Exhibit 8);
- Human Resource Director Kelly Leerman's notes of a conversation with [REDACTED] on July 3, 2016 (Appendix, Exhibit 9);
- [REDACTED] (Appendix, Exhibit 10);
- Emails regarding the investigation from the files of Kelly Leerman, Human Resources Director;
- Human Resources Department memo from Kelly Leerman dated August 29, 2016, Subject: Record of Interactions with Claimants (Appendix, Exhibit 11);
- [REDACTED] (Appendix, Exhibit 12);
- Security Log of Key Card use from July 27-30, 2016 (Appendix, Exhibit 13);
- [REDACTED] (Appendix, Exhibit 14);
- [REDACTED]
- [REDACTED] (Appendix, Exhibit 15);
- Text conversation history between Andrew Clinger and [REDACTED] from October 12, 2015 to August 7, 2016, Bates numbered CLI-00208 to CLI-00450;

[1] The entire compilations of texts between Clinger and [REDACTED] Clinger and [REDACTED] and Clinger and [REDACTED] are not attached as exhibits, based on privacy concerns regarding the individuals involved. Certain texts, or strings of texts, if relevant, are referenced herein. All of the text compilations were received from the office of John Gallagher, Esq., counsel for Andrew Clinger, who requested that I be sensitive to such privacy concerns before releasing the compilations in their entirety. I have referenced Bates numbers for the compilations I reviewed. It appears that the texts were taken from Clinger's mobile phone and compiled using a computer application called TouchCopy.

- Text conversation history between Andrew Clinger and [redacted] from October 12, 2015 to August 4, 2016, Bates numbered CLI-00451 to CLI-00518;
- Text message from Mayor Hillary Schieve to Andrew Clinger dated June 20, 2016, Bates numbered CLI-00519 (Appendix, Exhibit 16);
- "Statement from Andrew Clinger Regarding Alleged Sexual Harassment" dated July 30, 2016, for release to press, Bates numbered CLI-00520;
- "Statement by Andrew Clinger" dated September 8, 2016, for release to press, Bates numbered CLI-00521;
- Copies of newspaper articles covering accusations of sexual harassment against City Manager, Bates numbered CLI-00522 to CLI-00565;
- City of Reno Governance Project Report by Olive Grove Consulting, July 2016, Bates numbered CLI-00566 to CLI-00591 (Appendix, Exhibit 17);
- Copy of a litigation hold letter hand-delivered by City Attorney Karl Hall, Esq., to Andrew Clinger on or about July 25, 2016 (Appendix, Exhibit 18);
- Emails and text messages from the files of [redacted] (Appendix, Exhibit 19);
- Separation Agreement between Andrew Clinger and City of Reno dated September 14, 2016 (Appendix, Exhibit 20);

## III. Factual Background

Throughout this Report, certain individuals and landmark dates are referred to repeatedly. It is necessary at the outset, to give context to certain information, to provide background for the individuals and events mentioned herein.

### A. Individuals

As of 2016, Reno was governed by a City Council of seven, which includes the Mayor. Mayor Hillary Schieve has served in that capacity since 2014. Other current Council members include David Bobzien, Jenny Brekhus, Oscar Delgado, Naomi Duerr, Neoma Jardon and Paul McKenzie.

Andrew Clinger served as the City Manager for the City of Reno since 2011, before any member of the current City Council had begun serving. The City Manager reports to the City Council. In 2016, the two Assistant City Managers were Kate Thomas and Bill Thomas (not related), both reporting to Clinger.

Karl Hall is the City Attorney for the City of Reno, elected to the position in 2014.



Kelly Leerman is the Human Resources Director



Anthony Tansimore does not work for the City of Reno, but is Vice President of Leadership Impact for a consulting company called Olive Grove, which was retained by the City of Reno to perform consulting services for the City Council and the City Manager (and his staff).

B. Milestone Dates

Certain dates are referred to by many of the interviewees, and are central to an understanding of the sequence of events:

- 2011 – Andrew Clinger becomes Reno City Manager
- 2012 – Hillary Schieve, Jenny Brekhus, Neoma Jordan and Oscar Delgado are elected to the Reno City Council
- 2014 –Naomi Duerr and Paul McKenzie are elected to the Reno City Council and Hillary Schieve wins election to become Mayor of Reno. David Bobzien is appointed to the Council to fill the vacancy created with Schieve's ascension to Mayor
- 
- 6/21/16 – A Special City Council Meeting is conducted for the annual Performance Evaluation of City Manager Andrew Clinger; each of the Council members made public remarks regarding Clinger's performance as City Manager, including Councilwoman Naomi Duerr, who commented on "a sense of fear" among female managers in the City's employ; ultimately, the meeting concludes with a unanimous vote to renew Clinger's contract for two years, with a 3% raise
- 6/22/16 – A Meeting called by Mayor Schieve to include [redacted] staff for the purpose of educating City employees on the City's Sexual Harassment and Retaliation policies

- 6/29/16 – [REDACTED] makes a verbal sexual harassment, retaliation and hostile work environment complaint against Clinger to Human Resources

- 7/1/16 – [REDACTED] makes a verbal sexual harassment, retaliation and hostile work environment complaint against Clinger to Human Resources

  - Later the same day, [REDACTED] makes a verbal sexual harassment, retaliation and hostile work environment complaint against Clinger to Human Resources

- 7/3/16 – [REDACTED] makes a verbal report to Human Resources to corroborate a portion of the complaint made by [REDACTED]

- 7/21/16 – The Investigation Report of Alice Campos-Mercado, Esq. is forwarded to Human Resources and the City Attorney

- 7/29/16 – [REDACTED] reports the theft of certain case-related documents from [REDACTED] City office

- 9/14/16 – Andrew Clinger signs a Separation Agreement with the City

C. City Policies

At all material times herein, the City of Reno had in place two policies pertinent to this investigation.

Management Policy 603, "Equal Employment Opportunity and Non-Discrimination," generally ensures that all employment related decisions are based on individual qualifications and merit, without regard to race, creed, color, national origin, sex, sexual orientation, religion, age, disability, political affiliation, membership in an employee association, or any other protected-class status under the law." (Appendix, Exhibit 5)

Management Policy 607, "Prohibited Discrimination, Harassment and Retaliation Policy," generally recognizes every employee's right to work in an environment promoting equal employment opportunities free of harassment, discrimination or retaliation. The policy goes on to broadly define and provide examples of direct and indirect sexual harassment in the workplace. Further, the policy provides that the Human Resources office and the City Attorney share responsibilities for investigating sexual harassment complaints and describes the procedure for such an investigation. An investigation may be initiated on either an employee's written or verbal complaint to Human Resources. Notably, Policy 607 provides that, "Confidentiality will be maintained throughout the interview process to the extent consistent with conducting an investigation and determining appropriate corrective action." (Appendix, Exhibit 5)

## IV. The Complaints

A. [REDACTED]

On June 29, 2016, made a verbal complaint to Human Resources Director Kelly Leerman (Appendix, Exhibit 1). Leerman's notes of the meeting indicate the following:

- stated that in May of 2015, when she heard City Manager Andrew Clinger and stated that to her knowledge, Clinger and were unaware of her presence. She heard Clinger and talking and "groping each other in a sexual way."

- Further, complained more generally that Clinger makes her uncomfortable by stopping at her workstation. Although he does not make overtly inappropriate comments, she feels he is gauging her approval of him and her potential interest in him.

- also complained that the and has been seen to enter Clinger's office and close the door. told Leerman that she is unaware of any legitimate business reason for to be seeing the City Manager on such occasions.

- Additionally, complained of Clinger notes that became upset about this and took her anger out on opines that Clinger creates such conflicts and does nothing to resolve them. told Leerman that Clinger's ineffectiveness is shown by the fact that he has allowed unqualified individuals (like ) to "sleep their way into the job they're in." sees this as evidence of Clinger's lack of judgment and professionalism.

On July 12, 2016, was interviewed by Alice Campos-Mercado as part of the initial investigation of these complaints (Appendix, Exhibit 3). Mercado's report reflects the following additional facts obtained during her interview of

- Regarding the May, 2015 incident didn't actually see anything occur between Clinger and She heard the rustling of clothing that led her to believe they were groping one another. She couldn't make out any conversation between the two, but heard what she described as moans and giggling "like of pleasure," which she construed as the two of them "mutually responding to pleasure." She indicated that this was the only such instance of any behavior between and Clinger that she witnessed.

- She indicated that she had not reported this incident for over a year . She was moved to report the incident after being apprised of the Mayor's meeting on sexual harassment and after speaking with

- Regarding Clinger's general behavior, she described him as "smarmy" and "flirtatious" and of "no substance." She could not say that he had ever said anything sexually inappropriate to her or touched her inappropriately at any time.

- Further, told Mercado that she has no knowledge of anyone who "slept their way to the top" in City government. She has heard rumors of a romantic relationship between and Clinger but has no evidence thereof, other than what she believes she heard in May of 2015.

- described the relationship between Clinger and as more casual than professional, and that the relationship makes the workplace uncomfortable. This tension is the result of the way treats says the tension and work caused significant stress to She believes this tension is rooted in the conduct of Clinger's unprofessional relationship with

- also told Mercado that while she has seen the enter Clinger's office, she has no facts to support her suspicion of any improper relations between the two.

- When asked what she hoped to see from the initial investigation, indicated that she wanted to see the truth revealed, and that there might be consequences for the "dysfunctioning dynamic" affecting the workplace. She also wanted Clinger and held accountable for not doing their jobs.

In correspondence dated July 26, 2016, attorney William Peterson, Esq., wrote to City Attorney Karl Hall regarding the allegations that had been made (Appendix, Exhibit 2). Attached to that letter was an Exhibit A, described by Peterson as a report authored by describing acts and conduct perpetrated by Clinger and some of which were alleged to have been retaliatory in nature once had made a complaint against Clinger. Some of the additional allegations contained in Exhibit A include the following:

- Regarding the effect that Clinger and personal relationship had on the office atmosphere, indicated that charged that Clinger allowed for such "scapegoating" conduct because of his close personal relationship with

- complained about the manner in which the investigation was handled by City officials, including the fact that City Attorney Karl Hall failed to protect the confidentiality of her claim by apprising Clinger of the nature of the complaint as well as the fact that had been the one to file it. She believes that Clinger told others of identity as the complainant, which made the workplace even more uncomfortable for

- further complained that she believes the City policies require that the City Council and the Mayor should have been informed of the complaint, since they ultimately retain supervisory authority over the City Manager. She believes the City policies have been implemented in a manner more favorable toward Clinger.

- recommended that be interviewed as a "critical witness" in the investigation.

B.

On July 1, 2016, made a verbal complaint to Human Resources Director Kelly Leerman (Appendix, Exhibit 1). Leerman's notes of the meeting indicate the following:

- [redacted] reported that she believes that Andrew Clinger and [redacted] are involved in a romantic relationship. She sensed this based on their familiarity with one another and based on the fact that many other co-workers have asked her about whether the two are involved in an affair.

- [redacted] believes that Clinger makes organizational workload decisions based on personal relationships and not competency or qualifications. She believes there's no accountability for [redacted] work-related mistakes.

- She referenced the [redacted] ongoing negative attitude created an unprofessional and uncomfortable work environment.

- Like [redacted] reported that [redacted] spent too much time [redacted] especially after hours. [redacted] said there's no business reason for [redacted] to have interaction with Clinger. She also reports that on occasion, Clinger and [redacted] would "disappear" for periods of time.

- [redacted] related that [redacted] asked [redacted] to help her deal with Clinger. [redacted] told [redacted] that she believed Clinger was making unwanted romantic or sexual advances on [redacted] She asked [redacted] to sit between Clinger and [redacted] during meetings, because [redacted] was uncomfortable sitting next to Clinger. [redacted] related to [redacted] an incident where Clinger had touched her leg during a meeting, as well as another incident where Clinger rubbed [redacted] neck. [redacted] did not witness either of these events. [redacted] did witness Clinger treating [redacted] in a disrespectful manner, however.

- [redacted] told Leerman that she believed Clinger's incompetence and lack of leadership created a hostile, ineffective and corrupt work environment. Further, she believed Clinger made [redacted] the "scapegoat" for all of the inappropriateness.

On July 8, 2016, [redacted] was interviewed by Alice Campos-Mercado as part of the initial investigation of these complaints (Appendix, Exhibit 3). Mercado's report reflects the following additional facts obtained during the interview of [redacted]

- [redacted] told Mercado that [redacted] had reported to her the incident she witnessed in 2015 between [redacted] and Clinger. [redacted] encouraged [redacted] to report it to Human Resources.

- [redacted]

- [redacted] told Mercado that Clinger did not treat people differently based on gender. She decried the lack of professionalism and effectiveness in the office, and the fact that certain people (like [redacted]) are elevated based on favoritism rather than competence. She described [redacted] as a "toxic cesspool."

- [redacted] conceded to Mercado that she has no personal knowledge to establish the existence of a romantic relationship between Clinger and [redacted]

In an email dated July 20, 2016, [redacted] outlined for Leerman instances of ongoing conduct that [redacted] believed constituted hostility and retaliation (Appendix, Exhibit 3, attached as an exhibit to Mercado's Report of Investigation). In that email, [redacted] related the following:

"This email documents what I have been experiencing in the wake of notifying your office of my workplace environment conditions:

1. The office atmosphere [redacted] has become unbearably hostile and tense. I am being ostracized and avoided. The isolation is so unpleasant that I am developing headaches, have difficulty sleeping, and am having a hard time doing my work. I no longer feel comfortable coming in on weekends or staying late at night – which I formerly did regularly and is necessary because of my heavy workload.

2. [redacted] I do not know where. Or when.

3. I learned last night that there are discussions underway [redacted] No one has spoken to me directly. Another staff person who had been speaking with [redacted] filled me in – sort of as a heads up.

4. Additional staff members from several departments have also told me that [redacted] has ben bad-mouthing me to them, implying that I am receiving undeserved and preferential treatment. [redacted] frequently fraternizes with [redacted] office daily) and I know that these are opinions that [redacted] holds -- I have overheard some of [redacted] conversations.

I feel strongly that had the city's investigative process been conducted confidentially, as the city policy requires, I would not be experiencing these conditions."

In correspondence dated September 28, 2016, [redacted] attorney, Mark Mausert, Esq., wrote to Mr. Keller of Kamer Zucker Abbott and elaborated on [redacted] claims of a hostile work environment. Some of the additional allegations include the following:

- Clinger [redacted] through Mausert,

[REDACTED] as evidence of unprofessionalism and also alleges that Clinger regularly referred to [REDACTED]

- Mausert, on [REDACTED] behalf, described [REDACTED] ire toward [REDACTED] as including denigrating remarks and open hostility as well as a refusal to speak with [REDACTED]

- Mausert also describes the [REDACTED]

On November 18, 2016, [REDACTED] copied me on her letter of resignation from the City. [REDACTED] cited to hostility within City offices [REDACTED] as the main reason for her "constructive discharge." She also cited to the fact that she has been "excluded from the second investigation" as a result of the City not agreeing to certain terms as conditions for her participation.

C. [REDACTED]

On July 1, 2016, [REDACTED] made a verbal complaint to Human Resources Director Kelly Leerman (Appendix, Exhibit 1). Leerman's notes indicate the following:

- [REDACTED] first concern communicated to Leerman was that she might become a victim of retaliation [REDACTED] believed that [REDACTED] discovery of this [REDACTED] has angered [REDACTED] so she fears retaliation.

- [REDACTED] says one reason she feared retaliation is that Clinger treats her badly already. She believes he uses power over women to "keep them down."

- [REDACTED] described a meeting [REDACTED] with [REDACTED] which became contentious. After the meeting, [REDACTED] asked [REDACTED] "Hey [REDACTED] are we okay?" [REDACTED] was too upset to respond. All three got on the elevator, which stopped on the next floor, at which time Clinger entered the elevator with them. In the elevator, [REDACTED] asked [REDACTED] are we okay?" At this point, [REDACTED] said Clinger reached over, stroked the side of her neck with his fingers several times, and said, "If she gets red right here, she is not okay." Everyone but [REDACTED] chuckled at the statement, at which point [REDACTED] embarrassed and humiliated, got off the elevator.

- [REDACTED] related that Clinger had made romantic advances on her, and that she had specifically told him she was not interested in a relationship.

- She related that in March of 2016, Clinger had asked [REDACTED] to download an application designed to allow for texting within a group such that the texts would not later be traceable or recoverable, and therefore not subject to a public records request. [REDACTED] said everyone downloaded it, but that she and [REDACTED] did not

use it. Weeks later, Clinger found a new and similar application, called "Telegram," but only asked [REDACTED] and [REDACTED] to download it, along with Clinger. It allowed for texts to be communicated between those individuals, but had a special feature that made the texts disappear shortly after being reviewed. Since Clinger [REDACTED] [REDACTED] said she acquiesced and downloaded the app. She then began to get "flirty and sexually inappropriate" texts from Clinger using that app. She said she felt compelled to respond, since Clinger was texting her directly. At some point, Clinger asked her to text photos of herself, but [REDACTED] never did. Shortly thereafter, [REDACTED] deleted the app. When she deleted it, she told Clinger that she was married and didn't want to participate in texts or have him make any more advances on her.

- [REDACTED] described an incident in May of 2016 at the Coffee Bar, [REDACTED] [REDACTED]. [REDACTED] tried not to sit next to Clinger, but on this occasion he patted an empty seat next to him and urged her to sit there. Feeling awkward with the situation, she complied. While seated there, Clinger "put his hand on my thigh and rubbed his hand up and down my leg several times, much longer than it would take to feel the fabric." She indicated that [REDACTED] [REDACTED] witnessed this conduct.

- On a subsequent occasion at the Coffee Bar, [REDACTED] again tried not to sit next to Clinger, but again he patted the chair next to him and insisted she sit next to him. Again, she acquiesced.

- In June of 2016, Clinger received the results of the anonymous employee survey in advance of his annual performance evaluation. He asked [REDACTED] and [REDACTED] how they felt about his performance as City Manager, and seemed depressed by some of the responses to the survey.

- After the City Council meeting on June 21, 2016, when Clinger's contract with the City was renewed for two additional years, Clinger had a meeting with [REDACTED] with no one else present. He told her, "I will be here two more years and I will find out who is bad-mouthing me to Council and I will take care of it."

- [REDACTED] indicated that only male [REDACTED] are allowed to talk directly to Council members. She said Clinger has forbidden female [REDACTED] from talking to Council.

On July 11, 2016, [REDACTED] was interviewed by Alice Campos-Mercado as part of the initial investigation of these complaints (Appendix, Exhibit 3). Mercado's report reflects the following additional facts obtained during the interview of [REDACTED]

- [REDACTED] came to her meeting with Mercado primarily prepared to discuss the retaliation [REDACTED]

- Regarding the incident in the elevator with [REDACTED] and Clinger, [REDACTED] said she did not view this conduct by Clinger in a sexual manner. Rather, she felt not respected by Clinger in front of [REDACTED] She told Mercado that Clinger is "a caring man," and he "genuinely cares" about his employees. Later in the interview with

Mercado, [redacted] indicated that Clinger doesn't care about her, and that "it's all about him."

- Regarding the texting app "Telegram," [redacted] added that when Clinger asked her to send a photo of herself, he did not indicate that it should be nude or sexual in nature. She could not identify what was in the sexually inappropriate texts he sent her, and said his "Good morning" texts were uncomfortable for her when she received them [redacted]

- Regarding the meeting at the Coffee Bar when she alleges Clinger rubbed her leg, [redacted] indicated that she asked [redacted] who she told about the incident, not to report it as she preferred to handle the situation on her own.

- [redacted] told Mercado that Clinger looks at her in a way that makes her feel uncomfortable and that he once told her that her skirt was "distracting." She offers that men have treated her disrespectfully before, and that she feels responsible for Clinger's behavior.

- [redacted] described the relationship between Clinger and [redacted] as extremely personal, but indicated that she doesn't know if there is (or has been) a sexual relationship between them. She related that at tines they looked at each other like they're "in love," and at other times they fight "like when parents aren't getting along."

- With regard to the [redacted] She said the decision did not involve favoritism. She stated that it was [redacted] While [redacted] criticized the manner in which Clinger [redacted] she also told Mercado that the decorum and professionalism at the City has decreased since [redacted]

- When asked by Mercado about [redacted] indicated that she knows of no facts to support a contention that any improper relationship existed between Clinger and [redacted] In fact, she observed that no such relationship existed. She noted that [redacted]

- When asked what she wanted to see from Mercado's investigation, [redacted] focused on a professional relationship and culture within the office, equitable spreading of work, acknowledgement of work performance, clarity of direction and a shift to values and following processes.

On July 12, 2016, the day after her interview, [redacted] sent a follow-up email to Mercado (Appendix, Exhibit 3, attached as exhibit to Mercado's Investigation Report). In that email, [redacted] tells Mercado:

> "I never intended to be a part of the sexual harassment investigation, but rather was looking [redacted] and legal allegations I brought

forward to a few of the highest powers in our organization (City Manager, Chief of Police and City Attorney).

It is my understanding that the original sexual harassment complaint was filed by someone else and now your limited scope and my ancillary stories of potential retaliation and hostile work environment concerns has landed me a primary spot in a sexual harassment investigation, which was never my intent."

In the email, [redacted] goes on to state that she is most disappointed in the City Manager's management style and lack of accountability and leadership. She also directed Mercado's attention to a [redacted]

On July 20, 2016, Mercado conducted a telephonic follow-up interview with [redacted] She asked about whether [redacted] had sent suggestive texts to Clinger. [redacted] responded that she had participated in one message. When asked who initiated it, [redacted] indicated that she felt the need to send the text because Clinger was so unresponsive. [redacted] then asked to continue the conversation with Mercado only if some else was present. No other questioning took place. The text messages, as referenced by Mercado and attached to her report, include the following exchange during January of 2016, while Clinger was on a business trip in Washington, D.C.:

[January 20, 9:23 p.m.]

[redacted] Are u asleep?

AC: Not yet

[redacted] Just saying hi! Missing your ugly mug!

AC: Haha sure you do.
Party time since I'm not there

[redacted] Mean it! Right now missing u. Party has to be with u.
On my way
Get me a roon?
Room?

AC: Lol I'll book it

[redacted] Hmmmm....Sounds possible. Work from plane and surprise visit. What would I learn from the conference? How to sleep in a roll away bed?

AC: Not sure you'd learn much from the conference

[redacted] There are things you would teach me. I need a coach.

AC: I'll be your coach

[REDACTED] I am imagining it now. I could learn from u.

(Appendix, Exhibit 3)

In correspondence dated July 26, 2016, [REDACTED] then attorney William Peterson, Esq., wrote to City Attorney Karl Hall regarding the allegations that had been made (Appendix, Exhibit 2). Regarding text exchanges between [REDACTED] and Clinger, Peterson wrote:

> "[REDACTED]... has admitted that she initially participated in a flirtatious exchange because of the message communicated by the City Manager, as manifested by the obvious success of [REDACTED] that participation in a flirtatious relationship with the City Manager is a condition to success under his administration, if you are female."

In correspondence dated October 10, 2016, [REDACTED] attorney, Mark Mausert, Esq., wrote to City Attorney Hall regarding the allegations made by his clients. Regarding conduct by [REDACTED] in response to Clinger's alleged advances, Mausert wrote:

> "[REDACTED] is a very bright woman and saw that the only way to function well, and be safe, was to stay in Clinger's good graces. And, the best way to do that was to respond to his predatory advances in a way which did not alienate him. It is the classic conundrum faced by a woman who is confronted with sexual predation."

On or about July 29, 2016, [REDACTED] reported that a manila envelope with a copy of materials related to her complaint against Clinger was opened, and the materials stolen, from her [REDACTED] credenza. Only the empty envelope remained.

## V. Investigatory Interviews

During the course of this investigation, interviews were conducted with a number of individuals (see Section II, above) either in person or telephonically. The interviews were not recorded.

At the beginning of each interview, I told the interviewee that I had been engaged by the City of Reno as a neutral fact finder. The neutrality was based on the fact that I was not a Reno resident and knew none of the individuals involved in the case. As a fact finder, I was tasked with determining relevant facts surrounding the complaints made against the City Manager. I told interviewees that I was given the latitude to make credibility determinations.

For each in-person interview, the interviewee was given a one-page form entitled "Introductory Comments and Requests." (Appendix, Exhibit 21). Edwin Keller, Esq., of Kamer Zucker Abbott, provided this form to me, attached to an email dated September 21, 2016. It includes a Limited Confidentiality Request, a statement regarding the prohibition of any retaliatory conduct and a final section with the heading, "No Guarantee of Complete Confidentiality."

For telephonic interviews, I either gave a recitation of the contents of the form or read it verbatim to the interviewee. All of the individuals I attempted to interview decided to go forward with the interviews after receiving this form.

The following are summaries of the interviews I conducted in conjunction with this investigation. They are not chronological. Rather, I have made every effort to present them in an order that provides at least some context to the issues presented.

A. Andrew Clinger (interviewed September 27, 2016)

On September 27, 2016, I met with Andrew Clinger at the office of his attorney, John Gallagher, Esq. I explained to Clinger the purpose of my interview and shared with him the Introductory Comments and Requests form referenced above. Clinger readily agreed to speak with me. Mr. Gallagher was also present for the interview, but never sought to direct my questioning or suggest answers to my questions. I was allowed full access to interview Clinger, and the only time Mr. Gallagher interjected was in response to a question that may have implicated Clinger's attorney-client privilege.

Clinger told me that he became City Manager for the City of Reno in 2011 after serving for six years as Nevada's State Budget Director. Prior to that, he had worked in the State Budget Office, in other positions, since 1997. He was first contacted for the Reno City Manager position by then City Councilwoman Jessica Sferrazza. He saw the position as a new opportunity to do something different and therefore pursued it.

Clinger said he's still only partially aware of the nature of the claims that have been made against him. He was interviewed by Alice Campos-Mercado as part of the first investigation, so he has some awareness of what has been alleged. He acknowledges that City employee [redacted] a copy of a letter dated July 26, 2016, written by William Peterson, Esq., then attorney for the three complainants, which not only outlines in some detail the allegations made by his clients but which also had attached to it an outline of complaints prepared by [redacted] Clinger said that even as of the date of our interview, he had not read any of those documents. Instead, he said that upon receipt of the documents, he immediately forwarded them to his attorney, Mr. Gallagher.

Clinger described the atmosphere within his administration as professional and said he never treated women differently than men in his office. He said that an allegation that there existed a "play along to get along" mentality among female employees is "completely ridiculous" and untrue. He said he never operated that way as City Manager.

Clinger described [redacted] with the City and her [redacted]

Clinger said his relationship with [redacted] was "professional only." He denied that any personal or romantic relationship existed between the two.

Clinger was asked about the text messages from January 20, 2016 (quoted above in Section IV(C)) between he and [redacted] He indicated that these texts were on his regular cell phone texting feature and not on any other texting platform like Slack or Telegram. Regarding this text exchange, Clinger said he was in Washington, D.C., on City business at the time when he received the texts from [redacted] He was "caught off guard" by the somewhat suggestive nature of the texts, which Clinger construed as [redacted] at least being flirtatious with Clinger. Clinger said he had not previously received that type of text from [redacted] He indicated that on one occasion after this, he received from [redacted] a provocative, "semi-clothed" photo of [redacted] that was sent using the Telegram texting app. As a result, that photo text has not been preserved, since the nature of Telegram is such that texts disappear after being read.

Clinger said the neither the texts received while he was in Washington, nor the photo text from [redacted] were invited in any way.

Clinger said that any allegation that he made any romantic or sexual advances on [redacted] is "absolutely" untrue. He provided me with a printed history of all text messages between he and [redacted] from October 12, 2015, until July 22, 2016. He indicated that he purchased his current cell phone in October of 2015, which is why the text history only goes back that far.

Clinger is aware that [redacted] has alleged that Clinger touched her leg [redacted] at the Coffee Bar restaurant in mid-May of 2016. Clinger generally recalls the meeting, and said he might have found a chair next to him for [redacted] to sit in if, as often happened, she was late for the meeting. He doesn't ever recall patting a seat, and demanding that [redacted] sit next to him. Regarding the allegation that he touched her leg one or more times during the meeting, Clinger said, "it never happened, ever." He also understands that this conduct is alleged to have been witnessed by [redacted] Clinger said the allegation is untrue.

Clinger is also aware that [redacted] has alleged that he touched her neck inappropriately in an elevator in March of 2016. Clinger said there's "no way" he touched her neck in the manner she alleges. He acknowledges that he told Mercado that he recalled the occasion but did not touch [redacted] and he reiterated that during our interview.

Clinger said that in late July of 2016, [redacted] told him that [redacted] was potentially the victim of a theft from [redacted] Clinger said he told [redacted] to tell [redacted] to file a police report. Clinger was unaware of what items [redacted] claimed were taken from [redacted]

Clinger said he's aware that [redacted] has been implicated in the allegations. He said [redacted] once told him that there were rumors in the office about a relationship between Clinger and [redacted] Clinger said he "basically blew it off" because it wasn't true. He stated that he has never had any inappropriate relationship with [redacted] and thinks it's unfair that [redacted] name has been brought up at all. He said he has "no idea" where these allegations came from, or why they surfaced. Clinger offered to provide me with a text message history with [redacted] similar to the one he provided with [redacted] It was provided to me from his attorney's office about a week after our interview.

Regarding his relationship with [redacted] Clinger acknowledged that it is different than his relationship with other City employees. He said that he and [redacted] have "an honest relationship,' such that he knows "she'll be real with me." He said it has never been a romantic or sexual relationship, but he is aware that rumors of such a relationship existed in City offices. As early as 2015, [redacted] had given him information that she'd heard those rumors [redacted] Again, Clinger "blew it off" as idle talk among employees.

Since there has never been any type of romantic relationship between [redacted] and Clinger, he said that allegation that they were "groping" one another romantically [redacted] is absolutely untrue. He said it's "completely made up. It never happened." He acknowledges that it's difficult to prove an event never occurred, but he is adamant that no romantic relationship has ever existed between he and [redacted] I requested Clinger's text message history with [redacted] which was provided to me from his attorney's office about a week after our interview.

Clinger said that [redacted] He denied the allegation that [redacted]

[redacted] based on her romantic relationship with Clinger, or that the existence of such a relationship was any factor in [redacted] either getting or keeping that position. He also denied that her [redacted] Clinger provided her with any preferential treatment, although he conceded that he considered that "she's got my back" as a result of their honest relationship.

Clinger recalled [redacted] and Clinger was aware that some on the City Council were anxiously awaiting its completion. He acknowledges that prior to the meeting, he and [redacted] had disagreed as to whether [redacted] had failed to complete certain components of the plan. [redacted]

Clinger denied that he told [redacted] that [redacted] suggested the changes, since [redacted] was angry with [redacted] Clinger said [redacted] told him that she believed it was [redacted] but Clinger said he told [redacted] He is aware that [redacted] was angry with Clinger and [redacted] and that [redacted] didn't hide that anger from either. [redacted] both Clinger and [redacted] He's aware that [redacted] stopped speaking to [redacted] Clinger said he had several meetings with [redacted] after [redacted] over the course of the next few months, to try and ameliorate the issues [redacted] had with Clinger and especially [redacted] He said he told her that she had to be able to communicate professionally with [redacted] (and others) [redacted]

Clinger was also aware of the effect that [redacted] anger and resentment was having on [redacted] who told Clinger that [redacted] was very angry with [redacted] He had also heard rumors that [redacted] was claiming to be overworked, [redacted] so Clinger met with [redacted] to ask her about it directly. [redacted] told Clinger she was having no such issues. During our interview, Clinger said that he tried to accommodate [redacted] needs and said [redacted]

In February of 2016, Clinger introduced a new texting application to City staff called Slack that Clinger had learned about from his brother-in-law. He said [redacted] downloaded the app on their phones. According to Clinger, Slack would allow texts between those on the network to be "secure." He did not indicate that there had been any prior issues with texts between City staff members not being secure. Clinger said use of the app "fizzled out" in a short time, since Slack was apparently cumbersome to use.

Shortly thereafter, in March of 2016, Clinger found a second text platform called Telegram. It was less cumbersome to use than Slack, so Clinger thought it worthwhile to try it before introducing it to the entire staff. He downloaded it and asked only [redacted] and [redacted] to download it with him. An important feature of Telegram is that texts, once opened, disappear and can't be recovered. Clinger said the three of them used it for a month or more. It was using this app that Clinger said he received a suggestive photo from [redacted] which of course can no longer be retrieved. Clinger said he understands now that using such an application while a prominent member of City government is inconsistent with transparency. He also understands that it looks even worse because of the allegations that were eventually made against him. He believes that the combination of a casual workplace, a private text platform and a more casual (but not romantic) relationship with [redacted] leave him open to accusations like the ones that have been made.

On June 21, 2016, the City Council held a meeting to consider Clinger's annual performance evaluation and vote on whether to extend his contract with the City.

Prior to the meeting, City staff employees were given the opportunity to complete an anonymous survey evaluating Clinger in a number of different categories (Appendix, Exhibit 6). Clinger had seen the results of the survey and considered them overall to be positive, although there were areas of his performance that might be improved.

During the June 21 public meeting, each member of the Council had the opportunity to comment publicly on Clinger's performance over the past year. Many of the comments were positive, but some offered areas of critique. Councilwoman Naomi Duerr commented on sensing "fear" among some female managers at the City when discussing Clinger's performance. Clinger said he had no idea what Duerr was talking about and no forewarning that such a comment would be made. He had no information of any female managers in fear of him. He believes he reacted visibly when Duerr made the comment, because he recalls someone immediately texting him to keep a "poker face" as he sat on the dais during the meeting. Clinger said there was nothing in the employee surveys that hinted at any fear or harassment of female City managers.

On the following day, June 22, 2016, the Mayor hastily called a meeting [redacted] to educate employees on the City's sexual harassment policy. Clinger was in attendance, along with other [redacted] and Councilwoman Duerr, which Clinger thought was particularly odd. On the heels of her comments the night before, Clinger thought that perhaps Duerr had talked to the Mayor and told her things that provided the impetus for the June 22 meeting. Immediately following the meeting, Clinger said the Mayor told him that Duerr "told me things about you, and if they're true it's very disturbing." Beyond that, the Mayor gave Clinger no specifics.

That afternoon, Clinger met with Human Resources Director Kelly Leerman, asking her if she knew who might be making allegations against Clinger. [redacted] On the same day, Clinger spoke with [redacted] who told him that [redacted] had recently spent several hours at Duerr's home and had made allegations to Duerr of Clinger's sexual harassment of [redacted]

Approximately one week later, [redacted] made the first complaint to Human Resources. Clinger said that City Attorney Karl Hall informed him of the first complaint, including the general nature of the complaint and [redacted] identity as the complainant. Hall told Clinger to "be careful," and not to retaliate against [redacted] For some time, Clinger thought that the only complainant was [redacted] Hall did not inform Clinger that [redacted] and [redacted] had also made complaints against Clinger.



On or about July 13, 2016, Clinger met with Alice Campos-Mercado to be interviewed as part of her other than [redacted] Although Mercado asked questions about potentially actionable conduct against [redacted] Clinger said Mercado repeatedly told him that [redacted] had not made a complaint against him. He also said that he left the interview unaware that [redacted] had made a complaint against him.

On or about July 20, 2016, Clinger was told by City Attorney Hall "good and bad news." The good news was that Mercado was going to find no violation of City policies by Clinger. The bad news was that given the allegations made in a letter Hall received from the complainants' attorney, they might have to renew the process and begin a second investigation.

Clinger said he understood by August or September that he could no longer manage in the City, given the allegations and the atmosphere among employees. He believes he was forced out of his position as City Manager and had no choice but to leave. He said it was (and remains) his inclination to vindicate himself with respect to the allegations made against him, but he said that if he fought the allegations at a public hearing, it would divide the City to an even greater extent, even if he were ultimately successful.

On the issue of being forced out, Clinger said he believes it's an "organized effort" between [redacted] Councilwoman Duerr and [redacted]

Clinger recalls that he hired a consulting firm called Olive Grove in the spring of 2016 to look at communication between the Council and City staff, including the City Manager. Interviews were conducted and the chief consultant, Anthony Tansimore, told Clinger in May of 2016 that there were three Council members against Clinger because he was a Republican. Tansimore told Clinger that Councilwoman "Duerr is out to get you." Tansimore didn't put this information into his report but strongly suggested cancelling a planned retreat with City staff and the City Council because of the animus of certain Council members toward Clinger, as uncovered by Tansimore. Clinger ended up cancelling the retreat on Tansimore's advice.

As to the "organized effort," Clinger said that he's aware that Duerr met with [redacted] prior to the filing of her complaint and he believes Duerr encouraged [redacted] to make allegations against Clinger. Clinger said he had a lunch meeting with Duerr on June 20, 2016 (the day before his performance evaluation by the Council), during which Duerr spent most of the time talking generally about sexual harassment (without mentioning any names). Clinger believes that other Council members may also have spoken with the complainants before or during the first investigation period.

Clinger said that [redacted] wanted him out as City Manager and wanted her friend [redacted] to get [redacted] Clinger believes that both [redacted] and [redacted] thought [redacted] Clinger theorizes that the complainants

probably thought that the Council might remove Clinger during his performance evaluation, but when that didn't happen the complainants took matters into their own hands. Clinger said [redacted] told him that she heard [redacted] say during the Mercado investigation that "we have three things against" Clinger. Further, Clinger said he's heard from City employees [redacted] and [redacted] about the conspiracy to have Clinger removed. According to Clinger, "everyone knows about the conspiracy."

In addition to the materials already described, Clinger's attorney also forwarded to me a copy of a text message Clinger received from Mayor Hillary Schieve on June 20, 2016, which is the day before the Council met to discuss Clinger's performance evaluation (Appendix, Exhibit 16). The Mayor's message quoted a text that the Mayor had sent to Councilwoman Jenny Brekhus and Councilwoman Naomi Duerr. That text read, in pertinent part:

> "As for Andrew's contract I am not going with a temporary contract. Jenny again trying to make this council completely unsettled and you mark my words this will backfire on her. Again Jenny is out of line. Andrew doesn't deserve this treatment and I am not going down any witch hunt path with her."

Shortly after my interview with Clinger, I contacted Kamer Zucker Abbott and requested to be able to interview the members of the Reno City Council, including the Mayor.

B. Councilwoman Naomi Duerr (interviewed October 19, 2016)

Naomi Duerr was interviewed at her home in a wide-ranging conversation lasting more than four hours. At the outset of the interview, she was concerned about the confidentiality of the process. She reviewed the confidentiality handout that I provided, which was prepared by special counsel for the City. She was concerned about potential retaliation from former City Manager Andrew Clinger, who she says began actively working with Councilwoman Jenny Brekhus' campaign opponent. Although she expressed some reluctance to speak with me initially, she ultimately decided to go forward with the interview.

Duerr was elected to the Reno City Council in 2014 after years in both the public and private sector as a manager of several entities. She didn't know Clinger very well until after she was elected to the Council and says she met Clinger and [redacted] just before the general election in 2014. She described Clinger as "a nice guy" who got nothing done, which frustrated her. She describes her relationship with Clinger as generally "cordial but unproductive."

Duerr disagreed with Clinger's management style, which she described as ineffective and inefficient. She said he wanted every communication between the Council and City staff to go through him. Council members would tell him what they wanted done, he'd tell staff members, they would respond back to Clinger, and Clinger would respond to Council. Duerr found that process cumbersome and ineffective. She just wanted to be able to go to the source to obtain information.

Additionally, Duerr began to notice that female staff members didn't talk to her or other Council members. She had plenty of conversations with male staff members, [redacted] but virtually no direct contact with any female staff members. She notes that she had few if any conversations with [redacted] She said she didn't know [redacted] at all. Duerr referred to this lack of communication between Council members and female staff as the "cone of silence." She approached [redacted] directly once and was told by [redacted] that Clinger won't let her talk to Council members, and that she feared

being fired if she talked to them. Based on her conversations, Duerr believes this was limited to female managers and is evidence of how women were treated in the workplace under Clinger.

Duerr said Clinger could be "caustic." She related a lunch meeting with him, where he told her she was micro-managing him. She said his comments were disrespectful and hurtful, and "you don't talk to your boss that way." She wanted to follow up with him to show him that his examples did not constitute micro-management, but ultimately did not.

However, Duerr said that she has never directly witnessed Clinger treating a woman disrespectfully.

Duerr was in attendance at the June 21, 2016, City Council meeting to discuss Clinger's annual performance evaluation. She had not filled out a written performance evaluation, as Councilwoman Brekhus apparently had, even though she said Brekhus "begged me to," so that Brekhus wouldn't be on an island at the meeting.

Duerr described a number of events that occurred prior to the June 21, 2016, City Manager performance review.

On June 13, 2016, Duerr said she had a meeting with Clinger to discuss the cancellation of the City retreat, which had been planned as part of an unveiling of the Olive Grove consulting report. Duerr had spoken with Anthony Tansimore of Olive Grove during the consulting process and admits she told him that she was one of several Council members unhappy with Clinger's performance as City Manager. At the lunch meeting with Clinger, Duerr asked why the retreat was cancelled, and was told by Clinger that he simply got a text saying it was cancelled.

Duerr also acknowledged that in early August of 2016, after she had reviewed the Mercado report, she had another conversation with Tansimore at Olive Grove and told him about the claims against Clinger (without revealing any names). She also told him she thought Clinger had "a 1% chance" of surviving as City Manager.

Prior to the June 13, 2016, lunch meeting with Clinger, Duerr had reviewed the results of the anonymous employee surveys and noted nothing that would suggest any issues of sexual harassment among City staff. However, she noted that Clinger's performance scores had dropped in 26 of 30 categories and she generally discussed the survey results with Clinger during their lunch. She said Clinger was worried about being fired, but Duerr assured him she wasn't ready to fire him.

On June 16, 2016, Duerr had a meeting with [REDACTED] who initiated it. Duerr said it was unusual for [REDACTED] to seek out Duerr, since she wasn't allowed to talk to Council members. According [REDACTED]

At the June 16 meeting, Duerr said [REDACTED] main concern was [REDACTED] She had advised Clinger [REDACTED] and he apparently didn't care.

According to Duerr, [redacted] was afraid that if she made a huge issue [redacted] she'd ultimately be fired.

Duerr said that at this meeting, [redacted] also [redacted] refused to disclose why she was [redacted] She kept saying, "I can't talk about it." Duerr wasn't entirely clear during our interview just how much [redacted] told her during this meeting. She thought perhaps [redacted] told her about [redacted] and may have said, "Lots of stuff happens there, but I can't talk about it." Duerr said that at this meeting, she didn't know exactly what was happening with [redacted] but concluded that something must indeed have been occurring that upset her. Duerr believes she told [redacted] to go to Human Resources if she was having a problem. During our interview, Duerr said she could not recall if [redacted] told her at this meeting that Clinger had sexually harassed her or touched her, but agreed that if she had heard that information that she would've addressed it immediately.

Days later, Duerr said she had lunch with [redacted] to discuss the [redacted] Duerr said she wasn't meeting with female managers to find ammunition to use at Clinger's upcoming performance review. Instead of discussing the [redacted] kept bringing up Clinger even though Duerr didn't want to discuss him with [redacted] talked about [redacted] by Clinger at [redacted] told Duerr that Clinger had told [redacted] that [redacted] and [redacted] proceeded to "go off on [redacted]" Then, according to Duerr, [redacted] turned her attention to Clinger and repeatedly said, "I'm done with him." This lunch reinforced Duerr's idea that Clinger didn't treat female managers with respect.

Duerr said that she has no direct knowledge or evidence of a romantic or sexual relationship between Andrew Clinger and [redacted] but says a number of City employees have asked her about it. She "speculates" that it's a comfortable relationship, "maybe sexual and maybe platonic," or "maybe like brother and sister," but in any event very informal in nature. She believes that Clinger has shown [redacted] significant favoritism in her employment with the City, which she believes has had a negative effect on City staff members.

Duerr said she also talked to [redacted] prior to Clinger's performance review, but that [redacted] was "very guarded" and didn't give Duerr much information. Duerr said she didn't know [redacted] very well at the time, but said her guarded nature lends additional credence to her theory of how Clinger treated female mangers (i.e., making them reluctant to talk to Council members).

Duerr denied having a meeting with [redacted] to obtain information on Clinger.

In preparation for Clinger's performance evaluation on June 21, 2016, Duerr also had conversations with other Council members. She talked to Councilman Paul McKenzie on June 20 and said McKenzie had "deep concerns" about Clinger (but not as deep as Duerr's). She also spoke with Councilwoman Jenny Brekhus, who wanted Clinger out based on issues she'd had with him for over a year. She tried to get in touch with Mayor Hillary Schieve, but was unable to arrange a time for them to meet. She recalled receiving a text from Mayor Schieve about trying to avoid a "witch hunt" at Clinger's review.

At the June 21 Council meeting, each of the Council members had the chance to publicly comment on their assessment of Clinger's performance. During her comments, Duerr made the following statement, referring to the anonymous employee surveys:

"There's a sense of fear I've sensed in some of these comments; I'm an intuitive person, so I feel stuff. I really think those are some areas that need some focus work. I'll even say this: especially

in the area of female managers. I'll just put that out there. I think, I shouldn't really say that, I don't really have data about that. Maybe I'm sensitive to it, being a female manager – maybe over-sensitive to it. But if there's an opportunity to work on that, that's an area to work on"

In our interview, Duerr said she made the comment as a result of all of her prior conversations with [redacted] and [redacted] She also referenced [redacted] as another female manager who was not allowed to speak to Council members. Duerr said that her comment was not addressing issues of sexual harassment; rather, it was simply about female managers not being able to talk to the City Council.

Ultimately, the Council unanimously renewed Clinger's contract during that meeting on June 21, 2016. Duerr said she voted in favor of it because she knew it would pass, and she didn't want to be "on a political island" having voted unsuccessfully to oust the City Manager.

On the following day, Duerr attended a special meeting called by Mayor Schieve to address with the [redacted] the City's sexual harassment policy. Duerr told me that although this meeting was called and took place the day after her public comments about female managers being in "fear," the meeting had nothing to do with those comments. Duerr said that the Mayor called the meeting based on three incidents having occurred over a short period of time: 1) an incident involving an inappropriate text having been sent by [redacted] (Duerr reported that the Mayor told her about this incident, which was addressed appropriately by Clinger as City Manager); 2) an issue of an employee making an inappropriate communication to [redacted] (which the Mayor told Duerr was also handled appropriately by the City Manager); and 3) Duerr having reported to the Mayor that [redacted] had told Duerr that Clinger touched her inappropriately. The Mayor concluded that there could be serious issues that needed to be stemmed immediately and therefore called the meeting.

In my interview, Duerr recognized that if [redacted] having been touched by Clinger was one of the reasons for the June 22 meeting, as told to the Mayor by Duerr herself, then she must have had that knowledge before June 22, 2016. Duerr said that perhaps [redacted] told her "vaguely" about sexual harassment during their June 16 meeting.

The June 22 sexual harassment meeting was primarily conducted by City Attorney Karl Hall. Duerr said she attended the meeting only because Mayor Schieve wanted her to be there. She said she felt uncomfortable being at the meeting.

About a week later, Duerr was told that a complaint had been made. She assumed it was [redacted] that made it, because [redacted] had been upset and Duerr had told her to go to Human Resources if she had an issue. When Duerr was told that [redacted] made the first complaint, she told me that she didn't really know who that was. She thought [redacted] employee. Duerr never talked to [redacted] about filing a complaint before it was filed.

Duerr knows now that [redacted] and [redacted] also made complaints, but she wasn't told formally until City Attorney Karl Hall told Council members on July 19, 2016. Even at that time, Duerr discussed with Hall the fact that Clinger needed to be on administrative leave during the investigation, as Duerr was fearful of retaliation against the complainants.

Duerr describes [redacted] and [redacted] as "three ethical, upstanding, hard-working women." She also said that she didn't know [redacted] or [redacted] very well. She had met [redacted] three