# EXHIBIT 5

EXHIBIT 5

<u>Declaration Under Penalty of Perjury</u>

COMES NOW Maureen McKissick, who under penalty of perjury, affirms the following statements are correct:

1. I am a former employee of the City of Reno and am currently a plaintiff in a Title VII sexual harassment/retaliation case against the City of Reno (Case No. 3:17-cv-00458-MMD-VPC). I was employed by the City from 2004-2016, was given several promotions, received multiple commendations and awards, and did not have any disciplinary actions during my tenure. I am providing this Declaration because of the manner in which I have been treated by the Reno City Attorney's Office and because I do not believe that Office will fairly litigate the case in an unbiased manner, in the best interests of justice and the citizens of Reno.

2. In late summer 2015 my then-new assistant, Brianna Wolf, told me of an incident which occurred in approximately June 2015. Ms. Wolf explained she was working late in her cubicle on the 15th floor of the building which contains City Hall offices. She told me the City Manager, Andrew Clinger, and the Assistant City Manager, Kate Thomas, entered the office area, and apparently unaware of her presence, began to engage in sexual activity on the other side of her cubicle. She heard sounds of touching, murmuring and pleasure, as well as the sounds of rustling clothes. Ms. Wolf quietly exited the area.

3. Brianna Wolf explained she had not told me of this incident earlier because she did not know me very well. Ms. Wolf asked what she should do with the information regarding this incident. I advised her to hold off on reporting the incident because I was deeply skeptical that the Human Resources Department was trustworthy. I was worried Ms. Wolf would be subject to retaliatory hostility. At the time I provided this advice I had already begun to experience retaliatory hostility emanating from Kate Thomas and her staff. This hostility and ostracism was perpetrated in an open manner, with no apparent fear of repercussion. Accordingly, I was afraid the same sort of retaliatory hostility would be directed at my subordinate if she exposed a sexual relationship between two highly placed officials.

4. Ms. Wolf's information was not the first time the relationship between Mr. Clinger and Ms. Thomas had come up. Starting in 2014, shortly after my office was moved to the 15th floor, multiple staff in other departments asked me if I knew whether Mr. Clinger and Ms.

Declaration - 1



Thomas were involved in a romantic relationship. Many people had noticed behaviors that suggested their relationship was on that basis, e.g. the looks they exchanged, their innuendoes. Starting in 2015, after Ms. Thomas also moved to the 15th floor, Ms. Visha Siddharthan, Mr. Clinger's secretary, expressed to me that she had suspicions they were having an affair. She told me that Ms. Thomas had obtained full administrative rights to Mr. Clinger's calendar and scheduled meetings with him with no explanation which Ms. Siddharthan suspected were not work-related. Ms. Siddharthan told me that Mr. Clinger's wife had installed a GPS tracker on his cell phone so that she could monitor his whereabouts; she noted Mr. Clinger sometimes left his cell in his office when he was out with Ms. Thomas. I thought this was odd because Mr. Clinger generally always carried his cell. Starting in 2016, Ms. Siddharthan told me she had similar suspicions that Ms. Ashley Turney might also be having a relationship with Mr. Clinger. Ms. Turney was frequenting the 15th floor on a regular basis for no apparent reason and leaving the office with Mr. Clinger at unscheduled times.

     5.     In August 2015, I attended an Executive Team meeting at which Acting Chief of Police Jason Soto produced an Opinion, issued by the Washington Supreme Court, i.e., the Nissen Opinion. Up to this point the members of the Executive Team had thought, if they owned their telephones, they could not be forced to produce the telephones or records. The Nissen Opinion contradicted this notion. I told the other Executive Team members the law, as stated by the Washington Supreme Court, was being interpreted the same way all over the country and it was only a matter of time before the Nevada Court went the same way. Andrew Clinger was at this meeting and received a copy of the Opinion, i.e., Jason Soto emailed a copy of the Opinion to Visha Siddharthan, Andrew Clinger's secretary, who distributed the email to all members of the Executive Team, including Andrew Clinger. After this, Andrew Clinger instructed members of the Executive Team to use the Slack app for communications. When I asked Mr. Clinger why this instruction was issued, he failed to answer my inquiry. I told Mr. Clinger the use of such an app, if intended to thwart public records request, was improper. I later learned some members had subsequently been instructed to use an even more powerful app, i.e., the Telegram app which encrypts and destroys messages. Prior to this instruction, I had been instructed by Ms. Thomas in Mr. Clinger's presence to periodically destroy text messages on my phone; as our supervisor, Mr. Clinger did not contradict this instruction. Those messages were not personal. They related

directly to City business. The proposition the telephones of the members of the Executive Team were only used for personal reasons is nonsensical. We used our telephones for every purpose, but in large part for City business. That members of the Executive Team frequently texted regarding City business was a well-known fact.

6. On June 22, 2016, at approximately 11:30 a.m., I received an email from Andrew Clinger's secretary which summoned me to a mandatory meeting at 12:30 p.m. I attended this meeting, along with the other members of the Executive Team, Mayor Schieve, Council member Naomi Duerr. and City Attorney Karl Hall. Ms. Schieve's demeanor was very stern. Ms. Schieve informed us she was in possession of some very concerning and credible information to the effect there was behavior going on at the City which violated the City's policies on sexual harassment and discrimination. She asked Karl Hall to read the City's sexual harassment policy. Mr. Hall did so. The Mayor told us the City had a "zero-tolerance" policy regarding sexual harassment and she wanted anyone with information regarding sexual harassment violations to step forward. We were instructed to meet with the Human Resources Director Kelly Leerman if we had any information regarding sexual harassment violations. We were instructed to convey the same instructions to our subordinates. Later that day, I informed Ms. Wolf of what occurred at the meeting and we discussed the possibility of having Ms. Wolf report what she witnessed on the 15th floor, i.e., the incident involving Ms. Thomas and Mr. Clinger whereby Ms. Wolf heard a sexual liaison.

7. On or about June 26, 2016, I met with Robert Chisel, who was over Human Resources and who had just returned from a two-week vacation, to asked him whether the information we had been given during the Mayor's June 22 meeting, while he was out of the office, was accurate and the process was trustworthy. He told me it was. On or about June 28, 2016, Mr. Chisel told me that he had met with Mr. Hall to inform him about what he knew regarding four women who had potential sexual harassment complaints against Mr. Clinger. Mr. Chisel said he considered the City to be 'on notice' and asked Mr. Hall to open an investigation. Mr. Hall refused, saying he would not open an investigation without a formal complaint. (A formal complaint is not necessary.) Mr. Chisel informed me of Mr. Hall's position. I then informed Ms. Wolf. In order to satisfy the conditions established by Mr. Hall, Ms. Wolf made a formal complaint to Human Resource Director Kelly Leerman on June 29. Later that day, Ms.

Declaration - 3

Wolf called me to say that Ms. Leerman had just contacted her to inform her that Mr. Hall had revealed Ms. Wolf's identity to Mr. Clinger. I was horrified that Mr. Hall had breached Ms. Wolf's confidentiality and had done so immediately. I reached out to Mr. Chisel to ask him if the process was still trustworthy. He responded that he was stunned at Mr. Hall's actions.

On June 30, 2016 I decided as a member of the Executive Team I had an ethical obligation to report what had been asked of me. Further, I saw early signs that Ms. Wolf's complaint might not be treated with the gravity that it deserved. I felt I needed to corroborate that Ms. Wolf had contemporaneously informed me of the after-hours incident as well as go on the record with my own complaints in hopes they would be taken seriously.

8. On July 1, 2016, I met with Human Resource Director Leerman and reported I was being subjected to retaliatory hostility based on sex; I witnessed sexual harassment of staff employees by Andrew Clinger; and my assistant, Ms. Wolf, heard the beginning of a sexual liaison approximately a year earlier. Before relating this information, and in the wake of Ms. Wolf's breach of confidentiality, I asked for, and received from Ms. Leerman, assurance to the effect my identity would be protected.

9. After the Fourth of July weekend, 2016, I began to experience increased retaliatory hostility, which appeared to be orchestrated by Assistant City Manager Kate Thomas. That is, my fellow employees refrained from talking to me and even looking at me. I experienced this hostility first hand and Ms. Wolf was told by Tillery Williams of Ms. Thomas' instructions to this effect, which were issued because Ms. Wolf and I had allegedly formed a conspiracy to get rid of Ms. Thomas and Mr. Clinger. That left me and Ms. Wolf in a very uncomfortable situation, i.e., we worked in close proximity with a number of other City employees, none of whom would even look at us, or speak with us. The situation exuded hostility and was intolerable. I was also informed Mr. William Dunne, a recently hired Revitalization Manager, and a friend of Ms. Thomas, was accusing me of being a mastermind behind an attempt to remove Mr. Clinger and Ms. Thomas for personal gain. Mr. Frank Avera told me the statements Mr. Dunne made regarding myself were so awful he would not repeat them.

10. On July 8, 2016 I was interviewed by Alice Campos Mercado, Esq. Although I had been assured my interview and my identity would be confidential, my identity was compromised prior to the interview, i.e., I was instructed to wait in an outer lobby at City Hall



for Ms. Mercado. A number of City employees saw me and I was asked what I was doing there. Some of these employees were aware a sexual harassment investigation was underway. Accordingly, the fact I was a witness re that investigation became obvious very quickly as I was compelled to wait for approximately 30 minutes. When I entered the interview room, Ms. Mercado immediately asked me if I was related to Alan McKissick, Esq.; I told her that I had been married to him for 20 years. In response, she emphasized that she had been hired by the City as an investigator, not as an attorney. I told Ms. Mercado of the retaliatory hostility, based on sex, I was experiencing. Ms. Mercado refused to entertain my allegations and repeatedly informed me that my allegations were "beyond the scope" of her investigation. I did not understand, and do not understand, how the "scope" of an investigation can be pre-determined without imperiling the integrity of the investigation. The information I provided to Ms. Mercado would have established Ms. Kate Thomas deliberately ostracized myself and Ms. Wolf, on a systematic basis, because of Ms. Wolf's complaint of a sexual liaison between herself and the City Manager. Yet, Ms. Mercado repeatedly ignored the information I provided to her.

11.   I related to Ms. Mercado the fact Mr. Clinger and Ms. Thomas manifested an inappropriate relationship in the workplace, i.e., they often were too close physically, including their body language, and the way they exchanged looks evidenced a nonprofessional level of intimacy. Ms. Thomas routinely made statements with a sexual connotation, such as "I wonder what Andrew makes of the bikini wax appointment on my calendar?" I explained to Ms. Mercado how the relationship was on and then off and when it was on I was actively scapegoated for taking Ms. Thomas' work, i.e., work which had been directly assigned to me by Mr. Clinger. Mr. Clinger told me he needed me to take over various projects or work streams which were under Ms. Thomas' supervision because he wanted them to be successful. Mr. Clinger would assign me projects saying words to the effect, "Here, can you fix this?"

12.   I informed Ms. Mercado during the July 8, 2016 meeting that I had I witnessed Clinger treat Ms. Gescheider in an inappropriate manner and that Ms. Gescheider was upset, to the point of being almost in tears, when she requested I help her with the problem posed by Clinger's sexual aggression. Ms. Mercado trivialized this report as "bad management", which she said was not illegal. I said words to the effect, "Yes, I don't disagree, it's bad management, but the bad management is specific around whatever this relationship is between the two of them

(i.e., Mr. Clinger and Ms. Thomas)." I still do not understand this reasoning and why Ms. Mercado refused to deal with a direct report of sexual harassment by Mr. Clinger, directed at a City employee.

13. After the July 8, 2016, I emailed to Ms. Mercado a report of the retaliatory hostility I was experiencing. I am unaware of any timely, remedial action taken by the City regarding the conduct I reported.

14. On July 15, 2016 I met with Human Resources Director Leerman and informed her I was experiencing heightened retaliation. I asked her whether Ms. Mercado had completed her investigation. Ms. Leerman informed me the results of the investigation were in and Ms. Mercado had not made a finding of misconduct. Ms. Leerman told me she was sorry and that in hindsight the investigation had been too narrowly scoped and could have been done better. I told Ms. Leerman I was very upset and intended to file an EEOC complaint. Shortly after this conversation, Deputy City Attorney Mark Dunagan telephoned me. Mr. Dunagan told me the investigatory process had been flawed; the City Attorney did take my complaint seriously; there was enough evidence of misconduct to justify convening an attorney-client meeting with the Council, for the purpose of informing the Council of the misconduct; the City Attorney was going to recommend a full investigation into all of the misconduct which had been reported; and the City Attorney was going to recommend Mr. Clinger be placed on administrative leave during the process.

15. The next day I communicated what had happened to Ms. Wolf. She told me she would request a meeting with Ms. Leerman to understand why she, the first complainant, had not been told of the results. Ms. Wolf told me about her meeting with Karl Hall and Ms. Leerman on July 18, soon afterwards. They denied the results of the Mercado investigation were known. Mr. Hall indicated he did not want the Council to become involved. I apprehended from the information conveyed to me by Ms. Wolf my complaints were to be trivialized and covered up. Accordingly, based on the conflict between the information conveyed by Ms. Leerman on Friday and Ms. Wolf on Monday, I discussed the need to seek representation with Ms. Wolf. Ms. Wolf reached out to attorney William Peterson, Esq. on both of our behalfs the following day.

16. On July 21, 2016, Mr. Peterson received a letter from Bonnie Drinkwater, Esq., who had been retained by Mr. Hall. Ms. Drinkwater wrote that Mr. Hall was prepared to take

Declaration - 6



disciplinary action up to and including termination if I did not "maintain confidentiality." The Wall Report (see #21, below) makes clear that at the time the letter was sent, Mr. Clinger was not maintaining confidentiality and was allowed to communicate with members of the City Council and other staff. That is, Mr. Hall placed me, the complainant, under a "gag order" while Mr. Clinger was not. Furthermore, Mr. Hall has no authority to terminate City staff apart from his own staff in the City Attorney's Office.

17. On July 22, 2016, I received a telephone call from Councilwoman Naomi Duerr. Ms. Duerr told me during this conversation Mr. Hall convened an attorney-client meeting with the Council on July 20, 2016 and informed them of the identities of the complainants; that we had retained counsel; and they were to have no further contact with us. Ms. Duerr related to me what she purported to me to be the entire content of the meeting. The information related to me by Ms. Duerr did not comport with the course of action outlined by Mr. Dunagan. Based on what had occurred, I apprehended Mr. Hall regarded himself as being in an adversarial relationship with me. My perception, to the effect the only meaningful recourse I would obtain would be through the judicial process, was reinforced. That is, it was obvious the assurances Mr. Dunagan conveyed to me were not going to be followed through on.

18. Throughout July 2016 I experienced ostracism and hostility at work, i.e., other employees openly shunned me and the environment on the 15th floor was openly toxic. I sought medical assistance on August 1, 2016 because of headaches and severe anxiety. I was unable to sleep. On August 2, 2016, I took leave, per the Family Medical Leave Act. I never returned to work. On September 28, 2016, prior to my scheduled return to work on October 3, 2016, I met with Assistant City Manager Bill Thomas to discuss the logistics of my re-entry to the workplace. Mr. Thomas told me he did not know where I would be placed and he could not protect me. He said words to the effect, "I cannot guarantee you will be safe from retaliatory hostility." As a result, I told Mr. Thomas I could not return under these conditions and used vacation time to extend my leave. I did not know what else to do. That is, I knew if I returned, the hostility would resume.

19. On September 20, 2016, Mayor Hillary Schieve telephoned me at approximately 9:20 p.m. The call lasted until after 11:00 p.m. Mayor Schieve told me Special Counsel Kamer informed her the City's first investigation was very badly done. She said Mr. Kamer indicated



Mr. Clinger violated a number of City policies, as well as Title VII of the 1964 Civil Rights Act. She said Mr. Kamer told her the City Attorney's Office and Karl Hall failed to handle the process and the complaints properly and a second, proper investigation was needed. Mayor Schieve told me Mr. Kamer told her Mercado's investigation could not form a legitimate basis for any action and he believed all the complainants had legitimate claims.

20.  On October 7, 2016, I received a letter accompanied by an agreement. It was sent by Ms. Leerman. The agreement entailed placing me on paid administrative leave while a second investigation was done and while any remediation recommended by the second investigation was performed. I signed off on this agreement. On November 17, 2016, Mr. Thomas told me to return to work. The second investigation was still underway and remediation had not occurred. Furthermore, my interview, re the second investigation, was never done so I did not know how the City would have the information to make accurate findings. I was directed to return to work during a very short work week, the Monday before the Thanksgiving Day holiday. I did not return to work. I decided to resign because I did not want to return to a work environment wherein almost no one would speak with me, I would be openly shunned on a daily basis, and everyone believed false rumors spread by Ms. Thomas.

21.  On October 17, 2016, per the invitation of Mr. Hall, I attended what was supposed to be a "settlement conference." Myself and the other two complainants, Mark Mausert, Bill Peterson, Karl Hall, Mayor Shieve, Naomi Duerr, and Neoma Jardon attended. Discussion of settlement did not actually occur. Instead, the meeting consisted of an attempt to convince us to return to work. However, the investigation had not been completed and the work environment remained hostile. I was not willing to return to work under those conditions. None of the Council members were familiar with our situation. They had not read the correspondence and had not been adequately advised by the City Attorney, i.e., they had little or no information about our claims and were unaware of the content of the correspondence. In short, this was not a real settlement conference. I regard the settlement process as having been abused by Mr. Hall and the City. That is, we were lured to a meeting which was supposed to be a settlement conference, but during which every attempt to discuss settlement was rebuffed. The City's purpose was to convince us to drop our claims and return to work. They also sought to separate us with offers of different agreements governing our return to work.

Declaration - 8



22. The Report of Judge David Wall was released, heavily redacted, on December 26, 2016. I inferred from this timing, and from other statements (e.g., Mr. Hall's characterization of my claims as being part of a "witch hunt") the City Attorney's Office was behaving with malice. Even without interviewing me, the Wall investigation resulted in a conclusion my claims had merit, and through no fault of my own, I was subject to retaliatory hostility. In spite of this finding, and notwithstanding that the Mercado investigation was "deeply flawed", City attorney Hall never corrected his statements to the media to the effect my claims were "baseless" and "without merit." Mr. Hall made these statements for more than a year, from July 30, 2016 to August 11, 2017. Mr. Hall's false characterization of my claims constituted an act of retaliatory hostility. Worse, by making such a statement, Mr. Hall ratified and encouraged the ostracism and retaliatory hostility I experienced at work.

I hereby affirm, under penalty of perjury, the statements made herein are correct.

DATED this 31st day of October, 2017.

*Maureen McKissick* (signature)
Maureen McKissick