# EXHIBIT 6

# EXHIBIT 6

## ATTORNEY/CLIENT CONFIDENTIAL

## DECLARATION UNDER PENALTY OF PERJURY

COMES NOW, declarant, Deanna Gescheider, who under penalty of perjury affirms the following statements are true:

1. I am a plaintiff in *McKissick v. City of Reno* (Case No. 3:17-cv-00458-MMD-VPC). I was previously employed by the City of Reno. I resigned my employment, effective on February 1, 2017. I regard my resignation as a constructive/wrongful discharge as the result of sexual harassment/retaliatory hostility. I am familiar with the contents of the Complaint and Jury Demand, which has been filed in the above-numbered case. I regard the allegations therein as true.

2. I worked for the City of Reno for approximately four and one-half years. When I resigned, I held the position of Director of Communications and Community Engagement for the Office of Communications and Community Engagement. During the time I was employed by the City of Reno, I was never formally disciplined by the City and received no evaluations or reviews. I was promoted on one occasion, which included a change in responsibility, placement on the Executive Staff, and I directly reported to City Manager Andrew Clinger.

3. I am providing this Declaration to provide context of incidents of retaliatory hostility I experienced because of the mishandling of the investigation into my claims. Based on my experience, I do not believe the City Attorney's Office will be fair and unbiased or represent and litigate in the best interests of the taxpayers.

4. Executive Staff meetings were held weekly on Monday and Friday mornings and were led by City Manager Andrew Clinger, and included Assistant City Managers Kate Thomas and Bill Thomas, Acting Police Chief Jason Soto, Fire Chief Dave Cochran, Director of Finance Robert Chisel, Director of Communications and Community Engagement (myself), and Assistant to the City Manager Maureen McKissick.

5. In Executive Staff meetings, Assistant City Manager Kate Thomas regularly directed the Executive Staff to delete our text history amongst ourselves.

6. City Manager Andrew Clinger was present and said nothing to counter Thomas's direction.



7. The Executive Staff followed the direction, and Mr. Clinger appeared to do the same.

8. Because of the investigation that preceded this action, we discovered he allegedly preserved his text history.

9. Shortly after the Supreme Court of Washington issued the *Nissen* Opinion in late August 2015, Acting Police Chief Jason Soto brought the Opinion to an Executive Staff meeting followed by a warning and a conversation about how to hide our text history by using a text application and/or not text at all to avoid the public records request process.

10. During this meeting, Maureen McKissick expressed concern, asking Mr. Clinger if the purpose of finding a text application was to avoid the public records request process, as the intent alone would itself violate the duty to maintain public records. Mr. Clinger did not address her question.

11. Mr. Clinger sent many texts, to members of the Executive Staff, the City Council, and me personally, regarding City business. For instance, beginning in January 2016, Mr. Clinger reduced his in-office hours. He was in the office available for meetings on the mornings of Monday, Wednesday and Friday and on the afternoons of Tuesday and Thursday except for City Council meetings. When we asked how we would communicate with Mr. Clinger when he was not in the office, he told us to text him. The texts integrally concerned City business, i.e., those were government records.

12. In February 2016 Mr. Clinger asked his Executive Staff to download and test the application *Slack* on a Saturday afternoon. We all complied. Again, Ms. McKissick asked if we were doing this to avoid public records requests. There was not a response to Ms. McKissick's questions, and to my knowledge no one used the application beyond that day.

13. By March 2016 Mr. Clinger had discovered the Telegram application. He first tested it with Assistant City Manager Kate Thomas and followed by asking me in person to download it to communicate with him. I was uncomfortable with the directive and avoided it for approximately a week. Mr. Clinger persisted and asked if I needed help downloading it.

14. Mr. Clinger explained there are three levels of secrecy for text messages in the Telegram application. The first level is accessible, the second level is encrypted, and third level is encrypted, timed and explodes the archive on the server meaning the application deleted the texts and became unrecoverable. Finally, one could not screen shot the communication.

Declaration - 2



15. Mr. Clinger told me it was only Ms. Thomas and myself who were testing it. This concerned me because of my perception of their inappropriate personal relationship. Under duress, I did as my superior directed and downloaded the application with his in-person assistance.

16. The communications through Telegram from Mr. Clinger ranged from work-related, to "good morning," to "your skirt is distracting (during a State of the City meeting with the Mayor)," to multiple requests for me to send photos of myself, which I avoided by telling him "I didn't know how." He followed up by showing me how to send photos in person. I appeared to comply by sending him work-related attachments using the Telegram app. I referred to him as boss regularly on our communications within this application to remind him he was in charge.

17. A few weeks into using the application I discussed its use with Ms. Thomas and I confided in Mr. Robert Chisel, Director of Finance (responsible for Human Resources) its use made me uncomfortable.

18. It became apparent to me Mr. Clinger was not using the app solely for work purposes, but primarily for having sexually-oriented communication with me, I deleted the app. Ms.Thomas told me she did the same for the same reasons.

19. I followed up with Mr. Clinger in-person where I reiterated my concerns, asked him to be strictly professional with me moving forward and apologized for any part I had in his confusion thinking I would be amenable to his advances.

20. On two separate occasions, one occurring on May 13, 2016, and the other shortly thereafter, Mr. Clinger patted the chair next to him at the Friday weekly Executive Staff meeting at Coffeebar after I had tried to sit somewhere further away from him. The May 13, 2016 incident included him rubbing my leg under the guise of feeling the material of my pants. I felt undermined, humiliated, intimidated, disrespected and sexualized. Rattled, I crossed my legs to counter his move allowing me to move away from him and tried to hide my discomfort from the others. After the meeting, Mr. Chisel explained that he had seen the incident and my reaction and he confronted me to ask if I was ok. I began to cry and begged him not to report it. I believed it would cause me more harm than good and I feared for my job. He agreed, also making it clear if it happened again, he would have to report it.

21. On June 22, 2016 at approximately 12:30 p.m., I was ordered by the Mayor of Reno

Declaration - 3



to attend a mandatory meeting of top level management. The City of Reno Executive Staff, along with the Acting Community Development Director, and the Business Manager were invited to the Mayor's conference room. The meeting was presided over by Mayor Hillary Schieve, City Attorney Karl Hall and Councilmember Naomi Duerr. Mayor Schieve informed those present that she possessed credible and very concerning evidence of sexual harassment. City Attorney Hall handed each of us a copy of City Policy 607, the City's policy regarding the sexual harassment, retaliatory hostility and sexual discrimination. Mr. Hall also read the policy to those present. I noted the description of "physical harassment" included "patting". After Mr. Hall finished reading the policy, Mayor Schieve sternly directed any of us with knowledge of sexual harassment to make a report to the City's Human Resources Director, Kelly Leerman. We were assured reports would be confidential, and promised no retaliation would result from any reports, and told the City was a "zero-tolerance organization." We were also instructed to take the information and message from the Mayor to our teams and direct our team members to report any sexual harassment.

22. Shortly after the June 22 meeting, I was copying the harassment policy for my team and Mr. Bill Dunne, Revitalization Manager approached me and asked what I was doing. I told him. While the copies were running, he said something to the affect, "I quit slapping women on the ass at least two years ago."

23. On June 22, 2016 Mr. Chisel who oversaw the Human Resources department was on vacation out of the Country. I contacted him to make him aware of the meeting because I was concerned that his employee, Kelly Leerman, Director of Human Resources, was not in attendance. He was surprised and knew nothing about the meeting. He forwarded me notes he had been keeping via email. He explained, per the Mayor's direction at the meeting and his Human Resource position responsibilities, he would likely be required be to report the incidents he witnessed.

24. On or about June 28, Mr. Chisel informed me that he had reported the events he witnessed at the Coffeebar to Ms. Leerman and Mr. Hall. He informed me he had conflicted himself out of the investigative process from that point forward because he was an eye witness.

25. Mr. Chisel informed me that Mr. Hall was not taking the allegations seriously and refused to proceed with any investigation until formal complaints were filed.

Declaration - 4



26. On July 1, 2016, with significant misgivings, I met with Human Resources Director, Kelly Leerman. She assured me confidentiality would be maintained and encouraged me to proceed with a formal complaint. I described the evidence I had collected supporting my perception that there was illegal activity and violations of statutes regarding ethics in government (NRS 281A.430, NRS 281A.400 and NRS 281A.065) happening at the City of Reno. I had recently apprised Mr. Clinger and Mr. Hall of my concerns regarding this issue. I explained to Ms. Leerman I feared retaliation from making this report.

27. Ms. Leerman confirmed Mr. Chisel had already reported the sexual harassment incidents I had experienced with Mr. Clinger. I proceeded to give her my side of the story concerning those events. I reported to Ms. Leerman how Mr. Clinger had been sexually harassing me, e.g., I confirmed Mr. Clinger had in fact rubbed my leg during an Executive Staff meeting; how Mr. Clinger had touched my neck while saying, "when Deanna gets really angry she turns red right here;" how Mr. Clinger instructed me to download the Telegram application (showed me how to download the app) and then used that application to send me sexually-oriented messages, which were then automatically destroyed by the application; I informed Ms. Leerman of the sexualized culture and conduct I witnessed, which was directed at Ms. Thomas by Mr. Clinger and made a professional work environment at the City of Reno virtually impossible; I reported the hostile work environment Ms. Thomas created for Ms. McKissick of which Mr. Clinger was aware and allowed; and reported further leadership concerns I had with Mr. Clinger's management style and misconduct, etc..

28. Later in July, Ms. Leerman informed me Mr. Hall hired Alice Mercado, a local Reno attorney, who would be investigating the allegations of sexual harassment by Mr. Clinger. Ms. Leerman scheduled the interview for me with Ms. Mercado.

29. On July 11, 2016, approximately two hours prior to my interview with Ms. Mercado, Ms. Thomas and I met over a late lunch. Over the past four years I had developed a professional and personal relationship with Ms. Thomas. I considered her both a close friend and a trusted colleague who had dealt with many of the same issues that I had experienced. Despite her earlier recognition of the issues and serious complaints she had about Mr. Clinger, Ms. Thomas warned me that she had "decided she could take more shit" because she had to keep her job. She further warned me that Mr. Clinger's wife had kept all his text messages and if the complaints against

Declaration - 5



him were sexual harassment, he planned to fight. She said he confirmed none of the inappropriate text messages were from her, implying that his wife had inappropriate text messages to him from me. Her well-timed warning and vague threat was intimidating considering she knew I was being interviewed in a few hours. Ms. Thomas shared with me Mr. Clinger knew the initial complaint was made by Brianna Wolf and he suspected Ms. McKissick was involved. She also warned me that Mr. Clinger had mentioned my name as a potential claimant.

30. Although she decided not to make any official complaint, Ms. Thomas, told me about an incident, which confirmed their sexualized relationship. She described recently after a lunch with Mr. Clinger, she was getting out of his car and she remembered to take her sandwich box home. She said something like, "I'd better not leave this in your car or it will make it smell." Mr. Clinger replied, "No, but you can leave your underwear in my car."

31. Later, on the afternoon of July 11, 2016, I met with Ms. Mercado. She began by explaining her narrow scope of her investigation, which meant she did not want to discuss my formal report regarding unethical or illegal activity. She had been directed to focus on the allegations of sexual harassment by Mr. Clinger. She told me ask to Mr. Hall and Ms. Leerman why the interview had been scoped so narrowly.

32. For approximately 15 minutes I challenged her narrow scope. I was beyond uncomfortable because the primary complaint I had made was fear of retaliation for reporting what I perceived as illegal activity and ethical violations.

33. Nonetheless, I answered Ms. Mercado's questions regarding my accounts of the sexual harassment incidents. Ms. Mercado's interview felt more like an interrogation. For instance, regarding the rubbing of the leg incident, Ms. Mercado asked me, "was the touch sexual?" and I replied that I didn't know his intent, but I did know how it made me feel: undermined, humiliated, intimidated, and disrespected. She asked me in an accusatory manner "did you move his hand?" Essentially, Ms. Mercado seemed to be blaming me for Mr. Clinger's misconduct.

34. I told Ms. Mercado of the sexualized environment I perceived Mr. Clinger and Ms. Thomas had created. I did not know how to deal with the ebb and flow of the unprofessional relationship and felt he based his personnel evaluations on his relationships instead of actual

Declaration - 6



performance. This meant Ms. Thomas could make many million-dollar mistakes and be rewarded with promotion. Specifically, after Ms. Thomas cost the City millions in, ADP deployment overages, and strategic plan development, she was promoted. Ms. Mercado defended Mr. Clinger's treatment of Ms. Thomas, arguing that Ms. Thomas was simply "managing up," "she was managing her manager," "bad management was not illegal," and instead of fulfilling her duty to investigate, Ms. Mercado trivialized my reports.

35. Ms. Mercado asked if I thought Ms. Thomas and Mr. Clinger were having an affair. I replied that I neither knew nor cared. I informed Ms. Mercado that I cared about how unproductive and unprofessional their relationship had become. I noted that they regularly made suggestive innuendos, sexually charged jokes, and exchanged flirtatious looks creating an inappropriate work environment.

36. Ms. Mercado again defended their behavior informing me the City of Reno did not have an anti-fraternization policy and basically asserting that Mr. Clinger and Ms. Thomas could be having sex and it had no official repercussions.

37. In April 2016, Mr. Clinger announced during an Executive Staff meeting that he was removing Ms. Thomas's team from her purview and assigned them and their coinciding projects to Ms. McKissick. The announcement clearly caught them both off guard. Ms. Thomas held back tears and Ms. McKissick was visibly rattled. This incident coincided directly with Ms. McKissick's promotion in both title and pay, while Ms. Thomas's salary remained the same even though Mr. Clinger significantly reduced Ms. Thomas's responsibilities.

38. Ms. Mercado suggested this was proper management. Again, instead of remaining neutral and performing an investigation of the allegations, Ms. Mercado commended Mr. Clinger for confronting Ms. Thomas about poor job performance.

39. I responded that it appeared Mr. Clinger was instead encouraging animosity between Ms. McKissick and Ms. Thomas because Ms. Thomas had revealed to me that after publicly shaming her, Mr. Clinger told Ms. Thomas he only made the change because Ms. McKissick had lobbied for it. Mr. Clinger was aware that Ms. Thomas had been hostile towards Ms. McKissick for a long time and handled the situation in a manner that could only make it worse. I confronted Mr. Clinger about this choice on the day of that meeting. Mr. Clinger followed me into my office after the meeting wanting to discuss it and how poorly the reassignment had been received. I

Declaration - 7



criticized the way he handled the announcement of the reassignment, and he disregarded it, blaming Ms. Thomas for being oversensitive.

40. I gave Ms. Mercado several examples of Ms. Thomas ostracizing Ms. McKissick and how Mr. Clinger encouraged or failed to discourage that behavior. For instance, Ms. Thomas excluded Ms. McKissck from meetings, rarely addressed her, and spoke negatively about her to City of Reno employees.

41. Ms. Mercado continued to defend Mr. Clinger, asserting that "being mean is not illegal."

42. I moved on to describe Mr. Clinger's overtly sexual conduct. I described Mr. Clinger's directive to download Telegram and the sexual content of his text messages to me. When I explained that the application did not allow me to preserve the messages, Ms. Mercado was indignant. She called it "convenient" that I could not produce copies of the messages.

43. I explained to her that Mr. Clinger intentionally used that application because it destroyed the messages, but she appeared unpersuaded. Ms. Mercado failed to remain neutral, advocated for Mr. Clinger throughout the interview, and disregarded or minimized the incidents I reported. She did not record the interview and appeared to take scant notes throughout the three hours.

44. Only four days later, at a meeting I had scheduled to report Mr. Clinger's increasing retaliatory hostility. Ms. Leerman informed me that Ms. Mercado might not have finished her final report, but had completed her investigation and opined that there had not been any sexual harassment.

45. I asked Ms. Leerman what that meant for me and what the next steps were. She said, "you'd have to meet with your 'friends' and decide what you want to do next," making the quotation marks with her fingers. She provided no detail about the results of the investigation and did not indicate any remedial action would be taken. The news left me uneasy and confused. I felt unsafe at my place of work.

46. Mr. Clinger brought his wife to our Executive Staff meeting on July 15, 2016. Although the meeting had been regularly held at the Coffeebar, Mrs. Clinger had never attended or grabbed coffee during the meeting before. Considering the fact, Kate Thomas told me his wife was collecting and reviewing Mr. Clinger's text messages and that the Clinger's were ready

Declaration - 8



for to fight any allegations, I viewed this abnormality as intended to make me feel uncomfortable and keep me from being able to do my job.

47. Mr. Clinger began providing me direction through Ms. Thomas, which was abnormal. Mr. Clinger ceased attending previously scheduled meetings with me or speaking to me directly.

48. At a pizza meeting with various Executive Staff members, including Mr. Clinger, Ms. Thomas and Fire Chief Dave Cochran, and Safety Manager Kyle West, Mr. Clinger looked directly at me while saying, "karma is a bitch." I felt so scared I left before the meeting was over, telling Mr. Clinger that I would be in my office if the City Council or Executive Staff needed anything from me. I regarded this statement about "karma" as threatening, and directed at me.

49. Although Ms. Leerman had already informed me that Ms. Mercado's investigation into my claims had concluded, on July 20, 2016, Ms. Mercado called to ask additional, accusatory questions. Ms. Mercado's call came thirty minutes before a City Council meeting was set to begin, which was the busiest and most stressful time in my office. Calling to mind the veiled threats made at my lunch with Ms. Thomas, Ms. Mercado asked me if I had shared suggestive text messages with Mr. Clinger prior to downloading Telegram. I answered her questions, but as she continued probing, I felt like she was trying to build a case against me. It felt like she was building a case to blame me for Mr. Clinger's inappropriate sexual activity at the workplace. I was crying uncontrollably. I reiterated to her that I felt I had no protection throughout the entire process and it had been horrendous to work with the Mr. Clinger after the initial complaints had been made. Mr. Clinger and others had been overtly and subtly hostile. Mr. Clinger had stopped respecting my opinion or allowing me to perform my job; his demeanor toward me changed.

50. After Mr. Clinger learned that the allegations of sexual harassment had not been substantiated, he made aggressive and inappropriate remarks to characterize me and my co-complainants as liars.

51. Mr. Clinger said to the press Mr. Hall told him personally Ms. Mercado's investigation had concluded the allegations against him were "baseless."

52. I am unaware of any efforts by Mr. Hall, any member of his office, or any City of Reno employee to remedy or curtail Mr. Clinger's retaliatory conduct.

*53.* Mr. Hall set the stage for retaliatory hostility by allowing Mr. Clinger's conduct to go

Declaration - 9



forward. He furthermore engaged in retaliatory hostility himself by accusing me and the other complainants of engaging in a "witch hunt."

54. On or about July 28 or 29, 2016, my attorney-client privileged paperwork was stolen out of my office at the Reno City Hall. I immediately notified Ms. Leerman via email. She told me she notified the City Attorney's Office of the situation and she did not believe I was in physical danger.

55. I knew on Tuesday, July 26, 2016, Ms. Thomas had requested and received a master key, which would help her avoid surveillance cameras and access any office in Reno City Hall.

56. I notified the City of Reno's Safety Manager Kyle West about the theft because he managed the surveillance activity at City Hall. He nervously relayed that Ms. Thomas had called him to her office within an hour of me reporting the stolen paperwork to Ms. Leerman. Ms. Thomas had told him to tell me to file a police report. He told me he was not sure what was going on, but he was worried for me. I did not file a Reno police report because I did not trust advice from Ms. Thomas at that point in time and I did not expect fair treatment from the Reno Police Department since I had reported they were engaging in unethical and/or unlawful activity. Instead, I waited to hear back from Ms. Leerman, as she had directed.

57. Mr. Hall did not initiate an investigation for over two weeks later. I discovered the investigation had been initiated when I received a call late in the afternoon on Friday, August 12, 2016, informing me that deputy sheriffs were in my office dusting for finger prints and wanting to obtain my statement. The deputies informed me that Mr. Hall had initiated the investigation earlier that morning and walked the deputies to my office. The deputy sheriff concluded there was a lack of evidence and lack of leads and closed the investigation on November 29, 2016.

58. Revitalization Manager Bill Dunne also engaged in overt retaliation. Specifically, on September 29, 2016, Mr. Dunne threatened me, saying that he would get revenge even if it took him years. He claimed to have a file at home with which he could exact that revenge. He told me that Ms. Wolf and Ms. McKissick were not really my friends. His attempt at intimidating me as a witness was clear when he suggested that people saw me as a victim of Ms. Wolf and Ms. McKissick and encouraged me to recant my statements as having been coerced.

59. Retaliation continued ever after Mr. Clinger put himself on administrative leave.



Acting City Manager Bill Thomas demoted me by reorganizing, so that I was no longer on the Executive Staff. When I asked if I was being marginalized because of my involvement in the sexual harassment claims, he responded he was not certain I would continue to have a job and said something like, "if you make a bunch of money, I don't see how you can continue to work here." He threatened to retaliate if anyone complained to the City Council about him or his decisions.

60. After I reported Mr. Dunne's behavior, Mr. Thomas told me to "grower a thicker skin," and "not to take things so personally." He denied any responsibility to ameliorate the situation or prevent future incidents of hostility, which he predicted would occur.

61. While Ms. Leerman agreed there should have been discipline, she also denied responsibility, saying Mr. Hall and Mr. Thomas made the final calls regarding discipline.

62. Mr. Hall's wrongdoing was not limited to failing to prevent other's retaliation, he routinely overstepped his authority and attempted to intimidate me and my co-complainants. In July 2016, Mr. Hall threatened disciplinary action up to and including termination if I did not "maintain confidentiality." At the time the letter was sent, however, Mr. Clinger was not maintaining confidentiality, had been communicating with members of the City Council and other staff. Mr. Hall was attempting to place me under a gag order, while Mr. Clinger was not. Furthermore, Mr. Hall has no authority to terminate City staff apart from his own staff in the City Attorney's Office.

63. In October, Mr. Hall invited us to a settlement conference. My attorney Mark Mausert, Mayor Hillary Schieve, Councilmember Naomi Duerr, Councilmember Neoma Jardon, attorney William Peterson, Ms. McKissick, Ms. Wolf, and I attended the conference. Although Mr. Hall called the meeting a settlement conference, when we convened Mr. Hall provided my attorney a document for all of us to sign, which called for confidentiality and would have allowed Mr. Hall to contact us ex parte.

64. The Mayor and councilmembers said they could not just fire several people, so they wanted to discuss employment contracts, which could give us short-term security without any long-term guaranty. They floated ideas like working off-property to avoid retaliation; however, they had failed to consider the feasibility of their suggestions. For instance, being responsible for all City communications required me to be present at City Hall. I needed to be accessible to

Declaration - 11



1 | City employees, media and my eleven direct reports. Additionally, Mr. Hall had failed to completely inform either the Mayor or the Councilmembers about what had happened already.

65. I was blindsided and offended by being maneuvered into a meeting under false pretenses. There was no discussion of settlement and no negotiation other than Mr. Hall stating that our offer would not be acceptable.

66. Mayor Schieve, acknowledged Mr. Hall had withheld information from her in a text to me.

67. Sometime in October 2016, Mr. Hall or someone in his office released our settlement proposal to the press to cast us in a very bad light.

68. On October 7, 2016, three months after I made my initial complaint, Mr. Hall advised that I would be placed on paid administrative leave pending the conclusion of investigations, including the implementation of recommendations from the Special Counsel. Instead, on November 17, 2016, I received a phone call from Ms. Leerman, informing me that my paid administrative leave would end the following day and to return to work. My administrative leave was terminated despite a report by Mr. Hall at the City Council meeting on November 15, 2016, in which he confirmed that the investigation was still underway, and the final report was not expected until December 2016. I asked Ms. Leerman why the terms of my administrative leave were being altered and expressed my concerns that retaliation would be ongoing; she was unable to address my questions or concerns because she indicated that Mr. Hall's office had made the decision to terminate the administrative leave.

69. The final investigative report was released December 26, 2016, and included my name in the release to media. While the press decided to show integrity, meaning all outlets kept my name confidential, I received calls from reporters requesting interviews.

70. I was willing to be interviewed by retired Judge David Wall during the second investigation. I understood that his interview would last many hours and would not be recorded. My attorney offered to allow the interview, conditioned on his presence and a stipulation that would not allow the interview to be used in litigation by either side. The City refused to agree. I am informed Mr. Hall made the decision not to agree to the stipulation. Accordingly, I refused to subject myself to an interview.

71. When the City released the redacted report, Mr. Hall made a public statement

Declaration - 12



claiming my allegations were "baseless" and "without merit", even though Judge Wall had concluded that my claims were meritorious. Mr. Hall's statements materially contributed to my decision to resign my employment. The statements themselves were retaliatory and contributed to the hostility I experienced. Worse, I regarded Mr. Hall's statements as de facto invitation for City employees to indulge in retaliatory hostility, much like I had already experienced.

*The above summary is not a complete account of the incidents, interviews, experiences or statements.*

I hereby affirm, under penalty of perjury, the statements made herein are correct.

DATED this 30 day of October, 2017.

*Deanna Gescheider*