# EXHIBIT 7

EXHIBIT 7

Declaration Under Penalty of Perjury

COMES NOW Brianna Wolf, who under penalty of perjury, affirms the following statements are correct:

1. I am a former employee of the City of Reno and am soon to be a plaintiff in a Title VII sexual harassment/retaliation case against the City of Reno. I was employed by the City from May 2015 to December 2016. I am providing this Declaration because of the manner in which I have been treated by the Reno City Attorney's Office and because I do not believe that Office will fairly handle my case in an unbiased manner, in the best interests of justice and the citizens of Reno.

2. Sometime in late May or June of 2015 I was working late at my desk on the 15th Floor of City Hall. I was the only one in the office. City Manager Andrew Clinger and Assistant City Manager Kate Thomas entered the floor and did not see I was there. They were talking loudly and stopped on the other side of a cubical from me. I could not see them but could hear them very clearly as the office was silent otherwise – the lights had even been turned off for the day. Mr. Clinger and Ms. Thomas were flirting with each other. I tried to ignore them and focus on my work. But then I became aware of pauses in the flirting corresponding to sounds of clothes rustling and vocal reactions of pleasure. I quickly became too uncomfortable to remain at my desk. I grabbed my purse and walked out of the office, apparently without being detected. I was shocked by the clearly sexual nature of the interaction I had overheard by the two top managers at the City. I did not know what to make of it.

3. Sometime in August of 2015 my relationship with my superior, Maureen McKissick, had developed to a point of comfort and trust that I decided to tell her what I had overheard a couple months before. She was sorry I had such a disturbing experience so new on the job but also shared that many people at City Hall had suspected Mr. Clinger and Ms. Thomas were having an affair. We discussed if I should report my experience to Human Resources but decided against it. At that point I had recently made a complaint about unprofessional behavior by a councilmember and Human Resources did not follow-up. When I asked H.R. Director Kelly Leerman about it she demurred. When I told co-workers I had complained about the treatment by this councilmember they looked at me with shock and said things like, "Do you want to keep your job?" This told me that, if an alleged affair by Mr. Clinger and Ms. Thomas was essentially an open secret at City Hall and was tolerated, making a report to Human Resources about it would not amount to anything, or worse, result in an adverse impact to myself.

4. At some point in late 2015 or early 2016, Ms. McKissick and I were working in her office and Mr. Clinger's secretary, Visha Siddharthan joined. Ms. Siddharthan had evidently brought up her suspicions of an affair with Ms. McKissick before and Ms. McKissick asked me if I would share with Ms. Siddharthan the encounter I had overheard. I did and Ms. Siddharthan's reaction was something to the effect of, "I knew it!" She relayed that she was often frustrated that Ms. Thomas had

1



Case 3:17-cv-00458-MMD-VPC   Document 23-10   Filed 10/31/17   Page 3 of 16

full executive access to Mr. Clinger's calendar. She suspected Ms. Thomas added fake meetings on his calendar to cover-up for times they were alone together. She relayed Mr. Clinger's wife kept close tabs on him.

5. Also at some point in late 2015 or early 2016 I became aware of the hostility Ms. Thomas manifested towards Ms. McKissick. Ms. McKissick began venting to me about the cruel treatment she endured at the hands of Ms. Thomas. I was aware Ms. Thomas's treatment was triggered by Mr. Clinger reassigning work from Ms. Thomas to Ms. McKissick due to performance issues. I saw this happen firsthand with the Urban Land Institute project and the strategic plan. I felt angry that Ms. Thomas was punishing Ms. McKissick for her own deficiencies. I wondered how this was tolerated by Mr. Clinger. I encouraged Ms. McKissick to complain to Mr. Clinger but her conversations with him always resulted in soothing words but no action. We discussed complaining to Human Resources but again realized nothing would come of it. It was clear to me Mr. Clinger was unable to discipline Ms. Thomas.

6. On the afternoon of June 22, 2016 Ms. McKissick dropped a paper on my desk and said, "that was the craziest meeting I've ever attended." The paper was the City's sexual harassment policy. Ms. McKissick explained that she had been called to an emergency meeting by the Mayor, Councilwoman Duerr and City Attorney Hall. The Mayor shared that she was aware of sexual harassment at a high-level and wanted to reiterate the City's zero-tolerance policy. She directed anyone with knowledge of sexual harassment to report. I asked Ms. McKissick if now was the time to share what I had overheard the year before. She said maybe but better to think about it for a while. We wondered if the Mayor's interest made it more likely that the report would be taken seriously and handled appropriately. From everything we knew about Human Resources, we were still skeptical.

7. On June 27, 2016 Ms. McKissick related a conversation to me that she had with Robert Chisel, Director of Finance and overhead of Human Resources. Mr. Chisel told Ms. McKissick that he was aware of several reports of sexual harassment against Mr. Clinger and felt an obligation to share with City Attorney Karl Hall. During that conversation Ms. McKissick asked me if it would be okay to tell Mr. Chisel about my experience as well. Ms. McKissick felt Mr. Chisel was trustworthy so I said yes.

8. On June 28, 2016 Ms. McKissick related a follow-up conversation to me. Mr. Chisel had met with Mr. Hall and Mr. Hall refused to open an investigation into the allegations against Mr. Clinger. Mr. Chisel wondered if I would be willing to file a formal complaint to force Mr. Hall to investigate. Again, trusting Mr. Chisel and the pervious week's directive and assurances from the Mayor, I said I was willing to make a complaint.

9. On the morning of June 29, 2016 I met with Human Resources Director Kelly Leerman and reported what I had overheard the year before and connected it with the preferential treatment Mr. Clinger gave to Ms. Thomas and the harmful effects that had on Ms. McKissick and



myself. I was very clear that Ms. McKissick was the primary victim of the harassment. Ms. Leerman took notes and walked me through what would happen next, taking time to assure me that my identity would remain confidential. She also shared that retaliation was taken even more seriously than initial complaints so I had nothing to worry about.

10. On the afternoon of June 29, 2016 I received a phone call from Ms. Leerman, Ms. Leerman sounded rattled. She told me that Mr. Hall had just returned from informing Mr. Clinger that a report of sexual harassment had been made against him and Mr. Hall "could not remember" if he also revealed my identity to Mr. Clinger. Then she launched into a stream of apologies. I asked how could he not remember? Ms. Leerman said she was also mystified. Nonetheless Ms. Leerman assured me that Mr. Clinger was informed about confidentiality and would not further share my identity and was instructed not to retaliate. No actions were taken to physically separate myself and Mr. Clinger. I still had to work with him in a small office.

11. On the evening of June 29, 2016 I was told by Ms. McKissick that she had just spoken to Mr. Chisel about her concerns that my identity was potentially shared with Mr. Clinger. Mr. Chisel relayed that Mr. Hall had been tasked by Ms. Leerman to tell Mr. Clinger of the complaint and to inform Council of the complaint. While Mr. Hall did tell Mr. Clinger, he did not follow-through in telling Council – which distressed Mr. Chisel and Ms. Leerman – and of course myself. No reason was given for the delay.

12. The next day, on June 30, 2016 Ms. McKissick told me that she was considering going to Human Resources to also file a formal complaint. As a member of the executive team, she felt her direct involvement might help ensure the process would be done fairly. Mr. Hall's handling in the first day had not inspired confidence that my complaint was actually going to be taken seriously like the Mayor had assured. Ms. McKissick informed me the next day, July 1, 2016 that she had formally registered a complaint to Ms. Leerman.

13. On the afternoon of July 12, 2016 I was interviewed by Alice Campos Mercado. There are several important things to note:

    *a.* Ms. Mercado confirmed my identity has been shared with Mr. Clinger. I wondered why I had not been told the truth earlier. Almost two weeks had passed since Mr. Hall "maybe" revealed my identity and it had been agonizing to share the same small workspace with Mr. Clinger not knowing what he knew and constantly questioning how to interpret his behavior towards Ms. McKissick and myself.

    *b.* In my reporting to Ms. Mercado, I was very clear that the impact of the sexual relationship between Mr. Clinger and Ms. Thomas primarily impacted Ms. McKissick and, myself. After describing the encounter I overheard in May/June of 2015, I articulated that Mr. Clinger and Ms. Thomas have a compromised working relationship because they'd clearly had some sort of sexual relationship that lead each of them to have dirt on one another – they are both married, they both have families – they had leverage against each

3



other if things between them were to sour. I described the ongoing pattern of Mr. Clinger not being able to effectively manage Ms. Thomas. Ms. Thomas continually performed poorly and Mr. Clinger tolerated it without consequence. Mr. Clinger couldn't hold Ms. Thomas accountable because he needed to keep her happy. Instead of taking corrective action to improve Ms. Thomas' performance, he routinely shifted her work to Ms. McKissick because Ms. McKissick is very competent. Ms. Thomas reacted with escalating hostility towards Ms. McKissick. I described how Mr. Clinger even fed this hostility to insulate himself from Ms. Thomas's rage. In addition to describing the ostracism that Ms. Thomas exhibited to Ms. McKissick, I gave two concrete examples of Mr. Clinger making it worse. (1) The largest transfer of work from Ms. Thomas to Ms. McKissick occurred in April 2016. Mr. Clinger told Ms. Thomas that Ms. McKissick had requested the work even though that was the exact opposite of the truth. Ms. McKissick had strongly objected to more work when Mr. Clinger had off-handedly mentioned the idea to her months earlier, citing an already full plate and a desire to avoid any increase is Ms. Thomas' wrath. (2) Ms. McKissick shared a concerning incident with Mr. Clinger about one of Ms. Thomas' direct reports. The particular report had also been flagged to Mr. Clinger by the Mayor and several other executives. Yet in the days after Ms. McKissick had shared the concern with Mr. Clinger, the report confronted Ms. McKissick revealing that Ms. Thomas had told the report that Ms. McKissick personally didn't like her. I repeatedly tried to discuss the impact all of this had on Ms. McKissick and I was repeatedly asked what impact it had on myself. While it did certainly impact me – I described the stress and the ostracism I experienced by association – my intention in filing the complaint and in speaking with Ms. Mercado was to report the far greater impact it had on Ms. McKissick. I could not understand why Ms. Mercado continuously redirected me away from making that case. In my interview, Ms. Mercado flip-flopped between identifying Ms. Leerman and Mr. Hall as the person who set the scope. Presumably, it was a combination of both of them.

c.   In not making a finding of sexual harassment, Ms. Mercado stated "the complaint presented by Ms. Wolf was entirely unfounded." I have no doubt about the nature of what I overheard that one night between Mr. Clinger and Ms. Thomas – whether the liaison was consummated or whether it was the only liaison between them does not matter – it was not professional, it was not friendly, it <u>was</u> of a sexual nature. Ms. Mercado did not investigate if there were any other legitimate reasons to explain why Ms. Thomas' poor job performance was tolerated by Mr. Clinger when he did not otherwise tolerate poor performance by his staff.

d.   In addition to sexual harassment issues, I also reported broader mismanagement issues to Ms. Mercado. I described Mr. Clinger's complete disregard for following City Policy and I gave several examples where the City Charter was knowingly ignored by Mr. Clinger.



While Ms. Mercado did note these issues at a high level in her report, she did not investigate them or report any details.

e. A co-worker came up several times in my interview with Ms. Mercado. This co-worker also had a desk on the 15th floor, was a keen observer and had high ethical standards. He was a member of Ms. Thomas' staff who, like the rest of them, had barely interacted with me even though we were all in the same small space. At some point, he made clear to me that he was there to do a job, not to be allegiant to someone who was going to take him away from doing the right job. This broke the tension and allowed us to become friendly. He told me that since we had become more friendly, he was getting questions from the rest of Ms. Thomas' staff about why he was talking to me. To me, this was clear proof that the ostracism I felt was real and was promulgated by Ms. Thomas. The fact that he was willing to break ranks to be nice to me made me trust him and we regularly compared notes about all the inappropriate behavior we saw on the 15th floor. Here was someone that could speak to the ostracism and inappropriate behavior on the 15th floor and Ms. Mercado did not bring him in for an interview and to learn more. Why not?

f. The same co-worker told me later that day that Ms. Thomas knew it was me that has lodged a complaint and was spreading a rumor that Ms. McKisssick was the mastermind behind my complaint in a conspiracy to bring Mr. Clinger and herself down. I immediately called Ms. Mercado to report this obvious retaliation and collusion between Mr. Clinger and Ms. Thomas. Ms. Mercado said she would look into is as well as pass it along to Human Resources. While she mentions my report of retaliation in her investigative report, she did not investigate nor make any finding on it. My report of retaliation would have been easy to confirm by interviewing the noted co-worker and would have been easy to make a finding on. I don't understand why Ms. Mercado investigated claims of retaliation made in the same timeframe by Ms. Gescheider and not my own.

g. In reading Ms. Mercado's Investigation Report, I am struck by inconsistencies that evidence further bias towards Mr. Clinger:

    i. As stated above, my repeated attempts to assert Ms. McKissick as the main victim were completely rebuffed during my interview with Ms. Mercado and were also omitted from her Report. The primary thrust of my claim as reported to Ms. Leerman and Ms. Mercado was the affect Mr. Clinger and Ms. Thomas's sexual relationship had on Ms. McKissick's work environment. The primary thrust of Ms. Mercado's interview was asking me to elaborate answers to questions posed by Ms. Leerman when I submitted my complaint on June 29, 2016 that had nothing to do with my primary complaint. Mr. Mercado's report therefore mainly focused on "claims" I had not sought to report.

5



    ii.    Ms. Mercado was also biased in her discussion of the secondary impact the relationship had on me. Ms. Mercado reported that Ms. McKissick and myself had both told her that there was no adverse impact on my work performance (which was true) so she concluded there was no violation of policy. Yet, I did also make clear how Ms. Thomas and her staff ostracized me and I described how the tense environment Ms. Thomas created on the 15th floor for myself and Ms. McKissick impacted my emotional health. This is clear evidence of an "intimidating, hostile or offensive work environment" that is actionable under City Policy.

    iii.    When presented with conflicting evidence, Mr. Mercado did not investigate deeper. For instance, in making the initial report, Mr. Leerman asked if I had seen any other concerning behavior. I volunteered that Mr. Clinger's secretary, Ms. Siddharthan thought that Mr. Clinger and Ms. Turney were having an affair and that I had experienced several occasions of Ms. Turney trying to sneak behind me to visit Mr. Clinger's office after hours. I reported what I witnessed as suspicious and attributed all further speculation to Ms. Siddharthan. Ms. Mercado <u>quotes</u> me in her report as saying "no one" was aware of any "legitimate business" Ms. Turney had with Mr. Clinger. I <u>never</u> said that, I repeatedly reported to Ms. Leermand and Ms. Mercado that Ms. Siddharthan said that. From the Mercado Report and her interview notes, it is apparent Ms. Siddharthan reported she never had suspicions of Mr. Clinger's relationship with Ms. Thomas or Ms. Turney. This directly contradicts what I reported, yet Ms. Mercado did not seem to probe Ms. Siddharthan for the inconsistency nor did she even acknowledged the inconsistency in her report.

14.    On July 16, 2016 I received a very distressing email from Ms. McKissick. Ms. McKissick relating she had gone to see Ms. Leerman the day before to report an escalation of retaliation by Mr. Clinger and Ms. Thomas. While there, Ms. Leerman told her that Ms. Mercado had shared that she was not going to be able to make a finding of sexual harassment and conceded that the scope of the investigation had been too narrow. The email also relayed how Ms. McKissick received a phone call from Deputy City Attorney Mark Dunagan later that afternoon to also acknowledge the investigation had been flawed and that a new investigation would be necessary. Nevertheless, Ms. McKissick was very unsettled by the outcome and not fully assured by the City's response. I expressed how I could not believe the finding was being shared prematurely and inconsistently – why hadn't I been informed as well?! I told Ms. McKissick that I would seek a meeting with Ms. Leerman on Monday to try to better understand what was going on and feel out how much we could trust the City moving forward.

15.    On July 18, 2016 I met with Ms. Leerman. Half-way through Mr. Hall happened to knock on Ms. Leerman's door and she invited him to join the conversation with my consent. There were several things that were very disturbing about the meeting:

6



    *a.*    Ms. Leerman was evasive and tried to carefully choose her words. She denied having told Ms. McKissick the result of Ms. Mercado's investigation. She insisted that it was technically impossible to know the result because the report had not yet been delivered. She further explained Ms. McKissick must have misunderstood: their Friday conversation was about the retaliation by Ms. Thomas towards Ms. McKissick after the April transfer of work and staff and that was not sexual harassment because it was motivated by Ms. Thomas' loss of prestige. I reminded Ms. Leerman that the retaliation by Ms. Thomas subsequent to the work transfer is a prime example of the sexual harassment claim I submitted. Ms. Leerman then tried to pass the misunderstanding off on Ms. McKissick being scattered and how Ms. Leerman had to help her understand what is simple retaliation and what is sexual harassment. I felt the characterizations of "simple retaliation" and Ms. McKissick's mental state were inappropriate coming from a director of human resources. I felt Ms. Leerman was trying to cover-up the truth about having shared the early results of the Mercado investigation with Ms. McKissick.

    *b.*    When Mr. Hall later joined the meeting, I again raised my concern that early results were being disclosed to participants. I specifically said that it seemed from talk on the 15th floor that Mr. Clinger had also been told of the anticipated result of the Mercado Investigation. Ms. Leerman said she nor Mr. Hall had told Mr. Clinger. Mr. Hall did not correct this statement. Mr. Hall said the results of the investigation would first be shared with Council and Council would decide what action to take before the results were shared with the claimants or Mr. Clinger.

    *c.*    I asked Ms. Leerman and Mr. Hall when they informed Council about the complaints and how much information had been shared. I was told that they met with the just the Mayor in the days after my complaint was filed and only shared that a claim was filed – no details of the claim – and that an investigation would be conducted. Mr. Hall indicated that several weeks into the process he had similarly brief discussions with each Council member. I asked why the Council was not informed earlier as required by City Policy. Mr. Hall replied that he was concerned telling the Council would cause them to take it upon themselves to conduct an investigation. He reasoned that he wanted to maintain the confidentiality of the investigation without the Councilmembers trying to dig into what was going on and asking questions. I responded that it was absurd to not trust the Council to maintain confidentiality and again reiterated they were supposed to be informed in a timely matter. Mr. Hall then responded that he didn't realize he had an obligation to do so.

    *d.*    I then stated to Ms. Leerman and Mr. Hall that their choices to not follow the City's Policy was biasing the process to favor Mr. Clinger. Mr. Hall responded by asking why it was so important for the Council to be informed. I responded that there was retaliation occurring and, as Mr. Clinger's boss, the Council was the only body able to take action to prevent and



discipline him as required by City Policy – without their involvement Mr. Clinger could act with impunity. I reported how I had shared with Ms. Mercado almost a week earlier that Ms. Thomas was talking about me to a bunch of people in City Hall in connection with the complaint. Mr. Hall asked me how that was retaliation. I had to explain that Ms. Thomas should not even know that I'm the one who made a claim – this shows Mr. Clinger violated confidentiality and compounded Mr. Hall's mistake of telling him my identity by promptly telling Ms. Thomas – and that the nature of her rumors were that I was part of a conspiracy to take them down. I said my peers are talking behind my back about things that are supposed to confidential in a storyline that is false. I asked Mr. Hall how is that not a hostile work environment and he just said something to the effect of, "I don't know what people are saying. They were instructed to maintain confidentiality."

*e.* Compounding my concerns, I was shocked by Mr. Hall outright lying to me during the conversation. Several times he insisted that he had not told Mr. Clinger that I was the one who filed the complaint. Yet, Ms. Mercado had already told me that my identity was indeed shared and earlier in that very conversation, before Mr. Hall joined, Ms. Leerman told me something to the effect of, "Mr. Hall feels really bad for revealing your identity to Mr. Clinger. He knows he should not have done that. He asked me if he should call you to apologize and I said that he should leave you alone." I saw the failure to tell me the truth earlier as prejudiced and Mr. Hall continuing to lie to me as retaliatory hostility.

*f.* There were other troubling inconsistencies in the conversation with Ms. Leerman and Mr. Hall. For instance, Ms. Mercado told me during my interview that, as the impartial investigator, she was the one to determine the order of who she was interviewing. She had asked to interview me first but was told that I was not available. I clarified that my schedule had been wide open. During this conversation Ms. Leerman admitted that she and Mr. Hall had set the order of the interviews based on their judgment.

*g.* Ms. Leerman and Mr. Hall also seemed to have no plan for responding to the retaliation claims made by myself and Ms. McKissick. First, they claimed ignorance of the retaliation I had reported to Ms. Mercado the week prior. They then stated that retaliation would be considered separately from the sexual harassment claims and that they needed to wait for the results of the sexual harassment investigation before they could investigate retaliation because it would be a lot easier to prove retaliation if there was also a violation of the sexual harassment policy. They also acknowledged that they weren't really sure what to do, that they were unfamiliar with the policy and needed to get up to speed since it was new to them.

*h.* Ms. Leerman and Mr. Hall shared their plan to bring the results of the Mercado Investigation to the Council under an attorney-client meeting that they expected to call during the July 20, 2016 regular Council meeting. While they planned to share the "results" they did

8



not plan to share Ms. Mercado's report or any other notes in order to keep those confidential and not subject any details to public records requests. They acknowledged that the City Charter requires any review of the performance of the City Manager to take place in public but they did not want to go the way of the School Distract and "have things come out that people did not want to come out." Before Mr. Hall joined the meeting, Ms. Leerman told me that she and Karl had devised the attorney-client privilege meeting strategy because they did not want to have a public meeting, but knew that regardless of the sexual harassment finding of the Mercado Investigation, that there was a pretty significant list of concerning behaviors that Council needed to be made aware of. I did not understand why they were not holding a public meeting if they acknowledged there were behaviors that rise to the level that Council needed to be made aware. This seemed like favoritism to Mr. Clinger.

That afternoon I informed Ms. McKissick of my meeting with Ms. Leerman and Mr. Hall. Both of us were very concerned that the City was attempting to steamroll us by hiding the validity of our claims and not responding to retaliation. It was clear Mr. Hall was willing to lie to us and could not be trusted. That evening I consulted with a friend that works for as an attorney for another City and was advised to seek counsel. The next day, on July 19, 2016 I reached out to attorney William Peterson on behalf of myself and Ms. McKissick. When I spoke with Mr. Peterson, I learned that Ms. Gescheider was already working with him. That same day I sent the following email to Ms. Leerman and Mr. Hall:

> Kelly and Karl,
> Our meeting yesterday confirmed that the City has not followed the process outlined in the Prohibited Discrimination, Harassment and Retaliation Policy with the intent to protect the City Manager (the accused) over myself (the complainant). I further learned that the City has not yet contemplated a plan for responding to the retaliation claims which I began reporting last Wednesday, and neither of you were even familiar with the policy.
> Needless to say, I am disappointed in the process to date and do not have confidence in it moving forward. As a result, I will retain a personal lawyer to advise me from this point forward and represent me in the event further action is necessary.
> Brianna

16. On July 21, 2016 I was advised by Mr. Peterson that he had received a letter from the City stating:

> Please be assured that Karl Hall, the City Attorney, has designated this investigation as confidential in order to protect witnesses from harassment, intimidation and retaliation; to keep evidence from being destroyed; to ensure that testimony is not fabricated; and to prevent a cover-up. Mr. Hall is prepared to take disciplinary action up to and including termination for anyone who fails to maintain the confidentiality of the investigation.

I initially interpreted this as a positive development but became disillusioned when Mr. Hall took no disciplinary action in response to Mr. Clinger releasing a public statement on July 29, 2016 calling the claimants liars and publicly disclosing the results of the Mercado Investigation.

17. On October 17, 2016 the three claimants (myself, Ms. McKissick and Ms. Gescheider) and our counsel (Mr. Peterson and Mr. Mausert) met with Mr. Hall, Mayor Schieve, Councilwoman Duerr and Councilwoman Jardon. We had been told the purpose of the meeting was to discuss

9



settlement. The City has recently asked us for a settlement offer and we had sent it over in the days leading up to the meeting. However, when we arrived Mr. Hall told Mr. Mausert that the Councilwomen wanted to meet with the complainants without the attorneys present. Mr. Mausert refused to sign a document permitting it. We continued to meet with the attorneys present. Mr. Hall began by reading the "settlement guidelines" document that he had asked the three complainants and our counsel to sign which stated something to the effect that "nothing discussed in the meeting could be used in subsequent litigation." Yet at several points during the meeting Mr. Hall absolutely refused to discuss settlement. The two times we tried to direct the conversation to settlement figures Mr. Hall would say the meeting was over and motion to leave. Invariably the conversation continued but no settlement discussions took place. And so my counsel has advised me that I can therefore discuss the contents of the meeting in this declaration.

The interaction with the Councilwomen revealed that Mr. Hall had kept them almost completely in the dark. They appeared desperate to talk to us, noting several times how they had been told by Mr. Hall not to talk to us. The Councilwomen said they wanted to find a way to bring us back to work. While their intention felt sincere, that they knew practically nothing of the retaliatory hostility that permeated the workplace made for a very difficult conversation. In response to the Councilwomen crying and petitioning us to return, we were put into the stressful position of educating them why it was cruel to ask us to return. The Councilwomen were mostly unaware of the unmitigated retaliatory hostility such as:

    a. They had only recently learned about the Hot Crazy Matrix and Mr. Clinger's referring to Ms. Thomas as his unicorn. We knew Mr. Peterson had informed Mr. Hall of this in July and no response was ever had.

    b. They were not aware of the retaliation rumors started by Ms. Thomas that were now pervasive throughout City Hall even though Ms. McKissick and myself had both reported different, easily-confirmable incidents of the retaliation in early July. Councilwoman Duerr noted that she was aware of the rumor because she heard it from Ms. Thomas directly, but had not been aware that it was retaliation.

    c. They were not aware Acting City Manager Bill Thomas told the plaintiffs he couldn't protect them from retaliation and all their work had been moved to other people. The Councilwomen expressed disbelief, stating they had told Mr. Thomas that retaliation was not to be tolerated and to help us come back to work. We knew Mr. Mausert had informed the City of the comments by Mr. Thomas on October 4th and 11th and no response was had.

    d. They were not aware that we wanted to be interviewed by Judge Wall as part of the second investigation but the City would not agree to our reasonable terms for the interviews. The Councilwomen seemed to be under the impression that we had just flat-out refused to be interviewed.



    *e.* They were not aware that we had not had a single positive communication from the City Attorney's Office or Human Resource Department since July.

    *f.* They were not aware of the publicly-funded David Child's Report that Mr. Clinger and Ms. Thomas had buried before Mr. Clinger's performance review because the results were so damming. They still had not seen the results so we provided them with a photocopy of the summary of the focus group input.

    *g.* They were not aware that Mr. Hall had refused to share the Mercado Investigation Report with us.

To make it worse, in response to our education of the Councilwomen of the reasons why we could not return to City Hall without drastic remediation measures, Mr. Hall tried to pin us down as saying we did not *want* to come back to our jobs. We repeated clarified we wanted to return but didn't see how that was realistic under the current circumstances. That Mr. Hall kept trying to get us to "admit" that we didn't want to come back added to the feeling that Mr. Hall did not care about remediating, but only cared about obtaining evidence so he could win in future litigation.

We pressed the Councilwomen several times to understand what they knew. We learned that they had not seen any of the letters sent by our counsel to the City except for the recent settlement request letter (and since it was 15 pages long, they implied they had not fully read it). Mr. Hall confirmed he had not shared any of the letters with them and had only given them the (biased) Mercado Investigation Report. We also learned that they had not seen any of the letters between our counsel and the special outside council Greg Kamer and his staff. They were also unaware of the contents of the letters.

The Councilwomen expressed frustration with the state of things and lamented their lack of control. They citied several examples where their requests were ignored:

- The Mayor and Councilwoman Duerr had instructed Acting City Manager Bill Thomas to welcome us back.
- The Mayor did not understand why Bill Dunne was not fired after he retaliated against us on multiple occasions and given his previous employment history.
- The Mayor had "begged" Mr. Clinger <u>not</u> to hire/promote Ms. Thomas.
- The Mayor was adamant about bringing in an outside firm that "knows that they are doing."
- They expressed that it was "indefensible" that Mr. Clinger had violated confidentiality by lobbing Councilmembers and the media *while still employed as City Manager* but didn't know there was anything they could do about it.
- They did not condone the City Attorney refusing our terms to be interviewed as part of the second investigation by Judge Wall.

11



- The Mayor and Councilwoman Duerr expressed how they had been frustrated that Mr. Clinger prohibited them from speaking with staff and that they had stopped trying to talk to staff because they didn't want Mr. Clinger to retaliate against the staff person.

Despite all the above, the three Councilwomen insisted that things would be fine if we would only came back – we were needed to help them make things right. It felt naïve and irresponsible to ask us to trust them after all that had happened, how little they knew and how they admittedly had no control. It was clear the Councilwomen had not been informed about Title VII protections and any of the legal obligations of the City.

The meeting was heartbreaking. We had expected – and came prepared for – earnest settlement talks. We had hoped the outcome would be a reasonable agreement that allowed us to move on and heal after a devastating four months of mistreatment. Instead, we felt set-up and further abused by Mr. Hall. He allowed the three Councilwomen to emotionally plead with us to return to a work environment that was permeated with retaliatory hostility. He *knew* he had not informed the Councilwomen of any of the details to put that unreasonable request in context. And then he glared at us as we struggled to bring the Councilwomen up to speed. We ended the meeting deflated and concerned that Mr. Hall would continue to fail to properly inform his clients such that we would be dragged into litigation in pursuit of a resolution.

18.  On October 7, 2016 the City offered to put me on paid administrative leave "pending the conclusion of the relevant investigations currently underway." Prior to this offer I was unable to remove myself from the hostile work environment because I was a part-time employee and did not have access to leave. I had been surviving by working from home as much as possible. I signed the document and sent it back to the City on or about October 13, 2016. In accepting the offer, I had a phone call with Ms. Leerman about how my absence would be communicated to my co-workers. Mr. Mausert also sent a letter to Mr. Hall with the same inquiry. On Friday, October 14, 2016 I received the following email from Ms. Leerman:

> Hello,
> Karl received the letter from Mr. Mausert and a brief script was written for Bill Thomas. Bill will be talking only to folks who typically work with you and will be involved now in the Master Plan project.
> "Hello, I want to update you on our operational plans in the short-term. Maureen and Brianna are taking personal leave for the next few weeks. Until they return, the work on the Master Plan needs to be covered. I am asking Aric Jensen and Sierra to play a big role in the coverage to keep the project moving forward."
> Bill may then go on to talk a bit more about what expectations he has of the Master Plan project.
> I don't know if Bill will be talking to people today or Monday.
> Sincerely,
> Kelly

This did not address my concerns and I responded with the following email on Monday, October 17, 2016 also coping Deputy City Attorney John Shipman:



> Hi Kelly,
>
> Thank you for sharing your plan. I see a couple issues with it.
>
> First, a statement is necessary for a broader audience. Immediate co-workers are pressing, however our absence has impacts beyond co-workers. The timeline and budget of the Master Plan will need to expanded and other staff will be pulled-in. How will this be explained to those staff, the Planning Commissioners and the Council? You could suggest that you will speak of the need to expand the timeline/budget without connecting it to the absence of myself and Maureen, two of the main people staffed to the project, but everyone will know the connection. This phenomena will be the same for Maureen's other projects and all of Deanna's work. I would like for the City to be proactive in communicating the reasons for the change to avoid speculation in the rumor mill. Issue a public statement. Without, this move has the potential to deepen the prevailing gossip set by Kate Thomas, Andrew Clinger and Tray Abney. The City has effectively condoned Kate's storytelling when it failed to respond to the breech of confidentiality from Karl Hall to Andrew to Kate that I reported within days of filing my original complaint. The City also did not repudiate the public statements made by Andrew or Tray. It is time for the City to communicate a statement about the three women who filed a complaints that is based on balanced and factual information.
>
> Second, we are not taking personal leave. The City has offered to put us on paid administrative leave in recognition that it has been unable to adequately address retaliation and realized it was not a fair position to ask us to draw down our sick/vacation banks in order to avoid a hostile work environment. Or in my case, as a relative new and part-time employee, I do not have a bank of vacation time nor do I accrue sick leave so I had no option but to take leave without pay. The City is doing the right thing to take responsibility for the situation by offering to put us on paid admin leave and I would also like to see the City acknowledge this as such in the explanation. I object to any language that implies that we have somehow had a choice in this. We had to accept the offer of leave, but we all would have preferred to stay working in a safe work environment. By not providing us a safe work environment, it really was not a choice.
>
> We would be happy to draft a statement to this end if your offer from our Thursday call still stands.
>
> Best,
> Brianna

I never received any response from Ms. Leerman or the City Attorney's Office.

19.     In the afternoon of November 17, 2016 I received a phone call from Human Resources Director Kelly Leerman informing me that tomorrow, November 18, 2016 would be the last day of administrative leave and that I was expected to return to work on the following Monday, November 21, 2016. I asked if the investigations into our claims were complete. Ms. Leerman said something to the effect of, "the interviews are complete and Judge Wall is expected to deliver his report soon." I expressed concern about returning to an unremediated hostile work environment before the investigation was complete and before special counsel Gregg Kamer had reviewed and delivered his recommendations. I asked how it was possible that the City would call us back from leave against the terms of the agreement and Ms. Leerman said it was the direction from Mr. Hall. I asked Ms. Leerman if she agreed with the decision. She reluctantly admitted that she did not. I then asked why she was letting it happen – she was the Director of Human Resources after all. She said it was out of her power to influence and she was just the messenger.



Later that day she sent an email with the formal letter calling me back from leave attached. In the body of the email she stated that she had shared my concerns with Acting City Manager Bill Thomas and that he would reach out to me by phone.

Mr. Thomas called me the following day, Friday, November 18, 2016. I reiterated my concern that I was being called back against the terms of the City's own administrative leave agreement to an unremediated hostile work environment. He responded to the effect that I was a very productive employee and he needed me there to do work. I asked him if he was making the decision and he acknowledged that Mr. Hall had assured him it was okay from a legal standpoint. I expressed that I didn't see how it was possible to return under the circumstances and he indicated there was no other option.

On Monday, November 21, 2016 I resigned, i.e. I was constructively discharged. The City did not give me any other option to remain employed without my rights to a safe and healthy work environment being violated. I sent my resignation letter to Mr. Thomas and CCed the three Councilwomen who attended the October 17 meeting as well as Ms. Leerman, the City's counsel (Mr. Hall, Mr. Kamer and Judge Wall) and Mr. Mausert.

20.     On December 26, 2016 the City released heavily redacted copies of the Judge Wall Investigation Report and the Mercado Investigation Report. At the time I was enjoying the Christmas present from my husband: a relaxing stay at a hot springs resort. Needless to say I was unable to enjoy the present and was up all night trying to understand the reports given the heavy redactions. The decision to release the reports on a national holiday ripped me from the joyful reprieve of the holiday season. Knowing the media was already digesting and reporting, I felt that I had to stop everything to review the reports and get a sense for my fate. I was upset by what I read.

There are many issues with the report, but I feel the investigation of the conspiracy theory rumor that I had been reporting as retaliation since early July is particularly emblematic of the issues created by Mr. Hall preventing the claimants from being interviewed by Judge Wall. Instead of looking into the rumor as retaliation – as was the scope of his investigation – Judge Wall accepted the conspiracy as possible and redirected his scope to investigate its validity. Judge Wall speculated about my motivations for filing the complaint. Judge Wall relied on one co-worker's recollection to cast my motivations in poor light. He conclude that I had met with Councilwoman Duerr before filing the complaint even though Councilwoman Duerr herself said this was not true. He also concluded that I shared a case document with said co-worker "in an attempt to enlist him in a conspiracy." Both of these points have no factual basis: I never met with Councilwoman Duerr prior to filing the complaint and I shared the document with the co-worker because, as described in entry 13 above, I appreciated his willingness to break ranks and tell me about retaliation against me by Ms. Thomas and I did not want him to be blind-sided if the document did become public given the deep concern for retaliation that we both felt. It feels irresponsible that Judge Wall did not consider the context provided in the letters from my counsel, William Peterson, of our concern that the City Attorney was

14



trying to bury our claims. In that context, it was not unreasonable for us to be considering how to make the issue public.

Judge Wall seems to blame me and the other two complainants for "mushrooming the totality of claims against Clinger beyond control" and making secondary claims the focus of the Mercado investigation. Judge Wall does not acknowledge that this was entirely due to the way Mr. Hall and Ms. Leerman scoped the Mercado Investigation. Ms. Mercado used the notes from my initial report to Ms. Leerman as the basis for her interview and gave more weight to asking me about answers I gave to follow-up questions by Ms. Leerman about how Mr. Clinger treated me and if I had seen anything else concerning instead of my primary complaint. As noted above, I repeatedly tried apparently to no avail to focus Ms. Mercado on my primary complaint of a hostile work environment for Ms. McKissick. I feel publicly shamed by Judge Wall for actions that were actually attributable to Ms. Mercado/Mr. Hall/Ms. Leerman and for which I had no opportunity to correct before both Reports were released to the media.

I hereby affirm, under penalty of perjury, the statements made herein are correct.

DATED this 26th day of October, 2017.

_Brianna Wolf_
Brianna Wolf