1
2
3                  UNITED STATES DISTRICT COURT
4                       DISTRICT OF NEVADA
5                            * * *
6   MAUREEN McKISSICK & DEANNA              Case No. 3:17-cv-00458-MMD-CBC
    GESCHEIDER,
7                                           ORDER
                            Plaintiffs,
8        v.
9   CITY OF RENO and DOES I-X,
10                          Defendants.
11
12  **I.    SUMMARY**
13          This is an employment action brought under Title VII of the Civil Rights Act of 1964,
14  42 U.S.C. § 2000e *et seq.* ("Title VII"). Plaintiffs Maureen McKissick ("McKissick") and
15  Deanna Gescheider ("Gescheider") (collectively, "Plaintiffs") assert claims for sexual
16  harassment based on a hostile work environment and various claims of retaliation—
17  including constructive discharge. (ECF No. 1.) Plaintiffs and Defendant City of Reno ("the
18  City") have filed cross motions for summary judgment seeking disposition in their favor on
19  Plaintiffs' claims. (ECF Nos. 72, 78.)[1]
20          For the reasons below, the Court will grant the City's motion for summary judgment
21  on McKissick's hostile work environment claim and Plaintiffs' claims of retaliation. The
22  Court likewise denies Plaintiffs' motion for summary judgment on these same claims.
23  Gescheider's hostile work environment claim survives summary judgment. [2]
24      ///

25          [1]The Court has considered the respective responses (ECF Nos. 77, 83) and replies
    (ECF Nos. 82, 84) as well as Plaintiffs' errata (ECF No. 81).
26
          [2]Plaintiffs filed an unopposed motion for leave (ECF No. 76) to file an opposition to
27  the City's motion for summary judgment that is 13 pages in excess of the 30-page limit
    under LR 7-3(a). The motion for leave was filed the same day Plaintiffs' 43-page opposition
28  was filed (ECF Nos. 76, 77). This same-day practice is improper. *See* LR 7-3(c) ("A motion

## II. BACKGROUND

McKissick and Gescheider are former employees of the City. This action largely stems from verbal complaints made to the City's human resource department ("HR") by Plaintiffs and non-party Brianna Wolf. These complainants ultimately brought to the fore their concerns about what Plaintiffs allege to be a sexually harassing and hostile work environment—chiefly based on sexual favoritism—at the City, under the tenure of, and due to the conduct of then-City Manager, Andrew Clinger.

The following facts are undisputed, unless noted otherwise.

### A. The Parties and Individuals Relevant to the Events Underlying the Case

Clinger was hired as City Manager in 2011.[3] (ECF No. 72-1 at 7; ECF No. 72-6 at 4.) He reported to the City's governing seven City Council members, including the Mayor—Hillary Schieve since 2014—and council members David Bobzien, Jenny Brekhus, Oscar Delgado, Naomi Duerr, Neoma Jardon and Paul McKenzie. (ECF No. 72-1 at 7.)

At the time the complaints were made, there were two Assistant City Managers—Kate Thomas ("Kate") and Bill Thomas ("Bill")—not related. (*Id.*) Kate previously served as Assistant to the City Manager, then as Deputy Secretary of State, and was hired by Clinger as the City's Director of the Office of Management and Budget ("OMB"), with a $110,000 annual salary in October 2011. (ECF No. 72-7 at 12–19; ECF No. 72-7 at 18, 23.) Both Kate and Bill reported to Clinger. (ECF No. 72-1 at 7.)

///

///

to exceed these page limits must be filed before the motion or brief is due . . . In the absence of a court order by the deadline for the underlying motion or brief, the motion to exceed page limit is deemed denied."). Moreover, a motion to exceed page limit must be supported by a showing of good cause, which is lacking here. *Id.* Indeed, why Plaintiffs' counsel wrote a 29-page fact section is confounding. The facts in many places contain reference to questioning based on counsel's suppositions and at other times include information immaterial to this case. The Court would have stricken the opposition in its entirety if it did not ultimately conclude that doing so would not be prudent, resourceful, or economical at this juncture. It is with these considerations that the Court refrains from striking Plaintiffs' opposition and reluctantly grants Plaintiffs' motion for leave.

[3]Clinger was the Director and Chief of Budget Division for the State of Nevada ("State") before coming to work for the City. (ECF No. 72-3 at 23–24.)

McKissick began working for the City in March 2004 with an annual salary of $54,000. (*E.g.*, ECF No. 72-8 at 36–40.) In April 2012, Clinger promoted McKissick to Strategic Development Administrator as a member of the City's Management Team. (*Id.* at 20.) Clinger also assigned McKissick to Kate's team in the OMB. (*Id.* at 19.) On January 9, 2015, Clinger reclassified and promoted McKissick to Assistant to the City Manager and increased her salary to $100,938.86. (*Id.* at 15–16; ECF No. 72-14 at 23, 25.) The same day, Clinger reclassified and promoted Kate to Assistant City Manager, increasing her annual salary to $153,387.52. (ECF No. 72-7 at 6–7; ECF No. 72-14 at 23, 25.) Kate took the position left vacant by the departure of the former Assistant City Manager Cadence Matijevich. (ECF No. 72-50 at 2; ECF No. ECF No. 72-7 at 6–7.) Her reclassification increased her base pay by $44,487, putting her salary on par with the salary of the other Assistant City Manager, Bill. (ECF No. 72-50.) Kate's salary was comparable to the salary Matijevich received of $153,449. (*Id.*) Nonetheless, some City employees believed that Kate was unqualified for the position. (*E.g.*, ECF No. 78-4 at 10.) There was a sentiment Clinger favored Kate and rumors abounded about there being a sexual and inappropriate relationship between Kate and Clinger. (ECF No. 78-4 at 10, 12; ECF No. 77-7 at 18; ECF No. 77-32 at 38–39; ECF No. 72-11 at 9; ECF No. 77-33 at 27; ECF No. 72-1 at 20–21.)

In their respective roles at the time, both McKissick and Kate reported directly to Clinger and *had to* work closely with each other. (*See, e.g.*, ECF No. 72-14 at 25–27; ECF No. 77-33 at 9–10 (providing details on some of the working relationship).)

On September 18, 2012, Clinger hired Gescheider as Director of Communications and Community Engagement, with an annual salary of $95,000 and reporting to Matijevich at the time. (ECF No. 72-9 at 6.) On May 13, 2014, Clinger increased Gescheider's annual salary to $108,889.86, effective October 1, 2014. (*Id.* at 4.) In April 2015, Clinger reclassified Gescheider's benefits package from mid-management to management, increasing her salary to the range of $126,541–$165,770. (*Id.* at 2.)

In February 2015, the City Council appointed Ashley Turney ("Turney") to the position of City Clerk, with a $100,000 annual salary. (ECF No. 82-1 at 4.) Turney reported

1   to the City Council—not Clinger. (*See* Reno City Charter, Art. III, § 3.040(2); ECF No. 78-

2   4 at 16.) The City Clerk's salary is also fixed by the City Council. (*Id.*; ECF No. 82-2 at 3.)

3   In April 2016, the City Council directed Clinger to collaborate on an appropriate

4   compensation level for Turney in anticipation of Turney's annual performance evaluation.

5   (*E.g.*, ECF No. 82-4 at 41, 46; ECF No. 82-1 at 6–8; ECF No. 82-3 at 9–10.) Clinger was

6   to recommend a salary adjustment for Turney considering appropriate compensation

7   levels based upon the scope of Turney's responsibilities and performance. (ECF No. 82-

8   4 at 41 (K.2), 53–55)

9   Robert Chisel was the Director of Finance and Administration for the City of Reno

10  and also reported to Clinger, and to whom the human resources director—Kelly

11  Leerman—reported. (*Id.*)

### B.   Other Relevant Facts Regarding the Work Environment

13  In January 2015, a video called the "Hot Crazy Matrix" ("Video") was shared in City

14  Hall during an executive team meeting. (ECF No. 72-1 at 13–14, 79–81; ECF No. 77-32

15  at 15, 23, 26.) Per the Video, the term "unicorn"—describing a very attractive woman who

16  is not—or only a little—crazy—came to be used. (*E.g.*, ECF No. 72-1 at 13–14; ECF No.

17  77-21 at 29–30; ECF No. 72-19 at 7.) Kate, Gescheider and Turney referred to each other

18  as "unicorns," and collectively referred to themselves as the "unicorn trifecta." (ECF No.

19  77-32 at 22; ECF No. 72-1 at 80; ECF No. 72-19 at 7, 9–10; ECF No. 72-11 at 8–11.)

20  Clinger used the term "in a joking manner" to refer to both Kate and Gescheider in the

21  context of work and with reference to their appealing characters. (ECF No. 77-32 at 25;

22  *see also* ECF No. 77-21 at 28–29.) Clinger used the term to refer to Kate on multiple

23  occasions. (ECF No. 77-21 at 27; ECF No. 72-14 at 74.) At one executive staff meeting

24  Clinger referred to Kate as less than a unicorn and Gescheider gave Kate a stuff animal

25  the next day "to say . . . you are fine." (ECF No. 77-32 at 21.)

26  Gescheider testified that Kate and Clinger acted like they were "husband and

27  wife[,]" but she did not care whether they were having a romantic relationship; she cared

28  about how she felt during the interaction. (ECF No. 77-32 at 28.) Gescheider thought

4

Clinger put Kate "in a tough spot on a regular basis. I think she was doing what she had to do to survive." (*Id.* at 29.) Neither McKissick nor Gescheider personally knew whether Clinger and Kate had a sexual relationship, but thought the two were romantic. (ECF No. 77-32 at 28, 30; ECF No. 72-14 at 67–68; ECF No. 82-6 at 11.) Kate and Clinger both denied ever being romantically or sexually involved. (ECF No. 72-1 at 20–21, 73–74.) Both Wolf and McKissick believed Clinger had an inappropriate sexual relationship with Turney and that Turney spent an unnecessary amount of time interacting with Clinger.[4] (ECF No. 78-4 at 10, 12; ECF No. 72-1 at 81.) Turney denied any sexual relationship. ECF No. 72-1 at 59.)

On April 22, 2016, Clinger reorganized the City Manager's Office based on recommendations from the Urban Land Institute. (ECF No. 72-14 at 88–89; ECF No. 77-33 at 28.) As part of the reorganization, Clinger created the Office of Strategy and Policy to be managed by McKissick. (*Id.*) Clinger reassigned three employees who were previously assigned to Kate to work with McKissick. (*Id.*) Kate left the meeting about the reorganization in tears (*id.*; ECF No. 77-32 at 31). Neither Kate nor McKissick knew about the reorganization prior to the meeting. (*Id.*; ECF No. 77-7 at 9; ECF No. 72-14 at 25.) The reorganization exacerbated tension between Kate and McKissick. (ECF No. 72-1 at 77–78; ECF No. 78-4 at 16 (noting Gescheider' position that it was the way in which Clinger made the job-duty transfers to McKissick that fostered hostility).) Believing McKissick manipulated Clinger, Kate refused to talk to McKissick for a period of time, and generally avoided interacting with McKissick. (ECF No. 72-1 at 21; ECF No. 72-19 at 14–16; ECF No. 77-33 at 16.) In May, McKissick complained to Wolf about Kate, saying: "Things with Kate are worse than ever . . . She blames me." (ECF No. 72-55 at 2–3.)

Gescheider believed that around this time Clinger "recognized Kate wasn't performing." (ECF No. 77-32 at 31; *see also* ECF No. 77-2 at 12–13, 16–19.) She noticed Clinger began treating Kate meanly. (ECF No. 77-32 at 31.) Gescheider testified to her

///

---

[4]Clinger thought both McKissick and Gescheider were good employees. (ECF No. 77-11 at 16, 18.)

belief that Clinger used his power and control to treat women differently than men. (*Id.* at 33.)

Gescheider claims that Clinger touched her in an unwanted manner on three separate occasions. (ECF No. 77-32 at 11–12 (neck touching), 14 (two separate coffee bar incidents).) Chisel also reported seeing Clinger repeatedly rub Gescheider's leg on May 13, 2016, during an executive team meeting. (ECF No. 77-7 at 17.) Chisel reported witnessing a similar leg rubbing incident two weeks later and suggested this may have been Clinger's way of intimidating Gescheider 'to keep her in line.' (*Id.*)

On June 21, 2016, at a special meeting the City Council evaluated Clinger's performance as City Manager and voted unanimously to renew Clinger's contract. (ECF No. 72-1 at 8; ECF No. 77-7 at 9–10.) However, Duerr commented on a 'sense of fear' among female managers at the City. (*Id.*) The following day, Mayor Schieve called a meeting, which included the executive staff, to educate on the City's sexual harassment and retaliation policies. (*Id.*)

### C. Internal Complaints

On June 29, 2016, Wolf made a verbal sexual harassment, retaliation and hostile work environment claim against Clinger to the City's HR. (ECF No. 78-4 at 10.) Wolf particularly noted hearing Clinger and Kate talking with giggling, moaning and groping— but did not actually see such conduct. (*Id.*; *see also* ECF No. 72-15 at 34.) She noted Clinger and Kate had a casual relationship which made the working environment uncomfortable and that tension resulted from the way Kate treated McKissick following the change of assignments on April 22, 2016. (ECF No. 78-4 at 11.) Wolf reported that the tension and additional work caused McKissick significant stress. (*Id.*)

On July 1, 2016, McKissick filed an internal complaint against Clinger alleging hostile work environment based on Clinger's alleged sexual favoritism of Kate and retaliation. (ECF No. 78-4 at 11–12.) McKissick reported believing Kate and Clinger had a romantic relationship, that Clinger made organizational work decisions based on personal relationships, and that Kate was not held accountable for work-related mistakes. (*Id.* at

12.) She reported that Gescheider told her Clinger made sexual advances to her and that Gescheider asked McKissick to sit next to Clinger during meetings so Gescheider would not have to. (*Id.*; ECF No. 82-6 at 12; ECF No. 77-33 at 34–35.)

That same day, Gescheider reported to HR illegal conduct in connection with the Reno Police Department's website and relayed that Clinger made sexual advances to her, including through text messages on a texting app Clinger had her and Kate downloaded. (ECF No. 78-4 at 14–16.) Gescheider informed that she deleted the app shortly after downloading it and told Clinger she did not want to participate in texts or have him make sexual advances on her (ECF No. 78-4 at 15.) Gescheider also reported that Clinger directed women not to speak directly to City Council. (*Id.*; *see also* ECF No. 77-7 at 8 (Leerman relaying materially the same); *see also* ECF No. 77-32 at 33 (providing that Clinger treated women differently and had different expectations for women related to power and control).)

### D. After the Complaints and Clinger's Response to the Investigations and Departure from the City

City Attorney Karl Hall informed Clinger that Wolf filed a complaint against him. (ECF No. 83 at 6 (the City notes the matter is undisputed); ECF No. 78-4 at 11.) On July 8, 2016, Clinger mailed executive staff an article which, *inter alia*, included language warning employees not to upset their boss. (ECF No. 72-1 at 23; ECF No. 72-13 at 41.) Clinger accused the complainants of having an organized effort to have him terminated. (*E.g.*, *id.* at 23, 28; ECF No. 77-6 at 23–24.) Clinger and Kate texted each other venting about the complaints filed and the related events. (ECF No. 77-2 at 22–32, 35–59.) In response to a news article that Clinger was accused of sexual harassment, Clinger released a public statement proclaiming his innocence and stating that the accusations

///

///

///

///

were "utterly ridiculous." (ECF No. 72-46; ECF No. 83-6 to 2–3.) Clinger did not identify Plaintiffs specifically.

Clinger signed a separation agreement with the City on September 14, 2016, and his personnel file reflects that he was terminated. (ECF No. 72-1 at 8; ECF No. 72-6 at 1–10.)

### E. Internal Investigations

The City conducted two internal investigations, the first by attorney Alice Campos Mercado, and the other by retired judge, Judge David Wall. (ECF No. 1 at 9, 11–14). Respectively, the investigations resulted in a "Mercado Report" submitted on July 21, 2016 (ECF No. 72-15 at 87), and a "Wall Report," submitted on November 21, 2016.[5] (*See, e.g.*, *id.* at 13; ECF No. 72-1 at 3.)

The Mercado Report concluded that the complainants' claims were due to a displeasure and misperceptions related to Clinger's management style and perceived lack of decorum and professionalism among the City Manager and his executive staff. (ECF No. 72-15 at 112.)

The Wall investigation was initiated to look into any details not previously examined or that may warrant further inquiry. (ECF No. 72-1 at 3.) The Wall Report divided Plaintiffs' complaints into primary and secondary claims. (*See., e.g.*, *id.* at 95; ECF No. 72-21 at 79.) McKissick's primary complaint was that her work environment was highly stressful and uncomfortable following Clinger's reorganization of the City Manager's Office on April 22, 2016. (ECF No. 72-21 at 81, 83.) Gescheider's primary complaint was her fear of retaliation as a whistleblower. (*Id.* at 79–80, 82.) The secondary complaints included: Clinger's touching of Gescheider in the elevator and at the coffee bar; Clinger sending inappropriate texts to Gescheider via the texting app Telegram; the article Clinger sent to

///

---

[5]Wall testified that he was not directed to reach a particular outcome in his investigation. (ECF No. 72-21 at 85.) Mercado's testimony did not indicate differently as to her investigation. (ECF No. 72-15 at 15–16, 81 (Plaintiffs' counsel questioning based on his conclusion that the outcome of an investigation may be controlled by the withholding of information).)

the executive staff—alleged to be retaliatory; the alleged theft of personal items from Gescheider's office after the complaints were filed; the alleged romantic relationship between Clinger and Kate; Clinger's alleged dissemination[6] of the "Hot Crazy Matrix" video; and Clinger's alleged inappropriate relationship with Turney. (*Id.* at 81–84.) The Wall Report concluded that McKissick and Gescheider's primary complaints were meritorious, but the secondary complaints were largely unsubstantiated.[7] (ECF No. 72-1 at 97; ECF No. at 72-21 at 79–84.)

### F.    Plaintiffs' Administrative Leave, Filings with the Nevada Equal Rights Commission ("NERC") and Departures from the City

In mid-October 2016, McKissick and Gescheider accepted the City's offer to be placed on paid administrative leave pending the completion of the Wall investigation. (ECF No. 72-53.)

On November 16, 2016, Gescheider filed a Charge of Discrimination with NERC. (ECF No. 72-12 at 42–46.) On November 17, 2016, the City sent Gescheider a letter concluding her paid administrative leave and requesting that she report back to work on November 28, 2016, at 9:00 am. (ECF No. 72-39.)

On November 17, 2016, McKissick resigned, effective December 1, 2016. (ECF No. 72-41.) McKissick submitted a resignation later, noting: "In the wake of the events that unfolded after June 22, 2016, and, in particular the increasing hostility I experienced after March 2016, the City has become an unsafe work environment for me." (*Id.* at 3.) She expressed that "without proper investigation to remediate the conditions . . . I feel I have no choice except to resign." (*Id.*) On that same day, McKissick filed a Charge of Discrimination with NERC. (ECF No. 72-54.)

///

---

[6]The evidence does not establish that Clinger disseminated the video. (*E.g.*, ECF No. 72-1 at 80.)

[7]Wall did not interview McKissick or Gescheider because the City and Plaintiffs' counsel could not reach settlement regarding the interviews. (ECF Nos. 72-1 at 4; 72-52; 72-25 at 2–24; ECF No. 72-28; ECF No. 47 at 22–23.) Wall specifically notes that "[r]epeated attempts were made to interview [Plaintiffs], without success." (ECF No. 72-1 at 4.)

Gescheider resigned in January 2017, effective February 1, 2017. (ECF No. 72-40.)

Kate's employment was terminated in July 2017. (ECF No. 72-7 at 2.)

### G.     The Lawsuit

Plaintiffs allege four separate claims: (1) sexually hostile work environment/retaliatory hostility as to McKissick (ECF No. 1 at 2–6); (2) the same, but as to Gescheider (*id.* at 6–14); (3) retaliation against both McKissick and Gescheider—in various forms and incorporating Plaintiffs' separate allegations (*id.* at 14–15); and (4) retaliation/constructive discharge also as to both (*id.* at 15–16). These claims have been reviewed and narrowed in a prior dismissal order. (ECF No. 60.)

## III.    LEGAL STANDARD

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party and a dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the burden of showing that there are no genuine issues of material fact. *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). Once the moving party satisfies Rule 56's requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the

10

material facts." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 783 (9th Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252. Moreover, a court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fischbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

Further, "when parties submit cross-motions for summary judgment, '[e]ach motion must be considered on its own merits.'" *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (citations omitted) (quoting William W. Schwarzer, *et al.*, The Analysis and Decision of Summary Judgment Motions, 139 F.R.D. 441, 499 (Feb. 1992)). "In fulfilling its duty to review each cross-motion separately, the court must review the evidence submitted in support of each cross-motion." *Id.*

## IV. DISCUSSION

The cross motions boil down to the following issues. The City challenges certain evidence that Plaintiffs attempt to rely on. (ECF Nos 82, 83.) Plaintiffs intersperse arguments that the City waived its *Ellerth*/*Faragher*[8] affirmative defense with Plaintiffs' contention that sexual favoritism created a hostile work environment that the City did not adequately address or investigate. (*See generally* ECF Nos. 77, 78.) Plaintiffs further argue that they faced various forms of retaliatory hostility at the City and that the working conditions were intolerable so as to cause them to constructively discharge from their employment with the City. (*Id.*)

Plaintiffs' briefing is particularly disjointed and unorganized. For example, neither Plaintiffs' opposition, which includes a 29-page fact section, nor motion provides a section of undisputed facts.[9] The facts are followed by analysis that does not particularly reference

///

---

[8] *Burlington Industries, Inc., v. Ellerth,* 524 U.S. 742, 765 (1998); *Faragher v. City of Boca Raton,* 524 U.S. 775, 807 (1998).

[9] *See* LR 56-1 (requiring citation to "the particular portions of any pleading, affidavit, deposition, interrogatory, answer, admission, or other evidence on which the party relies");

the supporting record. Plaintiffs' analysis is also muddled and confusing to follow as it blends together arguments in support of the various claims without meaningful structure. Moreover, due to the sheer volume of purported facts, the Court excluded reference to certain declarations and deposition testimony because the Court concludes they either provide more of the same information—based on speculations and innuendos, lacking personal knowledge—are factually immaterial, or do not alter the Court's conclusions.

In any event, the Court begins by first addressing the City's evidentiary objections before discussing the other issues.

### A. Evidentiary Issues

The City objects to the following evidence Plaintiffs rely on chiefly to support their hostile work environment claims and contention that the City waived the *Ellerth*/*Faragher* affirmative defense: (1) a 2015 report by Jean Atkinson which Atkinson conducted while a member of the City's Civil Service Commission and which essentially concluded that there was gendered favoritism in the pay increases between men in the management group under Clinger and some women compared to other women (*e.g.*, ECF No. 77-13 at 3); (2) testimony by Kim Wallin and Mary Keating to the effect that Clinger created a sexualized work environment while previously employed with the State (ECF No. 77 at 23, 26–27; ECF No. 77-15); and (3) various acts of alleged misconduct or overreach by Hall during the internal investigations. (*See, e.g.*, ECF No. 83 at 4–5, 18–20.)

The Court has considered the City's evidentiary objections raised under Fed. R. Civ. P. 26(a) (2) and Fed. R. Evid. 404, 602, 701, 702, 703, 801, 802, and 805. (*Id.*) The Court concludes that the noted pieces of evidence do not affect its ultimate conclusions regarding Plaintiffs' hostile work environment claims or the efficacy of the internal investigations irrespective of Hall's alleged misconduct. Accordingly, the Court considers

///

*Joe Hand Promotions, Inc. v. Steak*, Case No. 12-cv-1930, 2014 WL 1304723, at *2 (D. Nev. March 31, 2014) ("Courts in this district routinely decline to reach the merits of arguments made in connection with a 'summary judgment' filing which contains no statement of undisputed facts at all.").

1   the challenged evidence immaterial at this juncture and therefore need not resolve the

2   City's objections.

3           **B.      Plaintiffs' Hostile Work Environment Claims**

4           In support of their sexually hostile work environment claims, Plaintiffs in sum argue

5   that Clinger gave unfair promotions and pay raises to three female subordinates that he

6   allegedly found attractive—Kate, Gescheider, and Turney,[10] maintained a sexually

7   charged work environment that was systematically imbued with sexual favoritism, and as

8   to Gescheider made sexual advances and engaged in inappropriate touching. (ECF Nos.

9   77 at 30–39; ECF No. 78 at 17–27.) McKissick's claim fails but Gescheider's claim will

10  proceed. The issues regarding the *Ellerth*/*Faragher* affirmative defense will therefore be

11  discussed only within the context of Gescheider's sexually hostile work environment claim.

12          "Title VII affords employees the right to work in an environment free from

13  discriminatory intimidation, ridicule, and insult." *Meritor Sav. Bank, SFV v. Vinson*, 477

14  U.S. 57, 65 (1986) (citation omitted). But Title VII is not a "general civility code." *Faragher*,

15  524 U.S. at 788.

16          To succeed on a hostile work environment claim a plaintiff must establish three

17  elements: (1) "she was subjected to sexual advances, requests for sexual favors or other

18  verbal or physical conduct of a sexual nature, (2) that this conduct was unwelcome, and

19  (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the

20  victim's employment and create an abusive working environment." *Ellison v. Brady*, 924

21  F.2d 872, 875 (9th Cir. 1991) (citation omitted). "The required level of severity or

22  seriousness varies inversely with the pervasiveness or frequency of the conduct."

23  *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1115 (9th Cir. 2004) (citation omitted).

24          "To determine whether conduct was sufficiently severe or pervasive to violate Title

25  VII, we look at all the circumstances, including the frequency of the discriminatory conduct;

26  its severity; whether it is physically threatening or humiliating, or a mere offensive

27  ///

28          [10]The contention does not hold true with Turney as the evidence supports that the
    City Council—not Clinger—was in charge of any promotions or raises Turney received.

utterance; and whether it unreasonably interferes with an employee's work performance." *Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003), *as amended* (Jan. 2, 2004) (citations omitted). "In addition, [t]he working environment must both subjectively and objectively be perceived as abusive." *Id.* (citation and internal quotation marks omitted).

Moreover, "Plaintiffs may prevail on a sexual-harassment claim based on a sexual-favoritism theory *only if* they can show that the favoritism was so ubiquitous that it amounted to implied quid pro quo harassment or that it was sufficiently severe or pervasive to alter the conditions of plaintiffs' employment." *Stewart v. SBE Entertainment Grp. LLC*, 239 F. Supp. 3d 1235, 1244 (D. Nev. 2017).

### 1. McKissick's Claim

McKissick alleges at most that she was awared that Gescheider was subjected to sexual advances and that Kate was purportedly in a relationship with Clinger.[11] (ECF No. at 2–6.) The Court previously found that McKissick's claim is solely premised on alleged sexual favoritism in City's workplace—particularly favoritism toward Kate. (ECF No. 60 at 5 & n.4.) Thus, Plaintiffs' allegations about Clinger also favoring Gescheider and Turney are largely irrelevant to McKissick's claim because McKissick does not contend that she was impacted by these other purported sexually favoring relationships.

Relevantly, McKissick particularly argues that Clinger's favoritism toward Kate caused him to transfer Kate's work duties to McKissick and to ignore or fail to discipline Kate for being extremely hostile to McKissick. (*See, e.g.*, ECF No. 77 at 31–33; ECF No. 78 at 21.) However, Clinger's alleged favoritism towards Kate, even accepted as true, ///

---

[11]In her Complaint, McKissick also alleges being aware of Clinger's "reputation for sexual harassment and his propensity for retaliation," and particularly notes when Clinger was employed with the State. (ECF No. 1 at 3.) However, beyond being inadmissible character evidence under Rule 404, that alleged reputation is largely irrelevant to McKissick's claim that she faced a sexually hostile work environment while employed with the City.

does not meet the requisite barometer of ubiquity to support a Title VII claim under a hostile work environment theory. Further, even though it is undisputed that Kate was severely hostile to McKissick,[12] this hostility does not establish a *sexually* hostile work environment or that the alleged sexual favoritism was sufficiently severe or pervasive to alter McKissick's work environment. The evidence also suggests that Kate's hostility toward McKissick was rooted in her work and members of her team being transferred to McKissick for which she blamed McKissick. (ECF No. 72-1 at 21; ECF No. 72-19 at 14–16; ECF No. 77-33 at 16; ECF No. 72-55 at 3 (McKissick relaying such blame).) In short, Plaintiffs present no evidence connecting any purported sexual relationship or sexual favoritism from Clinger to Kate as the reason for Kate's hostility toward McKissick.

At most, Plaintiffs *speculate* that Clinger failed to reprimand Kate or to protect McKissick from Kate's hostility because Clinger allegedly had a sexual relationship with Kate and thus wanted to protect Kate and avoided being honest with Kate regarding her alleged inability to competently execute her duties. (*See, e.g.*, ECF No. 77 at 31–33; ECF No. 78 at 21.) But, the evidence, even viewed in the light most favorable to Plaintiffs, supports that Clinger gave Kate's duties to McKissick because he considered McKissick a good employee who was capable of getting the work done. (ECF No. 72-1 at 21; ECF No. 77-11 at 16; ECF No. 77-33 at 13–14; ECF No. 72-15 at 33; ECF No. 77-27 at 22–23 (Leerman testifying he want to get the work "done right").) Further, it is undisputed that Clinger's stance on the matter was that Kate needed to get over being upset and Clinger spoke to Kate, attempting to address the issues between her and McKissick. (*See, e.g.*, ECF No. 77 at 21; ECF No. 77-21 at 26–27 (Chisel notes Clinger saying Kate "will get over it").)

///

///

///

_____

[12]The City admits this much. (ECF No. 83 at 21 ("Based in large measure on [Kate's] anger toward McKissick, the environment deteriorated to a point that McKissick could no longer function.").)

1    In sum, Plaintiffs' mere speculation that Kate's hostility to McKissick stems from

2    sexual favoritism is not enough to establish McKissick's claim. Accordingly, the Court

3    grants summary judgment for the City on McKissick's hostile work environment claim.

## 2.    Gescheider's Claim

5    Gescheider testified that Clinger subjected her to three acts of unwelcomed

6    touching—that he touched/rubbed her leg on two separate occasions and touched her

7    neck on another occasion; that he made romantic advances toward her; and asked her—

8    and Kate—to download a texting application and thereafter texted her flirtatious and

9    inappropriate messages. (ECF No. 72-1 at 84–89; ECF No. 77-32 at 11–14; ECF No. 72-

10   13 at 9, 33–37.)

11   In gist, the City argues that Gescheider's claim fails because, *inter alia*, the

12   evidence does not suggest a casual relationship between Gescheider's gender and the

13   touching, primarily because Clinger did not touch Gescheider's "female private area[s]."

14   (ECF No. 72 at 14; *id.* at 14–15.) The City further argues that the "touching was fleeting,

15   incidental, and not physically threatening or sex specific." (*Id.* at 14.) The City otherwise

16   sought to undermine the frequency and severity of Clinger's other purportedly unwanted

17   conduct. (*Id.* at 15–18.)

18   The Court disagrees with the City. First, a reasonable jury could conclude that

19   Clinger's touching of Gescheider was sexual in nature or was made because of her

20   gender, considering the totality of the circumstances in the workplace and Gescheider's

21   relationship with Clinger. Indeed, the City does not cite to any case to support its

22   contention that actionable touching *must* involve the alleged victim's "private areas." The

23   evidence also supports Gescheider's contention that Clinger's touching was unwelcomed.

24   For example, Gescheider testified that she viewed the touching of her neck as demeaning,

25   unwelcomed condescending, controlling and embarrassing. (ECF No. 77-32 at 12; ECF

26   No. 72-1 at 87, 88.) As to the final element, viewing the evidence in the light most favorable

27   to Plaintiffs, a reasonable jury could find that the work environment was subjectively and

28   objectively abusive, based on sex, considering the totality of circumstances. Gescheider

testified that she viewed Clinger was controlling of women. (ECF No. 77-32 at 33.) She experienced anxiety when he touched her neck. (ECF No. 77-32 at 12.) Chisel testified to finding Gescheider in tears after one of the leg-touching incidents and that he thought "she was scared." (ECF No. 78-10 at 3.) Gescheider reported working through fear caused by Clinger's unwanted conduct, even though she notes she continued to perform her work well. (ECF No. 72-2 at 50.) McKissick also testified that at meetings Gescheider would often have McKissick sit between Gescheider and Clinger and Gescheider went to McKissick, with reference to sexual harassment, and noted 'I need your help handling Clinger. I can't do it anymore. I need you to help me.' (ECF No. 82-6 at 12; ECF No. 77-33 at 34–35.).

The Court concludes that the totality of the circumstances and evidence make Gescheider's claim of hostile working environment well-suited for jury decision. *See, e.g.*, *Oncale v. Sundowner Offshore Servs., Inc.* , 523 U.S. 75, 81–82 (1998) ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive."). Accordingly, the Court next considers the issues regarding the *Faragher/Ellerth* affirmative defense, which the City asserted in its answer (ECF No. 10 at 4).

*Faragher/Ellerth* refers to a pair of Supreme Court cases read together to establish an affirmative defense available to employers under Title VII "when the employee has been unlawfully harassed, but there has been no 'tangible employment action[;]' [then] the employer may avoid liability by proving the defense of 'reasonable care.' " *Holly D. v. Cal. Inst. of Tech.*, 339 F.3d 1158, 1167 (9th Cir. 2003). "To prevail on the affirmative defense of 'reasonable care,' an employer must prove '(a) that [it] exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff

employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by [it] or to avoid harm otherwise.'" *Id.* at 1177 (citation omitted). The affirmative defense is intended to encourage employees to report harassing conduct before it becomes pervasive or sever and for employers to develop antiharassment policies in an effort to promote conciliation. *Kohler v. Inter-Tel Techs,* 244 F.3d 1167, 1175 (9th Cir. 2001) (quoting *Ellerth,* 524 U.S. at 764).

Plaintiffs challenge the availability of the defense on two grounds: (1) the City waived the defense and therefore should be estopped from relying on it; and (2) the City otherwise fails to meet the requirements of defense, noted above. (*E.g.*, ECF No. 78 at 19–27.) The City argues that Plaintiffs fail to show the absence of a genuine dispute as to whether the City has waived the defense and that it meets the defense's requirements. (*E.g.*, ECF No. 83 at 11, 17.)

The Court finds Plaintiffs' waiver argument is not adequately supported and Plaintiffs' relevant judicial and equitable estoppel positions—which appear to depend on a finding of waiver (*see, e.g.*, ECF No. 78 at 18–19)—are thus rendered moot. Plaintiffs argue that the City has waived the *Faragher/Ellerth* affirmative defense by invoking the attorney-client and attorney work-product privileges. (ECF No. 64 (motion to strike); ECF No. 78 at 18 (incorporating arguments from motion to strike).) However, Plaintiffs concede that there are "almost no cases which involve waiver of the affirmative defense." (ECF No. 64 at 10.) The Court found none relevant to Plaintiffs' position. Plaintiffs opt for relying on cases where the assertion of the *Faragher/Ellerth* affirmative defense is found to waive the attorney-client and attorney work-product privileges. (*See, e.g.*, ECF No. 64 at 10–11, 13 & ECF No. 78 at 18 (relying on *Angelone v. Xerox Corporation*, No. 09-CV-6019, 2011 WL 4473534, at *2–3 (W. D. N.Y. Sep. 26, 2011) (collecting cases); *Hearn v. B.J. Rhay*, 68 F.R.D. 574, 581–82 (E.D. Wash. 1975).) Based on such cases, Plaintiffs' counsel supposes that the inverse should also be true. (ECF No. 64 at 10–20.) This Court declines to find that that the City has waived the *Faragher/Ellerth* affirmative defense, as a matter

///

18

of law, by asserting the attorney-related privileges, although those privileges may very well be waived.[13]

However, the Court finds that a genuine material issue of fact exists to preclude summary judgment on the affirmative defense. Plaintiffs' pertinent arguments involve issues concerning Hall's involvement in the investigation that are in dispute. Particularly the parties disagree as to whether Hall's involvement in the investigation was improperly adversarial and whether Hall via the City Attorney's Office controlled the scope and direction of the investigations or failed to provide investigators with relevant information allegedly in the City's possession. (*E.g.*, ECF No. 78 at 18–27; ECF No. 64; ECF No. 83 at 12–16.) The parties also dispute whether Plaintiffs unreasonably frustrated the City's efforts to address Plaintiffs' claims. (*E.g.*, ECF No. 83 at 12–16; ECF No. 84 at 20.) These disputes present questions of fact for a jury. *See, e.g.*, *E.E.O.C. v. Wyndham Worldwide Corp.*, No. C07-1531RSM, 2008 WL 4527974 (W.D. Wash. Oct. 3, 2008) (finding that the availability of the *Ellerth/Faragher* affirmative defense is a question of fact for the jury in light of the parties' outstanding disputes).

In sum, Plaintiffs fail to establish that the City waived the *Faragher/Ellerth* affirmative defense and the issue regarding the defense's availability is otherwise to be considered by a jury.

### C.    Retaliation

The City argues that it is entitled to summary judgment on Plaintiffs' various retaliation claims, including the constructive discharge claim, because the actions Plaintiffs allege to be retaliatory do not constitute adverse employment actions. (*E.g.*, ECF No. 72 at 20.) The Court agrees.

Title VII makes it unlawful for an employer to discriminate against any employee "because [the employee] has opposed any practice made an unlawful employment

///

---

[13]To the extent Plaintiffs separately argue that the City should be judicially and equitably estopped from relying on the Wall Report because the City "sabotaged and impeded" and "prevented inquiry" into certain matters (ECF No. 84 at 7), the Court finds that Plaintiffs' legal arguments of estoppel are based on disputed facts.

19

practice by this subchapter, or because [she] had made a charge, testified, assisted, or participated in any matter in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a).

To prevail on a retaliation claim, a plaintiff must first establish a *prima facie* case of retaliation by demonstrating: (1) she engaged in a protected activity; (2) she suffered a materially adverse employment action taken by the employer; and (3) a causal link exists between these two events—the protected activity and adverse employment action. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064 (9th Cir. 2002); *see Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (requiring "material adversity"). "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013).

If a plaintiff establishes a prima facie case of unlawful retaliation, the burden shifts to the defendant employer to offer evidence that the challenged action was taken for legitimate, non-discriminatory reasons. If the employer provides a legitimate explanation for the challenged decision, the plaintiff must show that the defendant's explanation is merely a pretext for impermissible discrimination." *Dawson v. Entek*, 630 F.3d 928, 936 (9th Cir. 2011).

The Court finds that Plaintiffs fail to establish a prima facie case of unlawful retaliation.

### 1. Protected Activity

There is no dispute that Plaintiffs' engaged in protected activity when they filed complaints with HR. As to Gescheider, the charge of discrimination she levied against the City with NERC also constitutes protected activity because she remained employed with the City at the time.

### 2. Adverse Employment Actions

The Court now turns to the adverse employment action prong of Plaintiffs' *prima facie* case for retaliation. The Supreme Court has required a showing of material adversity:

20

that the alleged retaliatory action "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern and Santa Fe Ry. Co. v. White ("Burlington")*, 548 U.S. 53, 68 (2006). The reasonable employee is considered under an objective standard that is "judicially administrable." *Id.* The objective standard "avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings." *Id.* at 68–69. Finally, Title VII's "antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." *Id.* at 64. Nonetheless, Title VII does not protect an individual "from all retaliation, but from retaliation that produces an injury or harm." *Id.* at 67.

### a. Plaintiffs' Combined Claims of "Retaliation"

Plaintiffs jointly argue the following forms of retaliation which mainly stem from the City's handling of the harassment complaints: the City purportedly conducted an inadequate investigation; the disclosure of redacted investigative reports; the City failed to *promptly* investigate an alleged theft of personal items from Gescheider's office; the City refused to accept Gescheider's sexual harassment evidence in its initial investigation; the City failed to interview McKissick and Gescheider in the Wall investigation; the City *allowed* Clinger to publicly vow revenge and brand Plaintiffs as liars which contributed to the hostility in the workplace; Hall disparaged Plaintiffs which led to an atmosphere of sanctioned hostility; Clinger and others were openly hostile towards complainants; the City did not discipline Clinger—particularly evident by his large severance pay; Clinger did not properly discipline Kate but instead fueled her hostility; Hall arranged a "faux settlement" with Plaintiffs; the City did not properly investigate Kate, chiefly by not considering her hostility as sexual harassment. (*E.g.*, ECF No. 84 at 18–20; ECF No. 1.)

Many of these claims are either in dispute or cannot be substantiated. In any event, the Court agrees with the City that these actions do not constitute adverse employment actions. Plaintiffs do not establish that they were materially harmed by this conduct in a manner that would dissuade a reasonable employee from engaging in protected activity.

21

For example, Plaintiffs do not claim that they were demoted, disciplined, reassigned from an office, or had their staff reduced after they engaged in protected activity. Nor are these actions likely to discourage a reasonable victim of discrimination from complaining to "the EEOC, the courts, and their employers." *Burlington*, 548 U.S. at 68 (noting Title VII prohibits employer actions that are likely to deter in such regards). In fact, accepting Plaintiffs' reliance on the handling of the investigations to establish adverse employment action would erode the policy reason for encouraging employers to investigate complaints for fear that an investigation would lead to a claim of retaliation based on an inadequate investigation. *See also Cozzi v. County of Marin*, 787 F. Supp. 2d 1047, 1069 (N.D. Cal. 2011)(internal citations omitted) ("In general, the failure to conduct an adequate investigation after an alleged act of discrimination cannot be considered an action that . . . reasonably would deter an employee from engaging in the protected activity under Title VII.").

Plaintiffs further argue that they were retaliated against where the City placed them on administrative leave and then the City prematurely attempted to compel Plaintiffs to return to work. (ECF No. 1 at 5–6, 15.) Plaintiffs contend the directive to return to work amounted to an ultimatum. (*Id.*) However, the evidence shows that City *offered* that Plaintiffs take paid administrative leave pending the completion of Wall's investigation. (ECF No. 72-53.) The evidence also reflects that the City sent a letter to Gescheider informing her that her paid administrative leave would conclude and that she was to report to work on November 28, 2016 (ECF No. 72-39). This latter day was *after* the completion of the Wall Report which was submitted on November 21, 2016 (*e.g.*, ECF No. 72-1 at 3). Because the evidence supports that Plaintiffs willingly took paid administrative leave and that Plaintiffs were not directed to return to worked until a date after the Wall Report was concluded, Plaintiffs' allegation of material adverse action is unsupported.

Plaintiffs further claim they were constructively discharged in retaliation. (ECF No. 1 at 15.) A plaintiff asserting a constructive discharge claim based on a hostile work environment "must show working conditions so intolerable that a reasonable person would

have felt compelled to resign." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 147 (2004). Here, despite Clinger's departure, Plaintiffs essentially argue that the atmosphere at the City was too intolerable for them to return to their working environment. (*E.g.*, ECF No. 1 at 15; ECF No. 78 at 27–30; ECF No. 77 at 36, 39–40; ECF No. 84 at 19; *see also* ECF No. 77-33 at 47.) In sum, the City argues that Plaintiffs' constructive discharge claim fails because Plaintiffs fail to establish the high intolerable standards. (*E.g.*, ECF No. 82 at 18–19.)

The Court again agrees with the City. A reasonable person in Gescheider's position would not have been compelled to resign in Clinger's absence because her claims of severe and pervasive harassment are largely concerning Clinger and his conduct. The evidence suggests that as to Gescheider the conduct of others sans Clinger amounted to petty slights and the other forms of alleged retaliation did not amount to material adverse action, as discussed *supra* and *infra*. As to McKissick, the undisputed evidence shows that McKissick planned to quit after her administrative leave ended and her counsel advised her to have her "resignation" be a constructive discharge. (ECF No. 82-7 at 2–3; ECF No. 72-56 at 2; *see also* ECF No. 77-33 at 54 (McKissick indicating she couldn't go back because "it's like a wound that hadn't healed").) McKissick's conduct precludes her from claiming that she was constructively discharged.

### b. McKissick's Separate Claims

In their response to the City's motion, Plaintiffs factually note, without arguing, that McKissick was excluded from meetings by Kate and therefore denied information (ECF No. 77 at 12, 27; *see also* ECF No. 77-9 at 9 (Gescheider decl.).) Further, Plaintiffs did not make this allegation in the Complaint (*see generally* ECF No. 1) and only cite to Gescheider's declaration for support. In addition to being vague, the statement does not support a finding of adverse employment action.

McKissick additionally argues that albeit her claims of Kate's hostility were meritorious, the City failed to timely and adequately remedy that hostility, but instead ratified it. (ECF No. 1 at 6.) Having reviewed the evidence, the Court concludes that the

23

claim that the City ratified Kate's hostility is not supported. Further, it is unclear to what extent Kate's hostility deviated from the hostility she exhibited after April 2016—before McKissick's protected activity. Thus, a finding of retaliatory hostility is not sufficiently supported due to the unclarity as to causal and temporal proximity. Further to the extent the hostility is steeped in ostracism, McKissick notably also avoided Kate. (ECF No. 72-14 at 44–45, 67.) Aside from Kate, Plaintiffs note moments where individuals Plaintiffs deem supportive of Clinger and Kate displayed minor levels of antipathy toward Plaintiffs (*e.g.*, ECF No. 77-32 at 45; ECF No. 77-33 at 53; ECF No. 77-2 at 26). *But see Burlington*, 548 U.S. at 68 (noting that an employee is not immunized from pretty slights and annoyances that result from reporting discriminatory behavior).

### c.  Gescheider's Separate Claims

In the Complaint, Gescheider alleges that in retaliation another City employee, William/Bill Dunne, who was close to Kate, threatened her and McKissick. (ECF No. 1 at 12.) The evidence does not support her claim that Dunne threatened Gescheider or McKissick. Gescheider's testimony—as provided by Plaintiffs—reveal very little in her encounter with Dunne beyond him expressing that employees "were going to all be under the microscope" and being "angry about that and [he and others] held [Gescheider] accountable for that." (ECF No. 77-32 at 46.) Such comments neither amount to threats nor do they qualify as adverse employment action.

Gescheider alleges that her office was burglarized in retaliation. (ECF No. 1 at 12.) Notably, Gescheider testified that her allegation that items were stolen from her office was investigated and "there wasn't enough evidence to conclude that anyone had stolen [the item or items] and so that was that." (ECF No. 77-32 at 46–48.) Gescheider's allegation of stolen items, particularly in light of the fact that the matter was investigated, does not constitute adverse employment action.

In their response, Plaintiffs highlight that Clinger would not speak with Gescheider, even though it was necessary for the two to talk for Gescheider to do her job (ECF No. 77 at 17; ECF No. 77-27 at 14 (Leerman testifying accordingly)). While this may amount to

1    material adverse conduct,[14] the claim when examined in context does not support

2    reaching such conclusion here. First, the issue was not raised in the Complaint. Further,

3    the claim is merely listed among the facts in Plaintiffs' opposition (ECF No. 77 at 17) and

4    is in no way asserted as an action that was materially adverse. There is also no evidence

5    that Clinger's lack of talking to Gescheider impacted her ability to do her work in a way

6    that undermined her professional advancement to operate has a deterrent to protected

7    activity. *See Burlington*, 548 U.S. at 69.

8            Gescheider also contends that a statement by Bill to the effect that he could not

9    protect Gescheider from retaliatory hostility amounted to a failure to implement strong

10   remedial measures in retaliation. (ECF No. 1 at 14.) The reference to strong remedial

11   measures is vague and it is unclear how Bill's statement would serve to deter protected

12   activity or amount to adverse employment action.

13           Because Plaintiffs fail to establish materially adverse employment actions, they fail

14   to establish a prima facie case of retaliation and thus the Court grants the City summary

15   judgment on these claims.

16           In sum, the Court grants the City's motion for summary judgment on all but

17   Gescheider's sexually hostile work environment claim.

18   **V.    CONCLUSION**

19           The Court notes that the parties made several arguments and cited to several cases

20   not discussed above. The Court has reviewed these arguments and cases and determines

21   that they do not warrant discussion as they do not affect the outcome of the issues before

22   the Court.

23           It is therefore ordered that the City's motion for summary judgment (ECF No. 72) is

24   granted in part and denied in part. It is granted on McKissick's hostile work environment

25   ///

26   ///

27   _____

     [14]*Burlington*, 548 U.S. at 69 ("But to retaliate by excluding an employee from a
28   weekly training lunch that contributes significantly to the employee's professional
     advancement might well deter a reasonable employee from complaining about
     discrimination.").

claim and Plaintiffs' claims of retaliation. It is denied on Gescheider's hostile work environment claim.

It is further ordered that Plaintiffs' motion for summary judgment (ECF No. 78) is likewise granted in part and denied in part. It is granted to the extent the City's motion is denied. Plaintiffs' motion is otherwise denied.

It is further ordered that Plaintiffs' motion for leave (ECF No. 76) is reluctantly granted.

DATED THIS 18th day of July 2019.

_____
MIRANDA M. DU
UNITED STATES DISTRICT JUDGE